**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| LATHIERIAL BOYD, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF CHICAGO; CHICAGO POLICE | ) |
| OFFICER RICHARD ZULEY, star no. 15185; | ) |
| CHICAGO POLICE OFFICER LAWRENCE | ) Case No. _____ |
| THEZAN, star no. 9419, CHICAGO POLICE | ) |
| OFFICER ANDREW SOBOLEWSKI, star no. | ) |
| 16498; CHICAGO POLICE OFFICER STEVE | ) |
| SCHORSCH, star no. 8955; CHICAGO POLICE | ) |
| OFFICER JOHN MURRAY, star no. 3175; | ) |
| CHICAGO POLICE OFFICER WAYNE | ) |
| JOHNSON star no. 4266; and UNKNOWN | ) |
| CHICAGO POLICE OFFICERS, | ) |
| | ) |
| Defendants. | ) Jury Trial Demanded |

## COMPLAINT

NOW COMES Plaintiff, LATHIERIAL BOYD, by and through his attorneys, KATHLEEN T. ZELLNER & ASSOCIATES, P.C., complaining of Defendants, CITY OF CHICAGO; CHICAGO POLICE OFFICERS RICHARD ZULEY, LAWRENCE THEZAN, ANDREW SOBOLEWSKI, STEVE SCHORSCH, JOHN MURRAY, WAYNE JOHNSON, and UNKNOWN CHICAGO POLICE OFFICERS, and states as follows:

## I. INTRODUCTION

At age 24, Lathierial Boyd had already attained goals that many men twice his age only dream about. He was a successful real estate investor, a fashion model for the international modeling agency Elite and the father of 2 beautiful daughters, Camille and Olivia. The last thing that ever crossed his mind was that he would be framed for any crime, much less two murders.

1

Lathierial vastly underestimated the degree of racial prejudice that infected the named defendants in this matter. With a "maximum of hatred for a minimum of reason" these defendants set out to frame Lathierial for 2 murders. Lathierial had an airtight alibi at the time of the crime. His physical description did not remotely match that of the shooter. As soon as he learned that the police considered him a suspect, Lathierial voluntarily showed up and requested to be placed in a lineup. Although none of the witnesses picked him out of the lineup and at least one witness stated she was positive Lathierial was not the shooter, the defendants maliciously concealed this evidence and deliberately constructed a totally fabricated case against Lathierial for reasons only others with a similar lack of conscience would understand.

For years Lathierial tried to extricate himself from the Kafkaesque nightmare that had become his everyday reality. He wrote thousands of letters, pleading with lawyers and the media to help him. A few lawyers tried to help as did one television station but when the judicial system turned a deaf ear to his pleas they also gave up. Lathierial never gave up and became his own lawyer drafting and filing dozens of documents with the court protesting his innocence. During the 8,582 days totaling 205,968 hours he was locked away Lathierial lost an eye, and nearly lost his mind as the years slipped away. Of the 205,968 hours of his incarceration Lathierial spent 191,616 hours locked in his cell. He sank into a black hole of depression so profound and debilitating that he frequently contemplated suicide as the only way to be free again. He lost contact with his children and many of his closest friends. He became a mere shadow of the man he had once been. His most frequent comment on his wrongful incarceration was "I am dying in here man, can't you see I am dying." No one seemed to care or be listening to this broken and desperate man until finally the Cook County Conviction Integrity Unit responded to one of Lathierial's many letters and began a complete re-investigation of the case. After a full

year of investigation which confirmed that Lathierial was actually innocent of the crimes for which he was convicted Cook County State's Attorney Anita Alvarez dismissed all charges against him on September 10, 2013, stating in a press conference, "[I]t is my position that this man did not commit this crime." Unlike any of the previous exonerations of the Conviction Integrity Unit State's Attorney Alvarez also stated that Lathierial should never have been charged. On September 25, 2013 an order was entered finding Lathierial actually innocent of all charges.

The case would never have been charged absent Defendants' willful, unlawful, and malicious acts. Defendants caused Lathierial's prosecution to commence and continue without probable cause. They coerced witnesses, fabricated evidence, concealed highly exculpatory evidence, and deceived the prosecutors. Lathierial suffered severe physical and emotional damages throughout his 8,582-day wrongful incarceration.

## II. JURISDICTION AND VENUE

1.    This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq. to redress the deprivation under color of law of Lathierial's rights as secured by the United States Constitution.

2.    This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1367(a).

3.    This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1), as Lathierial is a citizen of the State of California, no Defendant is a citizen of California, and the amount in controversy is greater than $75,000.

4.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Lathierial's claims occurred in this judicial district and the parties resided in this judicial district at the time the events took place.

### III. THE PARTIES

5.     Lathierial Boyd ("Lathierial") was at all relevant times herein a resident and citizen of the State of Illinois.

6.     Defendant Richard Zuley ("Defendant Zuley") was at all times relevant herein employed as a police officer in the Chicago Police Department.

7.     Defendant Lawrence Thezan ("Defendant Thezan") was at all times relevant herein employed as a police officer in the Chicago Police Department.

8.     Defendant Andrew Sobolewski ("Defendant Sobolewski") was at all times relevant herein employed as a police officer in the Chicago Police Department.

9.     Defendant Steve Schorsch ("Defendant Schorsch") was at all times relevant herein employed as a police officer in the Chicago Police Department.

10.     Defendant John Murray ("Defendant Murray") was at all times relevant herein employed as a police officer in the Chicago Police Department.

11.     Defendant Wayne Johnson ("Defendant Johnson") was at all times relevant herein employed as a police officer in the Chicago Police Department.

12.     Defendant Unknown Chicago Police Officers were at all times relevant herein employed as police officers in the Chicago Police Department.

4

13.     Defendant City of Chicago is a duly incorporated municipal corporation and at all relevant times was the employer of Defendants Zuley, Thezan, Sobolewski, Schorsch, Murray, Johnson, and Unknown Chicago Police Officers (collectively "Defendant Officers").

14.     The City of Chicago is liable for the wrongful acts of the Defendant Officers while acting within the scope of their employment, pursuant to its statutory obligation to indemnify them.

15.     Each of the police officer defendants engaged in the conduct complained of under the color of state law and in the course and scope of his employment as a police officer with the City of Chicago.

16.     Each of the police officer defendants is sued in his individual capacity.

## IV. ALLEGATIONS OF FACT

### *Police respond to shots fired, obtain detailed and reliable descriptions of shooter*

17.     At around 2:00 a.m. on February 24, 1990, Chicago Police responded to a report of shots fired on the 3500 block of North Clark outside the reggae club "Exedus."

18.     When the police arrived they found two victims lying in the street, each shot multiple times. One of the victims, Michael Fleming, was dead at the scene. The other victim, Ricky Warner ("Ricky"), was alive but unconscious and paralyzed from the neck down. He was immediately transferred to a hospital.

19.     Chicago Police detectives Sikorski and Kowalski interviewed numerous eyewitnesses at the scene.

5

20.     According to the eyewitnesses, the victims appeared to be selling drugs in the street when a man walked up, pulled out a "TEC-9" or uzi-like automatic weapon, and opened fire. The shooter fled southbound on Clark and turned westbound down Cornelia.

21.     The eyewitnesses viewed a dark, copper or maroon colored vehicle similar to a Pontiac Grand Am or Buick Riviera speed from the scene.

22.     Numerous eyewitnesses viewed the shooter with enough detail to provide a description of his height, weight, and complexion, as well as details regarding his facial characteristics.

23.     Two of the eyewitnesses were standing right next to the victims when they were shot. And another one, Jennifer Bonanno ("Bonanno"), stood 8-10 feet from the shooter. Bonanno described the shooter to the officers as being "5'8 or 5'9 with a relatively small build. His face was very distinctive. He had a very prominent square chin that was very large. His haircut was unusual. It appeared to be shaved on the sides with a flat-top. He had a full mouth and high cheekbones." Bonanno described the shooter's complexion as being "midnight black" Boyd was 6'2" with a very light complexion and a thin nose that was the result of plastic surgery for his modeling career. According to Bonanno when she viewed a line-up at the Belmont police station, after she could not identify anyone Bonanno asked the detective who they suspected. When the detective pointed to Lathierial, Bonanno told the detective "there was no way in the world this was the shooter." Bonanno explained that Lathierial "looked   nothing like the shooter."

24.     The detectives' report did not indicate any reason for any of the witness descriptions to be questioned or considered unreliable. The police reports did not mention that any of the witnesses were intoxicated.

6

*Defendants learn important information about potential suspects*

25.     The police claimed they discovered a piece of paper in Ricky's pocket with the name "Breezo" and a telephone number written on it. The police submitted a subscriber check to determine the owner of the phone number.

26.     Detectives Sikorski and Kowalski proceeded to the home of Michael Fleming's mother. While there, they interviewed Michael's girlfriend, Charisse.

27.     Charisse explained that Michael and Ricky sold drugs together. They would sell marijuana and "fake cocaine" consisting of crushed up aspirin.

28.     Michael had recently told Charisse that "he had a problem with three (3) black guys to whom he had sold some fake cocaine, and that he had some altercation with some white guys for the same reason . . . ."

29.     The detectives subsequently learned that a "group of Jamaicans" had chased a man in the area of the shooting around the same time as the shooting. James Fleming, the brother of Ricky Warner provided an affidavit on April 16, 2001 stating that Ricky told James that Michael Fleming "had a fight" with some guys in the area of the shooting the week before over the fact "Ricky and Michael were selling fake drugs."

30.     Charisse told the officers that at 1:30 a.m. on February 23, 1990, Michael and Ricky made the spontaneous decision to leave Michael's mother's house and go to the area around Wrigley Field to try to sell marijuana and crushed up pills to the crowd of people they had recently observed.

31.     Neither Michael nor Ricky owned a car, so they took the elevated train to the location. At no point did Ricky or Michael advise anyone as to where they were going or what they were going to do.

7

32.     A few days after the shooting, Defendants Sobolweski and Thezan received the results of the subscriber check on the paper found in Ricky's pocket with the name "Breezo" and telephone numbers on it. The phone number was registered to a Stanley Morgan.

33.     Defendants Sobolewski and Thezan continued their investigation into Morgan, aka "Breezo." They learned that Morgan was a "Vice Lord" gang member with a criminal history. They also learned that he owned a 1982 Buick car with a vanity plate reading "BREEZO 1."

*Ricky indicates to Defendant Officers he does not know who shot him*

34.     Between March 7 and 12, Defendants Zuley, Murray, Sobolewski, and Thezan, either individually or in combination, interviewed Ricky in his hospital room on numerous occasions. A nurse explained to the Defendant Officers that Ricky was alert and conscious, but he could not speak. The nurse went on to explain that Ricky could communicate with the nurse's assistance.

35.     Despite the fact Ricky could not speak, Defendants Zuley, Murray, Sobolewski, and Thezan failed to video record their interviews with Ricky or otherwise document the manner in which Ricky communicated.

36.     In an initial interview, the interviewing Defendant Officers immediately began to question Ricky about Stanley Morgan, aka "Breezo." Ricky became agitated and refused to implicate Breezo. He indicated that he had Breezo's number because he was supposed to provide him with a "hot" radio.

37.     Rather than pursue Breezo, who was a Vice Lord gang member with a criminal past and a car of the same make as the one described as leaving from the scene, Defendant Officers excluded him as a suspect.

38.     Ricky indicated to one or more of Defendants Zuley, Johnson, Sobolewski, and/or Thezan that he **did not know who shot him** and Michael Fleming. The nurse present for the interview testified at trial that he indicated this, and that he did not reference anyone else's name other than "Breezo" throughout the interview.

39.     Ricky further indicated that he **could not** identify the shooter because his back was turned at the time. After he was shot and his spinal cord was severed Ricky could not lift his head from the position where he landed on the ground to view the shooter enter his car and drive away.

40.     Defendant Officers concealed from the prosecutors and the defense before, during, and after trial the undisputed fact that Ricky indicated to the officers that he could not identify the shooter because he was running away with his back to the shooter when he was shot.

41.     Defendants Zuley, Murray, Sobolewski, and/or Thezan showed Ricky various "I.R. photographs" taken from the police station. Ricky was told by these officers to identify a photo of Lathierial as "Rat," who he knew as a relative of the Kelly family that lived across the street from him.

42.     Ricky did not identify Rat as the man who shot him.

43.     The interviewing Defendant Officers fabricated their reports to state that Ricky "thought" it was "Rat" who shot him, that Ricky owed Rat about one thousand ($1000.00) dollars, that Rat owned a "TEC-9" type of gun, that he had written Rat's phone number on a piece of paper, and that Rat had threatened his family.

44.     With no witness—including Ricky—able to identify the shooter, with no physical evidence pointing to a particular suspect, and with Ricky refusing to implicate "Breezo," the Defendants were desperate to solve the case.

45.     Rather than perform any reasonable investigation as to the possibility that Ricky and Michael were shot by individuals regarding their sales of fake drugs, including that of a Jamaican gang who had assaulted other individuals in the same area that night or into "Breezo" as a viable suspect the Defendant Officers decided it would be easier to frame "Rat" for the crime. They spent the next several months fabricating and concealing evidence to cause and continue Lathierial's prosecution, despite having no probable cause.

46.     The Defendant Officers used the "Breezo" information that provided their initial lead as a template for framing "Rat."

### Defendants coerce Ricky's father to say "Rat" threatened his family

47.     One or more of Defendants Zuley, Murray, Sobolewski, and/or Thezan proceeded to Ricky's family home and interviewed Ricky's father, Herbert.

48.     Herbert advised the interviewing Defendants that a man with the last name "Chewing" or "Chewings" had come to his house and threatened his family regarding a drug debt Ricky owed the man. According to Herbert, this incident occurred 7-12 months earlier. Herbert stated that the man left in a beige car.

49.     Defendant Officers concealed the fact that Herbert stated that the man left in a beige car from the prosecutors and defense before, during, and after Lathierial's criminal trial.

50.     Herbert did not state he knew the man as "Rat."

51.     Defendant Zuley coerced Herbert into agreeing with their story that the man who threatened Ricky drove a white Jaguar with a vanity license plate reading "RAT." Defendant Zuley created reports to align with these fabricated statements.

52.     One or more of Defendants Zuley, Murray, Sobolewski, and/or Thezan subsequently coerced or otherwise manipulated Herbert to go along with their story that the man

who threatened Herbert and his family went by "Rat." One or more of the interviewing Defendant Officers fabricated his or their reports to corroborate this fabricated identification.

53.     A list of license plates containing "RAT" generated by the Illinois Secretary of State was produced to the Defendant Officers prior to Lathierial's criminal trial. This list revealed that (1) a license plate reading "RAT" was registered to one William Edwards, not Lathierial, (2) no license plates containing "RAT" were registered to a Jaguar, and (3) no license plate containing "RAT" was registered to Lathierial. The white Jaguar convertible originally described in Herbert's interview had been destroyed 2 years before the crime.

54.     Defendant Officers concealed the Secretary of State list from the prosecutors and defense before, during, and after Lathierial's criminal trial. The white Jaguar story had been abandoned by the time of trial.

### Defendants coerce Ricky to identify "Rat" as the shooter

55.     The Defendant Officers knew that "Rat" was the nickname of Lathierial.

56.     In a subsequent interview with Ricky in his hospital room between March 7 and 12, Defendants Zuley, Murray, Sobolewski, and/or Thezan, either individually or in combination, coerced or otherwise manipulated Ricky to agree that "Rat" was the person who shot him, and that "Rat" was Lathierial.

57.     In order to corroborate Herbert's fabricated and coerced statements, Defendant Officers had Ricky communicate that he saw Lathierial get into a white car after the shooting, despite the fact that Ricky was lying on his back, with a severed spine unable to lift his head at the time he allegedly saw Lathierial get into the white car parked across the street.

58.     It is undisputed that the identification was coerced. Defendant Zuley's report states, "**We got** BOYD identified positively by Ricky Warner." Also, although a family member

11

of Lathierial's owned a white Jaguar, it had been destroyed two years before the shooting and the alleged intimidation. Lathierial did not own a white car at the time of the shooting and he never owned a Buick.

59.     Defendant Zuley returned to the home of Ricky's father, Herbert, with a photo of Lathierial. Defendant Zuley advised Herbert that two sailors had already identified Lathierial as the shooter, which was a lie.

60.     Defendant Zuley coerced and manipulated Herbert to agree that Lathierial, as pictured in the photograph, was the man who came to Herbert's house and threatened his family.

61.     Indicative that the identification was fabricated, the photo shown to Herbert was four years old and depicted Lathierial at least 40 pounds heavier than he was at the time of the alleged intimidation, but Defendant Zuley made no mention in his report that Herbert mentioned Lathierial looked any different. Recognizing his mistake, Defendant Zuley later went back to Herbert's house with a more updated photo. Defendant Zuley advised that it would be this man that Herbert would need to identify at trial.

### *Lathierial denies any involvement and provides airtight alibi*

62.     Defendant Officers went to Lathierial's parent's house on March 11, at which time Lathierial's father was informed that Lathierial was being investigated for a murder.

63.     Lathierial's father conveyed the information to Lathierial. Knowing he had no involvement in a murder, Lathierial arrived at the police station the next day.

64.     Lathierial repeatedly denied having any involvement in the murder. He also repeatedly denied confronting anyone at the Warner home about any unpaid debt.

65.     Lathierial advised Defendants that he owned a .380 caliber pistol, for which he had a valid FOID card. Defendant Officers were aware that this gun did not match the 9mm

12

cartridges found at the scene of the shooting. Defendant Officers searched Lathierial's apartment and discovered the gun and FOID card. Defendant Officers falsified their reports by indicating that the gun was not registered.

66. Lathierial explained that he drove a grey hatchback, not a white Jaguar.

67. Lathierial made no inculpatory statements during the interrogation or during his many years of incarceration and he provided a verifiable alibi, which the Defendant Officers never investigated.

68. Lathierial spent the early evening of February 23, 1990 looking at shoes and clothes at Watertower Place with Harold Casey, the boyfriend of Lathierial's sister, Angela. Casey then drove Lathierial to Angela's condo located at 4280 W. Ford City Drive, Chicago, Illinois. Lathierial, Angela, and Casey ordered pizza, watched the Chicago Bulls basketball game, and then went to bed.

69. Casey, who was a Cook County Sheriff's deputy at the time, got up to use the restroom at 1:30 a.m. On his way to the restroom, Casey saw Lathierial asleep in the guest room. Casey drove Lathierial home the next morning at around 9:00 a.m.

70. Lathierial could not have gone to the murder scene at any point in the night, as he had no car keys, no key to Angela's apartment, and no key to the condo building's exterior entrance.

### *All nine eyewitnesses exclude Lathierial as the shooter*

71. As of February 23, 1990, Lathierial was 6' 2" tall and weighed about 215 pounds. He was clean-shaven without a mustache or a flat nose. Lathierial is an African American with a light skin complexion. Elite paid for plastic surgery to make his nose thinner and he did not have a prominent square jaw.

13

72.     Lathierial voluntarily participated in a lineup at the police station conducted by Defendants Zuley, Schorsch, and Johnson.

73.     All nine witnesses to the shooting viewed the lineup. Not one of them identified Lathierial as the shooter or indicated that Lathierial bore any resemblance to the shooter.

74.     At least one of the eyewitnesses, Bonanno, stood just eight to ten feet from the gunman at the time of the shooting. She advised the Defendants conducting the lineup that she got a good look at the shooter, but he was not present in the lineup. Bonanno asked the Defendant Officers who they suspected. One of the Defendant Officers pointed to Lathierial. Bonanno told the officer "there was no way in the world [Lathierial] was the shooter." She stated that Lathierial looked "nothing like the shooter."

75.     Defendant Officers concealed Bonanno's statements from the prosecutors and defense before, during, and after Lathierial's criminal trial.

76.     The other witnesses made similar statements as Bonanno's, stating that Lathierial absolutely was not the shooter, and Defendant Officers concealed those statements from the prosecutors and defense before, during, and after trial.

77.     In an attempt to justify the fact that no witness identified Lathierial as the shooter, Defendants Zuley and Murray fabricated their reports to falsely state that various witnesses, including Bonanno, stated that they were highly intoxicated at the time of the shooting and probably would not be able to make an identification.

78.     Bonanno made no such statement and she was not impaired at the time she witnessed the shooting. No other witness stated anything about being too impaired at the time of the shooting to make an identification. Notably, there is no indication in the initial reports that any witness made any such comment.

14

79.     Lathierial was not informed he had the right to have his attorney present at the lineup. Lathierial's attorney was not present at the lineup. Defendant Officers fabricated their reports to falsely state that Lathierial's attorney was present during the lineup.

***Defendant Officers fabricate final piece of evidence: the paper***

80.     Defendant Officers fabricated evidence in the form of a piece of paper with the word "Rat," two telephone numbers, and various weights on it. Defendant Officers gave this piece of paper to Ricky and advised him to give it to the medical personnel.

81.     Defendants' reports falsely state that they learned of the piece of paper when it was provided to them by medical personnel.

82.     Defendants were aware before Lathierial's criminal trial that neither phone number on the paper was registered to Lathierial's phone or pager. Defendant Officers failed to disclose this fact to the prosecutors or defense before, during, and after Lathierial's criminal trial.

***Lathierial is charged, tried, and convicted***

83.     The theory of Lathierial's guilt fabricated by Defendant Officers was weak. It is unlikely that Lathierial, who was a successful fashion model and business man, would open fire with an automatic weapon in a crowded, well-lit street, over an alleged $1000 drug debt that was at least seven months old.

84.     The theory also did not explain the gunman's clear targeting of Michael in addition to Ricky.

85.     It is also unlikely that Lathierial would have any idea that Ricky and Michael would be selling drugs at 3500 N. Clark, when they made the decision to go there spontaneously just about an hour earlier and they did not tell anyone where they were going.

86.     Notably, no physical evidence connected Lathierial to the crime in any way, and not one eyewitness could identify him as the shooter.

87.     Nevertheless, based on the false statements coerced by Defendant Officers, the Defendant Officers' false reports, and the prosecutors making the charging decision's unawareness of exculpatory information concealed by Defendant Officers, the State's attorney decided to charge Lathierial with murder.

88.     At trial, Defendant Officers provided false testimony and coerced witnesses to testify falsely in accordance with Defendants' false reports. Based on the fabricated and concealed evidence, a judge found Lathierial guilty.

89.     Lathierial was sentenced to 82 years of imprisonment. He would spend the next 23 years proving his innocence.

### *The State drops all charges after learning of exculpatory material*

90.     Over those 23 years, the State became aware of various pieces of evidence and information that would have altered the course of Lathierial's trial and conviction, including, but not limited to:

    a. Bonanno and other eyewitnesses stated that Lathierial absolutely was not the shooter.

    b. Bonanno and other eyewitnesses did not state that they were too inebriated at the time of the shooting to be able to identify the gunman.

    c. The "RAT" license plate was registered to someone unrelated to the case.

    d. No license plate containing "RAT," nor a Jaguar was registered to Lathierial.

    e. The phone numbers on the paper that appeared with medical personnel were not registered to Lathierial.

    f. Five months after the shooting, Ricky indicated that he "did not see the shooter and did not know who shot him . . . [and that] he was running away when he was shot, so he never saw the shooter."

g.  Years after the shooting, Herbert stated that he testified about the white Jaguar and vanity license plate because "they" told him to, and that the police told him that two sailors had already identified Lathierial as the shooter before he identified him as the one who had come to his house.

h.  Additional witnesses had confirmed that Lathierial had told the truth to Defendant Officers when questioned about his alibi.

91.  Finally, on September 10, 2013, after Lathierial had spent 8,582 days in prison, State's Attorney Anita Alvarez announced that the State would be dropping all charges against Lathierial and that he was to be released immediately.

92.  State's Attorney Alvarez stated in a press conference, "[I]t is my position that this man did not commit this crime." State's Attorney Alvarez stated that Lathierial should never have been charged.

93.  Lathierial filed a Petition for Certificate of Innocence on September 13, 2013. The State did not oppose the Petition and the Court granted Lathierial a Certificate of Innocence on September 25, 2013.

### *Lathierial's damages*

94.  Lathierial was wrongfully incarcerated from March 13, 1990 to September 10, 2013. As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Lathierial sustained injuries and damages including loss of his freedom for over 23 years, pain and suffering, severe mental anguish, emotional distress, loss of income, pathetic medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

95.     Due to the poor medical care received while incarcerated, Lathierial is permanently blind in one eye and suffers from other debilitating medical conditions.

## V. CAUSES OF ACTION

### COUNT I

42 U.S.C. § 1983 - 14th Amendment Due Process
Destruction and/or Concealment of Material Exculpatory and Impeachment Evidence
(Defendant Officers)

96.     Each paragraph of this Complaint is incorporated as if restated fully herein.

97.     In the manner described above and alleged herein, Defendant Officers concealed and/or destroyed material exculpatory and impeachment evidence from Lathierial and from prosecutors before, during, and after Lathierial's criminal trial, causing the prosecution against Lathierial to commence and continue for more than 23 years.

98.     In concealing and/or destroying the material exculpatory and impeachment evidence, Defendant Officers acted maliciously, intentionally, and with willful and wanton disregard for Lathierial's constitutional rights.

99.     Defendant Officers' actions directly and proximately caused the injuries and damages to Lathierial as claimed above, and constitute a due process violation under the 14th Amendment of the U.S. Constitution.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million (\$ 20,000,000.00) Dollars.

## COUNT II

### 42 U.S.C. § 1983
### Failure to Intervene
### (Defendant Officers)

100.    Each paragraph of this Complaint is incorporated as if restated fully herein.

101.    In the manner described above and alleged herein, during the constitutional violations described above, Defendant Officers stood by without intervening to prevent the misconduct, including but not limited to, the concealment and/or destruction of material exculpatory and impeachment evidence.

102.    As a result of Defendants Officers' failure to intervene to prevent the violation of Lathierial's constitutional rights, Lathierial suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

103.    The misconduct described in this Count was objectively unreasonable and was undertaken with malice and willful indifference to Lathierial's constitutional rights.


WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorney's fees, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million (\$ 20,000,000.00) Dollars.

## COUNT III

### 42 U.S.C. § 1983
Conspiracy to Deprive Lathierial of his Constitutional Rights
(Defendant Officers)

104.    Each paragraph of this Complaint is incorporated as if restated fully herein.

105.    In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Lathierial of exculpatory and impeachment information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

106.    Defendant Officers, acting in concert among and between themselves and with unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

107.    In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to arresting Lathierial without probable cause, fabricating and improperly suggesting identification evidence, withholding material exculpatory and impeachment evidence, and committing perjury during hearings and trials.

108.    The misconduct described in this count was undertaken with malice, willfulness, and/or reckless indifference to Lathierial's rights.

109.    Said conspiracy and overt acts were continued from on or about February 24, 1990 through to the present.

110.    The conspiracy proximately caused the injuries to Lathierial as set forth above.


WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorney's fees, and costs

against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million (\$ 20,000,000.00) Dollars.

## COUNT IV

### Illinois Law
### Malicious Prosecution
### (Defendant Officers)

111.     Each paragraph of this Complaint is incorporated as if restated fully herein.

112.     In the manner described above and alleged herein, Defendant Officers knowingly and maliciously initiated and/or caused judicial proceedings to continue against Lathierial knowing they lacked probable cause to do so.

113.     Defendants created false or incomplete police reports and/or made false and/or incomplete statements to other police officers, the prosecutors, and in court regarding the criminal investigation in this matter.

114.     Defendants instituted the judicial proceedings and/or caused them to continue against Lathierial with malice, and with willful and wanton disregard for the truth of the allegations asserted against Lathierial.

115.     This prosecution was terminated in Lathierial's favor on September 10, 2013 when all charges were *nolle prosequi*. That the termination of proceedings is indicative of innocence is demonstrated by the certificate of innocence issued on September 25, 2013.

116.     Defendants are liable for the prosecution because it was proximately caused by their unlawful actions as set forth above.

117.     These actions directly and proximately caused the injuries and damages to Lathierial as claimed above and constitute the tort of malicious prosecution under Illinois law.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($20,000,000.00) Dollars.

## COUNT V

### Illinois Law
### Intentional Infliction of Emotional Distress
### (Defendant Officers)

118.    Each paragraph of this Complaint is incorporated as if restated fully herein.

119.    In the manner described above and alleged herein, the acts and conduct of Defendant Officers were extreme and outrageous. Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Lathierial.

120.    Said actions were undertaken with malice, willfulness, and with reckless indifference to the rights of Lathierial.

121.    As a direct and proximate result of Defendants' wrongful acts, Lathierial suffered damages, including severe emotional distress and anguish.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($20,000,000.00) Dollars.

## COUNT VI

### Illinois Law
### Conspiracy
### (Defendant Officers)

122.     Each paragraph of this Complaint is incorporated as if restated fully herein.

123.     In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to maliciously prosecute Lathierial without probable cause and intentionally inflict emotional distress.

124.     In furtherance of this conspiracy, Defendants committed the overt acts as set forth above, including but not limited to, the arrest of Lathierial without probable cause, the coercion of witness statements, the manipulation and falsification of police reports, the concealment and/or destruction of material exculpatory and impeachment evidence, and the knowing presentation of fabricated evidence to initiate and continue proceedings against Lathierial maliciously.

125.     Said conspiracy and overt acts were continued from on or about February 24, 1990, through to the present.

126.     The conspiracy proximately caused the injuries to Lathierial as set forth above.


WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($20,000,000) Dollars.

## COUNT VII

### 745 ILCS 10/9-102 – Indemnification
(Defendant City of Chicago)

127. Each paragraph of this Complaint is incorporated as if restated fully herein.

128. Defendant City of Chicago was the employer of each of the Defendant Police Officers at all times relevant to this complaint, as set forth above.

129. All of the individually named Defendant Officers were at all relevant times acting within the course and scope of their employment.

130. Pursuant to 745 ILCS 10/9-102, the governmental entity set forth above is liable to pay all judgments and settlements entered against each of its employees for the claims set forth above.

WHEREFORE, pursuant to 745 ILCS 10/9-102, Lathierial demands judgment against Defendant City of Chicago in the amounts awarded to Lathierial against the individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs, and attorney's fees.

## COUNT VIII

### Respondeat Superior
(Defendant City of Chicago)

131. Each paragraph of this Complaint is incorporated as if restated fully herein.

132. At all times relevant to this complaint the Defendant Officers acted as agents of, and in the scope of their employment with, Defendant City of Chicago.

133.    Defendant City of Chicago is liable for the torts of the police officer Defendants for their violations of state law under the doctrine of *respondeat superior.*


WHEREFORE, Lathierial demands judgment against Defendant City of Chicago in the amounts awarded to Lathierial against the individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs, and attorney's fees.

## VI. JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Respectfully Submitted,


/s/ Kathleen T. Zellner
Kathleen T. Zellner


Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois
60515 (630) 955-1212
Atty No: 618457