**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| LATHIERIAL BOYD,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO; CHICAGO POLICE OFFICER RICHARD ZULEY, star no. 15185; CHICAGO POLICE OFFICER LAWRENCE THEZAN, star no. 9419; ESTATE OF CHICAGO POLICE OFFICER ANDREW SOBOLEWSKI, star no. 16498; CHICAGO POLICE OFFICER STEVE SCHORSCH, star no. 8955; CHICAGO POLICE OFFICER JOHN MURRAY, star no. 3175; CHICAGO POLICE OFFICER WAYNE JOHNSON, star no. 4266; and UNKNOWN CHICAGO POLICE OFFICERS,<br><br>Defendants. | ) | Case No. 13 C 7152<br><br>Judge Robert Gettleman<br><br>Magistrate Judge Sidney I. Schenkier<br><br>Jury Trial Demanded |

**FIRST AMENDED COMPLAINT**

NOW COMES Plaintiff, LATHIERIAL BOYD, by and through his attorneys, KATHLEEN T. ZELLNER & ASSOCIATES, P.C., complaining of Defendants, CITY OF CHICAGO; CHICAGO POLICE OFFICERS RICHARD ZULEY, LAWRENCE THEZAN, ESTATE OF ANDREW SOBOLEWSKI, STEVE SCHORSCH, JOHN MURRAY, WAYNE JOHNSON, and UNKNOWN CHICAGO POLICE OFFICERS, and states as follows:

## I. INTRODUCTION

At age 24, Lathierial Boyd ("Lathierial") had already attained goals that many men twice his age only dream about. He was a successful real estate investor, a fashion model for the international modeling agency Elite and the father of 2 beautiful daughters, Camille and Olivia. The last thing that ever crossed his mind was that he would be framed for any crime, much less two murders.

Lathierial vastly underestimated the degree of racial prejudice that infected the named defendants in this matter. With a "maximum of hatred for a minimum of reason," these defendants set out to frame Lathierial for 2 murders. Lathierial had an airtight alibi at the time of the crime. His physical description did not remotely match that of the shooter. As soon as he learned that the police considered him a suspect, Lathierial voluntarily showed up and requested to be placed in a lineup. Although none of the witnesses picked him out of the lineup and at least one witness stated she was positive Lathierial was not the shooter, the defendants maliciously concealed this evidence and deliberately constructed a totally fabricated case against Lathierial for reasons only others with a similar lack of conscience would understand.

For years Lathierial tried to extricate himself from the Kafkaesque nightmare that had become his everyday reality. He wrote thousands of letters, pleading with lawyers and the media to help him. A few lawyers tried to help, as did one television station, but when the judicial system turned a deaf ear to his pleas they also gave up. Lathierial never gave up and became his own lawyer, drafting and filing dozens of documents with the court protesting his innocence. During the 8,582 days totalling 205,968 hours he was locked away, Lathierial lost an eye, and nearly lost his mind, as the years slipped away. Of the 205,968 hours of his incarceration Latherial spent 191,616 hours locked in his cell. He sank into a black hole of depression so profound and debilitating that he frequently contemplated suicide as the only way to be free again. He lost contact with his children and many of his closest friends. He became a mere shadow of the man he had once been. His most frequent comment on his wrongful incarceration was "I am dying in here man, can't you see I am dying." No one seemed to care or be listening to this broken and desperate man until finally the Cook County Conviction Integrity Unit responded to one of Lathierial's many letters and began a complete re-investigation of the case. After a full

year of investigation that confirmed that Lathierial was actually innocent of the crimes for which he was convicted, Cook County State's Attorney Anita Alvarez dismissed all charges against him on September 10, 2013, stating in a press conference, "[I]t is my position that this man did not commit this crime." Unlike any of the previous exonerations of the Conviction Integrity Unit, State's Attorney Alvarez also stated that Lathierial should never have been charged. On September 25, 2013 an order was entered finding Lathierial actually innocent of all charges.

The case would never have been charged absent Defendants' willful, unlawful, and malicious acts. Defendants caused Lathierial's prosecution to commence and continue without probable cause. They coerced witnesses, fabricated evidence, concealed highly exculpatory evidence, and deceived the prosecutors. Lathierial suffered severe physical and emotional damages throughout his 8,582-day wrongful incarceration.

## II. JURISDICTION AND VENUE

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 et seq. to redress the deprivation under color of law of Lathierial's rights as secured by the United States Constitution.

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1367(a).

3. This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332(a)(1), as Lathierial is a citizen of the State of California, no Defendant is a citizen of California, and the amount in controversy is greater than $75,000.

4. Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Lathierial's claims occurred in this judicial district and the parties resided in this judicial district at the time the events took place.

## III. THE PARTIES

5. Lathierial Boyd ("Lathierial") was at all relevant times herein a resident and citizen of the State of Illinois. Lathierial is presently a resident and citizen of the State of California.

6. Defendant Richard Zuley ("Defendant Zuley") was at all times relevant herein employed as a police officer in the Chicago Police Department.

7. Defendant Lawrence Thezan ("Defendant Thezan") was at all times relevant herein employed as a police officer in the Chicago Police Department.

8. Defendant Estate of Andrew Sobolewski is joined as the successor in interest to Andrew Sobolewski ("Defendant Sobolewski"), who, on information and belief, is now deceased, and was at all times relevant herein employed as a police officer in the Chicago Police Department. Plaintiff will seek leave to amend the instant complaint naming the administrator of Andrew Sobelewski's estate once such information is discovered or the Court appoints a special administrator.

9. Defendant Steve Schorsch ("Defendant Schorsch") was at all times relevant herein employed as a police officer in the Chicago Police Department.

10. Defendant John Murray ("Defendant Murray") was at all times relevant herein employed as a police officer in the Chicago Police Department.

11. Defendant Wayne Johnson ("Defendant Johnson") was at all times relevant herein employed as a police officer in the Chicago Police Department.

12. Defendant Unknown Chicago Police Officers were at all times relevant herein employed as police officers in the Chicago Police Department.

13. Defendant City of Chicago is a duly incorporated municipal corporation and at all relevant times was the employer of Defendants Zuley, Thezan, Sobolewski, Schorsch, Murray, Johnson, and Unknown Chicago Police Officers (collectively "Defendant Officers").

14. The City of Chicago is liable for the wrongful acts of the Defendant Officers while acting within the scope of their employment, pursuant to its statutory obligation to indemnify them.

15. Each of the Defendant Officers engaged in the conduct complained of under the color of state law and in the course and scope of his employment as a police officer with the City of Chicago.

16. Each of the Defendant Officers is sued in his individual capacity.

## IV. ALLEGATIONS OF FACT

***Police respond to shots fired, obtain detailed and reliable descriptions of shooter***

17. At around 2:00 a.m. on February 24, 1990, Chicago Police responded to a report of shots fired on the 3500 block of North Clark outside the reggae club "Exedus."

18. When the police arrived they found two victims lying in the street, each shot multiple times. One of the victims, Michael Fleming, was dead at the scene. The other victim, Ricky Warner ("Ricky"), was alive but unconscious and paralyzed from the neck down. He was immediately transferred to a hospital.

19. Chicago Police detectives Sikorski and Kowalski interviewed numerous eyewitnesses at the scene.

20. According to the eyewitnesses, the victims appeared to be selling drugs in the street when a man walked up, pulled out a "TEC-9" or uzi-like automatic weapon, and opened fire. The shooter fled southbound on Clark and turned westbound down Cornelia.

21.     The eyewitnesses viewed a dark, copper or maroon colored vehicle similar to a Pontiac Grand Am or Buick Riviera speed from the scene.

22.     Numerous eyewitnesses viewed the shooter with enough detail to provide a description of his height, weight, and complexion, as well as details regarding his facial characteristics.

23.     Two of the eyewitnesses were standing right next to the victims when they were shot.   And another one, Jennifer Bonanno ("Bonanno"), stood 8-10 feet from the shooter. Bonanno described the shooter to the officers as being "5'8 or 5'9 with a relatively small build. His face was very distinctive.   He had a very prominent square chin that was very large. His haircut was unusual. It appeared to be shaved on the sides with a flat-top. He had a full mouth and high cheekbones."   Bonanno described the shooter's complexion as being "midnight black." Lathierial was 6'2" with a very light complexion and a thin nose that was the result of plastic surgery for his modeling career.   According to Bonanno, she viewed a line-up at the Belmont police station and could not identify anyone.   Bonanno then asked the detective who they suspected. When the detective pointed to Lathierial, Bonanno told the detective "there was no way in the world this was the shooter." Bonanno explained that Lathierial "looked nothing like the shooter."

24.     The detectives' report did not indicate any reason for any of the witness descriptions to be questioned or considered unreliable. The police reports did not mention that any of the witnesses were intoxicated.

***Defendants learn important information about potential suspects***

25.     The police claimed they discovered a piece of paper in Ricky's pocket with the name "Breezo" and a telephone number written on it.   The police submitted a subscriber check to

determine the owner of the phone number.

26.     Detectives Sikorski and Kowalski proceeded to the home of Michael Fleming's mother.  While there, they interviewed Michael's girlfriend, Charisse.

27.     Charisse explained that Michael and Ricky sold drugs together.  They would sell marijuana and "fake cocaine" consisting of crushed up aspirin.

28.     Michael had recently told Charisse that "he had a problem with three (3) black guys to whom he had sold some fake cocaine, and that he had some altercation with some white guys for the same reason . . . ."

29.     The detectives subsequently learned that a "group of Jamaicans" had chased a man in the area of the shooting around the same time as the shooting.  James Fleming, the brother of Ricky Warner, provided an affidavit on April 16, 2001 stating that Ricky told James that Michael Fleming "had a fight" with some guys in the area of the shooting the week before over the fact "Ricky and Michael were selling fake drugs."

30.     Charisse told the officers that at 1:30 a.m. on February 24, 1990, Michael and Ricky made the spontaneous decision to leave Michael's mother's house and go to the area around Wrigley Field to try to sell marijuana and crushed up pills to the crowd of people they had recently observed.

31.     Neither Michael nor Ricky owned a car, so they took the elevated train to the location.  At no point did Ricky or Michael advise anyone as to where they were going or what they were going to do.

32.     A few days after the shooting, Defendants Sobolewski and Thezan received the results of the subscriber check on the paper found in Ricky's pocket with the name "Breezo" and telephone numbers on it.  The phone number was registered to a Stanley Morgan.

33.     Defendants Sobolewski and Thezan continued their investigation into Morgan, aka "Breezo."  They learned that Morgan was a "Vice Lord" gang member with a criminal history.  They also learned that he owned a 1982 Buick car with a vanity plate reading "BREEZO 1."

***Defendant Officers fabricate statements and identifications to implicate Boyd, aka "Rat"***

34.     Between March 7 and 12, Defendants Zuley, Murray, Sobolewski, and Thezan, either individually or in combination, interviewed Ricky in his hospital room on numerous occasions.  A nurse explained to the Defendant Officers that Ricky was alert and conscious, but he could not speak.  The nurse went on to explain that Ricky could communicate with the nurse's assistance.

35.     Despite the fact Ricky could not speak, Defendants Zuley, Murray, Sobolewski, and Thezan failed to video record any of their interviews with Ricky or otherwise document the manner in which Ricky communicated.

36.     In an initial interview, the interviewing Defendant Officers began to question Ricky about Stanley Morgan, aka "Breezo."  Ricky became agitated and refused to implicate Breezo.  He indicated that he had Breezo's number because Ricky was supposed to provide him with a "hot" radio.

37.     Rather than pursue Breezo, who was a Vice Lord gang member with a criminal past, who owned a car of the same make as the one described as leaving from the scene, who was owed a debt by Ricky, and whose name appeared on a note in Ricky's pocket, Defendant Officers inexplicably excluded him as a suspect.

38.     Ricky indicated to one or more of Defendants Zuley, Johnson, Sobolewski, and/or Thezan that he **did not know who shot him** and Michael Fleming.  The nurse present for the

interview testified at trial that he indicated this, and that he did not reference anyone else's name other than "Breezo" throughout the interview.

39.     Ricky further indicated that he **could not** identify the shooter because his back was turned at the time. After he was shot and his spinal cord was severed Ricky could not lift his head from the position where he landed on the ground to view the shooter enter his car and drive away.

40.     Defendant Officers concealed from the prosecutors and the defense before, during, and after trial the fact that Ricky indicated to the officers that he could not identify the shooter because he was running away with his back to the shooter when he was shot.

41.     At some point between March 7 and 12, Defendants Zuley, Murray, Sobolewski, and/or Thezan showed Ricky various "I.R. photographs" taken from the police station.

42.     On information and belief, Ricky identified Lathierial in one of the photos as "Rat," or, for some other reason Ricky or one of the interviewing Defendants mentioned the name "Rat," who Ricky apparently knew as a relative of the Kelly family that lived across the street from him.

43.     Instead of performing any reasonable investigation as to the possibility that Ricky and Michael were shot by individuals regarding their sales of fake drugs, including those individuals in a Jamaican gang who had assaulted other individuals in the same area that night, or investigate "Breezo" as a viable suspect, the Defendant Officers decided it would be easier to frame "Rat" for the crime.  They spent the next several months fabricating evidence and concealing exculpatory evidence to cause and continue Lathierial's prosecution and ultimate conviction, despite having no probable cause or reason to believe Lathierial committed the crime.

44. The Defendant Officers used the "Breezo" information that provided their initial lead as a template for fabricating evidence to implicate "Rat."

45. Instead of accepting Ricky's statement that he could not identify who shot him, Defendants Zuley, Murray, Sobolewski, and/or Thezan used suggestive, inducing, manipulative, and/or coercive interview techniques to cause Ricky to falsely implicate "Rat" in the shooting and to fabricate a story that Ricky "thought" it was "Rat" who shot him, that Ricky owed Rat about one thousand ($1000.00) dollars, that Rat owned a "TEC-9" type of gun, that he had written Rat's phone number on a piece of paper, and that Rat had threatened his family. The Defendant Officers knew this information was false. The Defendant Officers fabricated their reports to reflect Ricky's false and fabricated statement, and to conceal the Defendant Officers' fabrication.

46. The Defendant Officers knew that "Rat" was the nickname of Lathierial.

47. One or more of Defendants Zuley, Murray, Sobolewski, and/or Thezan proceeded to Ricky's family home and interviewed Ricky's father, Herbert.

48. Herbert apparently advised the interviewing Defendants that a man with the last name "Chewing" or "Chewings" had come to his house and threatened his family regarding a drug debt Ricky owed the man. According to Herbert, this incident occurred 7-12 months earlier. Herbert stated that the man left in a beige car.

49. Defendant Officers concealed the fact that Herbert stated that the man left in a beige car from the prosecutors and defense before, during, and after Lathierial's criminal trial.

50. Herbert did not state he knew the man as "Rat."

51. Defendant Zuley used suggestive, inducing, manipulative, and/or coercive interview techniques to cause Herbert to falsely implicate "Rat" and fabricate a story that the

man who threatened Ricky drove a white Jaguar with a vanity license plate reading "RAT." Defendant Zuley knew this information was false. Defendant Zuley fabricated reports to align with the false story and to conceal his fabrication.

52. One or more of Defendants Zuley, Murray, Sobolewski, and/or Thezan subsequently used suggestive, inducing, manipulative, and/or coercive interview techniques to cause Herbert to go along with their story that the man who threatened Herbert and his family went by "Rat." Defendant Officers knew this information was false. One or more of the interviewing Defendant Officers fabricated his or their reports to corroborate this false identification and Defendant Officers' fabrication.

53. A list of license plates containing "RAT" generated by the Illinois Secretary of State was produced to the Defendant Officers prior to Lathierial's criminal trial. This list revealed that (1) a license plate reading "RAT" was registered to one William Edwards, not Lathierial, (2) no license plates containing "RAT" were registered to a Jaguar, and (3) no license plate containing "RAT" was registered to Lathierial. The white Jaguar convertible originally described in Herbert's interview had been destroyed 2 years before the crime.

54. Defendant Officers concealed the Secretary of State list from the prosecutors and defense before, during, and after Lathierial's criminal trial. The white Jaguar story had been abandoned by the time of trial.

55. In a subsequent interview with Ricky in his hospital room between March 7 and 12, Defendants Zuley, Murray, Sobolewski, and/or Thezan, either individually or in combination, used suggestive, inducing, manipulative, and/or coercive interview techniques to cause Ricky to falsely state that "Rat" was the person who shot him, and that "Rat" was Lathierial. The Defendant Officers knew this fabricated statement was false. The Defendant

Officers fabricated their reports to reflect Ricky's false statement and conceal the Defendant Officer's fabrication.

56.     In order to corroborate Herbert's fabricated statements, Defendant Officers used suggestive, inducing, manipulative, and/or coercive interview techniques to cause Ricky to fabricate a story that he saw Lathierial get into a white car after the shooting, despite the fact that Ricky was lying on his back, with a severed spine, unable to lift his head at the time he allegedly saw the shooter get into a white car parked across the street.

57.     The identification was clearly fabricated and the Defendant Officers knew it was false.  Defendant Zuley's report states, "**We got** BOYD identified positively by Ricky Warner." Also, although a family member of Lathierial's owned a white Jaguar, it had been destroyed two years before the shooting and the alleged intimidation. Lathierial did not own a white car at the time of the shooting and he never owned a Buick.

58.     Defendant Zuley returned to the home of Ricky's father, Herbert, with a photo of Lathierial.  Defendant Zuley advised Herbert that two sailors had already identified Lathierial as the shooter, which was a lie.

59.     Defendant Zuley utilized suggestive, inducing, manipulative, and/or coercive interview techniques to cause Herbert to agree that Lathierial, as pictured in the photograph, was the man who came to Herbert's house and threatened his family.  Defendant Zuley knew this identification was false. Defendant Zuley fabricated his report to reflect Herbert's false identification and conceal his fabrication.

60.     Indicative that the identification was false and fabricated, the photo shown to Herbert was four years old and depicted Lathierial at least 40 pounds heavier than he was at the time of the alleged intimidation, but Defendant Zuley made no mention in his report that Herbert

mentioned Lathierial looked any different. Recognizing his mistake, Defendant Zuley later went back to Herbert's house with a more updated photo. Defendant Zuley advised that it would be this man that Herbert would need to identify at trial.

***Lathierial denies any involvement and provides airtight alibi***

61.     Defendant Officers went to Lathierial's parent's house on March 11, at which time Lathierial's father was informed that Lathierial was being investigated for a murder.

62.     Lathierial's father conveyed the information to Lathierial. Knowing he had no involvement in a murder, Lathierial arrived at the police station the next day.

63.     Lathierial repeatedly denied having any involvement in the murder. He also repeatedly denied confronting anyone at the Warner home about any unpaid debt.

64.     Lathierial advised Defendants that he owned a .380 caliber pistol, for which he had a valid FOID card. Defendant Officers were aware that this gun did not match the 9mm cartridges found at the scene of the shooting. Defendant Officers searched Lathierial's apartment and discovered the gun and FOID card. Defendant Officers falsified their reports by indicating that the gun was not registered.

65.     Lathierial explained that he drove a grey hatchback, not a white Jaguar.

66.     Lathierial made no inculpatory statements during the interrogation or during his many years of incarceration and he provided a verifiable alibi, which the Defendant Officers never investigated.

67.     Lathierial spent the early evening of February 23, 1990 looking at shoes and clothes at Watertower Place with Harold Casey, the boyfriend of Lathierial's sister, Angela. Casey then drove Lathierial to Angela's condo located at 4280 W. Ford City Drive, Chicago,

Illinois. Lathierial, Angela, and Casey ordered pizza, watched the Chicago Bulls basketball game, and then went to bed.

68. Casey, who was a Cook County Sheriff's deputy at the time, got up to use the restroom at 1:30 a.m. On his way to the restroom, Casey saw Lathierial asleep in the guest room. Casey drove Lathierial home the next morning at around 9:00 a.m.

69. Lathierial could not have gone to the murder scene at any point in the night, as he had no car keys, no key to Angela's apartment, and no key to the condo building's exterior entrance.

***Eyewitnesses exclude Lathierial as the shooter***

70. As of February 23, 1990, Lathierial was 6' 2" tall and weighed about 215 pounds. He was clean-shaven without a mustache or a flat nose. Lathierial is an African American with a light skin complexion. Elite paid for plastic surgery to make his nose thinner and he did not have a prominent square jaw.

71. Lathierial voluntarily participated in a lineup at the police station conducted by Defendants Zuley, Schorsch, and Johnson.

72. All nine witnesses to the shooting viewed the lineup. Not one of them identified Lathierial as the shooter or indicated that Lathierial bore any resemblance to the shooter.

73. At least one of the eyewitnesses, Bonanno, stood just eight to ten feet from the gunman at the time of the shooting. She advised the Defendants conducting the lineup that she got a good look at the shooter, but he was not present in the lineup. Bonanno asked the Defendant Officers who they suspected. One of the Defendant Officers pointed to Lathierial. Bonanno told the officer "there was no way in the world [Lathierial] was the shooter." She stated that Lathierial "looked nothing like the shooter."

74. Defendant Officers concealed Bonanno's statements from the prosecutors and defense before, during, and after Lathierial's criminal trial.

75. Other witnesses made similar statements as Bonanno's, stating that Lathierial absolutely was not the shooter, and Defendant Officers concealed those statements from the prosecutors and defense before, during, and after trial.

76. In an attempt to justify the fact that no witness identified Lathierial as the shooter, Defendants Zuley and Murray fabricated their reports to falsely state that various witnesses, including Bonanno, stated that they were highly intoxicated at the time of the shooting and probably would not be able to make an identification.

77. Bonanno made no such statement and she was not impaired at the time she witnessed the shooting. No other witness stated anything about being too impaired at the time of the shooting to make an identification. Notably, there is no indication in the initial reports that any witness made any such comment.

78. Lathierial was not informed he had the right to have his attorney present at the lineup. Lathierial's attorney was not present at the lineup. Defendant Officers fabricated their reports to falsely state that Lathierial's attorney was present during the lineup.

***Defendant Officers fabricate final piece of evidence: the paper***

79. Defendant Officers fabricated evidence in the form of a piece of paper with the word "Rat," two telephone numbers, and various weights on it. Defendant Officers gave this piece of paper to Ricky and advised him to give it to the medical personnel. Defendant Officers knew the paper was a fabrication.

80. Defendants' reports falsely state that they learned of the piece of paper when it was provided to them by medical personnel.

81.    Defendants were aware before Lathierial's criminal trial that neither phone number on the paper was registered to Lathierial's phone or pager.  Defendant Officers failed to disclose this fact to the prosecutors or defense before, during, and after Lathierial's criminal trial.

***Lathierial is charged, tried, and convicted***

82.    The theory of Lathierial's guilt fabricated by Defendant Officers was weak. It is unlikely that Lathierial, who was a successful fashion model and business man, would open fire with an automatic weapon in a crowded, well-lit street, over an alleged $1000 drug debt that was at least seven months old.

83.    The theory also did not explain the gunman's clear targeting of Michael in addition to Ricky.

84.    It is also unlikely that Lathierial would have any idea that Ricky and Michael would be selling drugs at 3500 N. Clark, when they made the decision to go there spontaneously just about an hour earlier and they did not tell anyone where they were going.

85.    Notably, no physical evidence connected Lathierial to the crime in any way, and not one eyewitness could identify him as the shooter.

86.    Nevertheless, based on the false statements coerced and otherwise fabricated by Defendant Officers, the Defendant Officers' false reports, and the charging prosecutors' unawareness of exculpatory information concealed by Defendant Officers, the State's attorney charged Lathierial with murder.

87.    At trial, Defendant Officers provided false and fabricated testimony and continued to cause witnesses to testify falsely in accordance with Defendants' fabricated stories, identifications, and reports.  Based on the fabricated and false evidence, and without knowledge of the concealed exculpatory evidence, a judge found Lathierial guilty.

88.     Lathierial was sentenced to 82 years of imprisonment.  He would spend the next

23 years proving his innocence.

***The State drops all charges after learning of exculpatory material***

89.     Over those 23 years, the State became aware of various pieces of evidence and

information that would have altered the course of Lathierial's trial and conviction, including, but

not limited to:

    a.  Bonanno and other eyewitnesses stated that Lathierial absolutely was not the
        shooter.

    b.  Bonanno and other eyewitnesses did not state that they were too intoxicated at
        the time of the shooting to be able to identify the gunman.

    c.  The "RAT" license plate was registered to someone unrelated to the case.

    d.  No license plate containing "RAT," nor a Jaguar was registered to Lathierial.

    e.  The phone numbers on the paper that suddenly appeared with medical
        personnel were not registered to Lathierial.

    f.  Five months after the shooting, Ricky indicated that he "did not see the
        shooter and did not know who shot him . . . [and that] he was running away
        when he was shot, so he never saw the shooter."

    g.  Years after the shooting, Herbert stated that he testified about the white Jaguar
        and vanity license plate because "they" told him to, and that the police told
        him that two sailors had already identified Lathierial as the shooter before he
        identified him as the one who had come to his house.

    h.  Additional witnesses had confirmed that Lathierial had told the truth to
        Defendant Officers when questioned about his alibi.

    i.  Lathierial's gun was in fact registered and he had a valid FOID card, contrary
        to Defendants' reports.

90.     Finally, on September 10, 2013, after Lathierial had spent 8,582 days in prison,

State's Attorney Anita Alvarez announced that the State would be dropping all charges against

Lathierial and that he was to be released immediately.

91.     State's Attorney Alvarez stated in a press conference, "[I]t is my position that this

man did not commit this crime." State's Attorney Alvarez stated that Lathierial should never have been charged.

92.     Lathierial filed a Petition for Certificate of Innocence on September 13, 2013. The State did not oppose the Petition and the Court granted Lathierial a Certificate of Innocence on September 25, 2013.

***Lathierial's damages***

93.     Lathierial was wrongfully incarcerated from March 13, 1990 to September 10, 2013. As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions, Lathierial sustained injuries and damages including loss of his freedom for over 23 years, pain and suffering, severe mental anguish, emotional distress, loss of income, pathetic medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

94.     Due to the poor medical care received while incarcerated, Lathierial is permanently blind in one eye and suffers from other debilitating medical conditions.


## V.  CAUSES OF ACTION

## COUNT I

42 U.S.C. § 1983 - 14th Amendment Due Process
Destruction and/or Concealment of Material Exculpatory and Impeachment Evidence
(Defendant Officers)

95.     Each paragraph of this Complaint is incorporated as if restated fully herein.

96. In the manner described above and alleged herein, Defendant Officers concealed and/or destroyed material exculpatory and impeachment evidence from Lathierial and from prosecutors before, during, and after Lathierial's criminal trial, causing the prosecution against Lathierial to commence and continue for more than 23 years.

97. In concealing and/or destroying the material exculpatory and impeachment evidence, Defendant Officers acted maliciously, intentionally, and with willful and wanton disregard for Lathierial's constitutional rights.

98. Defendant Officers' actions directly and proximately caused the injuries and damages to Lathierial as claimed above, and constitute a due process violation under the 14th Amendment of the U.S. Constitution.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorneys' fees, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($ 20,000,000.00) Dollars.

**COUNT II**

42 U.S.C. § 1983 - 14th Amendment Due Process
Fabrication of Evidence
(Defendant Officers)

99. Each paragraph of this Complaint is incorporated as if restated fully herein.

100. In the manner described above and alleged herein, Defendant Officers fabricated and solicited false evidence, including witness identifications, witness statements and stories, police reports, and physical evidence they knew to be false.

101. As a result of knowingly fabricating and soliciting false evidence, Defendant Officers knew or should have known Lathierial was innocent. Defendant Officers continued

their investigation of Lathierial despite knowing or having should have known Plaintiff was clearly innocent.

102.   Also, the Defendant Officers used investigative techniques that were so improper that they knew or should known that those techniques would yield false information.

103.   The evidence fabricated by Defendant Officers was used at trial to secure Lathierial's unjust and wrongful conviction, resulting in an 82 year sentence and over 23 years of unjust and wrongful incarceration.

104.   Defendant Officers' misconduct directly resulted in the criminal conviction of Lathierial, thereby denying his constitutional due process rights guaranteed by the Fifth and Fourteenth Amendments.  Absent this misconduct the prosecution of Plaintiff could not have and would not have been pursued, much less resulted in a conviction.

105.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with a willful indifference to Lathierial's constitutional rights.

106.   Defendant Officers' actions directly and proximately caused the injuries and damages to Lathierial as claimed above, and constitute due process violations under the 14th Amendment of the U.S. Constitution.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorneys' fees, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($ 20,000,000.00) Dollars.

**COUNT III**

42 U.S.C. § 1983
Failure to Intervene
(Defendant Officers)

107. Each paragraph of this Complaint is incorporated as if restated fully herein.

108. In the manner described above and alleged herein, during the constitutional violations described above, Defendant Officers stood by without intervening to prevent the misconduct, including but not limited to, the concealment and/or destruction of material exculpatory and impeachment evidence, and the deliberate fabrication of false evidence that caused Lathierial's charges and conviction.

109. As a result of the Defendant Officers' failure to intervene to prevent the violation of Lathierial's constitutional rights, Lathierial suffered pain and injury, as well as emotional distress. These Defendants had a reasonable opportunity to prevent this harm, but failed to do so.

110. The misconduct described in this Count was objectively unreasonable and was undertaken with malice and willful indifference to Lathierial's constitutional rights.

111. Defendant Officers' actions directly and proximately caused the injuries and damages to Lathierial as claimed above, and constitute violations of Lathieral's constitutional rights.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorneys' fees, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($ 20,000,000.00) Dollars.

**COUNT IV**

42 U.S.C. § 1983
Conspiracy to Deprive Lathierial of his Constitutional Rights
(Defendant Officers)

112. Each paragraph of this Complaint is incorporated as if restated fully herein.

113. In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Lathierial of exculpatory and impeachment information to which he was lawfully entitled and which would have led to either his not being charged, his acquittal, or his more timely exoneration.

114. In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deliberately fabricate false evidence against Lathierial when they knew or should have known he was innocent, resulting in violations of Lathierial's due process rights.

115. Defendant Officers, acting in concert among and between themselves and with unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

116. In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to arresting Lathierial without probable cause, fabricating and improperly suggesting identification evidence, withholding material exculpatory and impeachment evidence, and committing perjury during hearings and trials.

117. The misconduct described in this count was undertaken with malice, willfulness, and/or reckless indifference to Lathierial's rights.

118.    Said conspiracy and overt acts were continued from on or about February 24, 1990 through to the present.

119.    The conspiracy proximately caused the injuries to Lathierial as set forth above.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, attorneys' fees, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($ 20,000,000.00) Dollars.

**COUNT V**

Illinois Law
Malicious Prosecution
(Defendant Officers)

120.    Each paragraph of this Complaint is incorporated as if restated fully herein.

121.    In the manner described above and alleged herein, Defendant Officers knowingly and maliciously initiated and/or caused judicial proceedings to continue against Lathierial knowing they lacked probable cause to do so.

122.    Defendants created false or incomplete police reports and/or made false and/or incomplete statements to other police officers, the prosecutors, and in court regarding the criminal investigation in this matter.

123.    Defendants instituted the judicial proceedings and/or caused them to continue against Lathierial with malice, and with willful and wanton disregard for the truth of the allegations asserted against Lathierial.

124.    This prosecution was terminated in Lathierial's favor on September 10, 2013 when all charges were *nolle prosequi*.  That the termination of proceedings is indicative of innocence is demonstrated by the certificate of innocence issued on September 25, 2013.

125.    Defendants are liable for the prosecution because it was proximately caused by their unlawful actions as set forth above.

126.    These actions directly and proximately caused the injuries and damages to Lathierial as claimed above and constitute the tort of malicious prosecution under Illinois law.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($20,000,000.00) Dollars.

## COUNT VI

Illinois Law
Intentional Infliction of Emotional Distress
(Defendant Officers)

127.    Each paragraph of this Complaint is incorporated as if restated fully herein.

128.    In the manner described above and alleged herein, the acts and conduct of Defendant Officers were extreme and outrageous. Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Lathierial.

129.    Said actions were undertaken with malice, willfulness, and with reckless indifference to the rights of Lathierial.

130.    As a direct and proximate result of Defendants' wrongful acts, Lathierial suffered damages, including severe emotional distress and anguish.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, and costs against Defendants as

well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($ 20,000,000.00) Dollars.

## COUNT VII

Illinois Law
Conspiracy
(Defendant Officers)

131.    Each paragraph of this Complaint is incorporated as if restated fully herein.

132.    In the manner described above and alleged herein, Defendant Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to maliciously prosecute Lathierial without probable cause and intentionally inflict emotional distress.

133.    In furtherance of this conspiracy, Defendants committed the overt acts as set forth above, including but not limited to, the arrest of Lathierial without probable cause, the coercion and/or manipulation of witness statements, the manipulation and falsification of police reports, the concealment and/or destruction of material exculpatory and impeachment evidence, and the knowing presentation of fabricated evidence to initiate and continue proceedings against Lathierial maliciously.

134.    Said conspiracy and overt acts were continued from on or about February 24, 1990, through to the present.

135.    The conspiracy proximately caused the injuries to Lathierial as set forth above.

WHEREFORE, Lathierial respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, and costs against Defendants as well as any other relief this Court deems just and appropriate, in excess of Twenty Million ($20,000,000.00) Dollars.

**COUNT VIII**

745 ILCS 10/9-102 – Indemnification
(Defendant City of Chicago)

136.     Each paragraph of this Complaint is incorporated as if restated fully herein.

137.     Defendant City of Chicago was the employer of each of the Defendant Police Officers at all times relevant to this complaint, as set forth above.

138.     All of the individually named Defendant Officers were at all relevant times acting within the course and scope of their employment.

139.     Pursuant to 745 ILCS 10/9-102, the governmental entity set forth above is liable to pay all judgments and settlements entered against each of its employees for the claims set forth above.

WHEREFORE, pursuant to 745 ILCS 10/9-102, Lathierial demands judgment against Defendant City of Chicago in the amounts awarded to Lathierial against the individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs, and attorney's fees.

**COUNT IX**

Respondeat Superior
(Defendant City of Chicago)

140.     Each paragraph of this Complaint is incorporated as if restated fully herein.

141.     At all times relevant to this complaint the Defendant Officers acted as agents of, and in the scope of their employment with, Defendant City of Chicago.

142.     Defendant City of Chicago is liable for the torts of the police officer Defendants for their violations of state law under the doctrine of *respondeat superior.*

WHEREFORE, Lathierial demands judgment against Defendant City of Chicago in the amounts awarded to Lathierial against the individual Defendants by way of judgment or settlement, including any and all amounts awarded for damages, costs, and attorney's fees.

## VI. JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully Submitted,

/s/ Kathleen T. Zellner
Kathleen T. Zellner

KATHLEEN T. ZELLNER & ASSOCIATES, P.C.
Attorneys for Plaintiff
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
(630) 955-1212
Atty No: 618457

**CERTIFICATE OF SERVICE**

I hereby certify that on **April 9, 2014**, I electronically filed the foregoing **First Amended Complaint** with the Clerk of the Court using the ECF system, which will send electronic notification of the filing on the same day to all attorneys of record as follows:

Terrence M. Burns
Paul A. Michalik
Daniel M. Noland
DYKEMA GOSSETT PLLC
10 South Wacker Drive
Suite 2300
Chicago, Illinois 60606
(312) 876-1700
Attorneys for Defendant City of Chicago

John F. Gibbons
Tiffany S. Fordyce
Elizabeth S. Ralph
GREENBERG TRAURIG, LLP
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
(312) 456-8400
Attorneys for Defendant Individually Named Officers

/s/Kathleen T. Zellner
Attorney for Plaintiff
KATHLEEN T. ZELLNER & ASSOCIATES, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
kathleen.zellner@gmail.com
(630) 955-1212