IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| LATHIERIAL BOYD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO; CHICAGO POLICE | ) | |
| OFFICER RICHARD ZULEY, star no. 15185; | ) | |
| CHICAGO POLICE OFFICER LAWRENCE | ) | Case No. 13 C 7152 |
| THEZAN, star no. 9419; CHICAGO POLICE | ) | |
| OFFICER STEVE SCHORSCH, star no. 8955; | ) | Judge Robert Gettleman |
| CHICAGO POLICE OFFICER JOHN MURRAY, | ) | |
| star no. 3175 and RAY KAMINSKI, as special | ) | |
| representative of the Estate of former Chicago | ) | |
| police officer ANDREW SOBOLEWSKI, | ) | |
| star no. 16498, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S LOCAL RULE 56.1(b)(3) STATEMENT

NOW COMES PLAINTIFF, Lathierial Boyd and For his Local Rule 56.1(b)(3) Statement, states as follows his response to Defendants' Local Rule 51.1 Statement of Undisputed Material Facts and as Plaintiff's Undisputed Material Facts:

**The Parties**

1. Plaintiff Lathierial Boyd ("Boyd") was a resident of the State of Illinois prior to his arrest and conviction in December 1990 and is now alleged to be a resident of the State of California. (Third Am. Compl., May 2, 2016, ECF No. 108-1 ("TAC") ¶ 5.)

**Response:** *Agreed.*

2. The Defendants are former Chicago Police Officers sued in their individual capacities. (TAC ¶ 14.)

1

**Response:** *Agreed.*

## Jurisdiction and Venue

3.    Boyd brings his claims against Defendants pursuant to 42 U.S.C. § 1983 for purported violations of his constitutional and civil rights and Illinois state law. (TAC, Counts I-II, IV-VIII.) The Court has jurisdiction over Boyd's federal claims under 28 U.S.C. §1331, as well as over his state claims through supplemental jurisdiction. (TAC ¶ 12, Counts I-II, IV-VIII.) All of the acts alleged in Boyd's pleading occurred in the Northern District of Illinois. (TAC ¶ 4.)

**Response:** *Agreed.*

## The Shooting and Investigation

4.    At approximately 2:00 a.m. on February 24, 1990, the Chicago Police Department ("CPD") responded to a report of shots being fired in the 3500 block of north Clark Street, just south of Wrigley Field. (TAC ¶ 115; Supplementary Report, February 24, 1990 ("Scene Report"), p. 6, attached as **Exhibit A.)**

**Response:** *Agreed.*

5.    Five individuals were injured in the shooting: Michael Fleming, who was pronounced dead the night of the shooting; Ricky Warner ("Ricky"), who survived the shooting but remained paralyzed from the neck down; Richard Kutchek ("Kutchek"), David P. Lofton ("Lofton"), and Boris P. Kaburov ("Kaburov"). (TAC ¶ 16; Scene Report, Ex. A, pp. 2-4, 6-8.)

**Response:** *Agreed.*

6.    Ricky, Fleming, Kutchek, and Kaburov were all immediately taken to Illinois Masonic Medical Center where Fleming was pronounced dead and where Ricky was taken into surgery. (Scene Report, Ex. A, pp. 3, 7.)

2

**Response:**    *Agreed.*

7.    The Scene Report identifies by name and contact information the following 11 witnesses to the shooting who were interviewed at the scene by detectives R. Sikorski and D. Kowalski: Tishyra M. Ward, Victor C. Vallacci, Jennifer J. Bonanno, David S. Heath, Kutchek, William J. Clohecy, Kaburov, Jeff M. Osborne, Lofton, Glenn B. Diamond, and Jason E. Brownstein. (Scene Report, Ex. A, pp. 5-9; TAC ¶ 17.)

**Response:**    *Agreed.*

8.    Eyewitnesses at the scene told detectives that Ricky and Michael Fleming appeared to be selling drugs on the street when a man walked up, pulled out a dark-colored auto-loading weapon, possibly a TEC-9, started shooting, and then took off running southbound on Clark Street and westbound on Cornelia Street. (TAC ¶ 18; Scene Report, Ex. A, pp. 6-9.)

***Response:***    *Agreed.*

9.    Eyewitnesses at the scene also provided descriptions of the shooter to detectives Sikorski and Kowalksi. (TAC ¶ 20; Scene Report, Ex. A, pp. 7-9.)

**Response:**    *Agreed.*

10.    Detectives at the scene discovered a piece of paper in Ricky's pocket with the name "Breezo" and a phone number written on it. After running a subscriber check, the detectives learned that the number was registered to a Stanley Morgan who was a known Vice Lord gang member who drove a 1982 white Buick with license plate "BREEZO 1 ." (Scene Report, Ex. A, p. 7; General Progress Report, March 7, 1990 ("3/7/90 GPR" SAO 3594), **attached as** Exhibit B.)

**Response:**    *Agreed.*

11.    Due to the serious injuries he sustained in the shooting, CPD detectives were not able to interview Ricky until March 7, 1990, 11 days after the shooting. (Supplementary Report,

3

March 4, 1990 ("3/4/90 Supp. Report"), attached as **Exhibit C;** 3/7/90 GPR, Ex. B; Supplementary Report, March 9, 1990 ("3/9/90 Supp. Report"), p. 2, attached as **Exhibit D.)**

     **Response***:    Disputed.  On March 4, 1990, Detective Schorsch stated that "Mr. Warner is currently in critical but stable condition but is unable to be interviewed at this time as he is currently on a ventilator machine." (3/4/90 Supp. Report, Defense Ex. C.)  Ricky Warner was never taken off the ventilator machine, but did have a Communi-Trach implanted prior to his testimony at trial.   The Communi-Trach was implanted at Northwestern Hospital on April 18, 1990. (Northwestern Memorial Hospital Patient Progress Notes (excerpts attached as **Plaintiff's Exhibit A**), SAO 1102.)  All of the pre-trial police interviews were conducted with Ricky Warner on a ventilator, without a Communi-Trach, which prevented him from being able to verbalize any information about the shooting.  (Deposition of Dr. Manu Jain, March, 17, 2016 ("Jain Dep. 3/17/16") (excerpts attached as **Plaintiff's Exhibit B**), 170:17-22; Continued Deposition of Dr. Manu Jain, April 4, 2016 ("Jain Dep. 4/4/16") (excerpts attached as **Plaintiff's Exhibit C**), 296:22-24; Deposition of Dr. Paul Meyer, April 22, 2016 ("Meyer Dep.") (excerpts attached as **Plaintiff's Exhibit D**), 31:23-32:1, 13-18; 42:18-19.)*

     12.     During those 11 days, CPD detectives continued to monitor Ricky's progress and learned on March 4, 1990 that Ricky was transferred from Illinois Masonic Medical Center to Northwestern Memorial Hospital ("Northwestern") on February 28, 1990. (3/4/90 Supp. Report, Ex. C.)

     **Response:**    *Agreed.*

     13.     CPD detectives were also informed by Northwestern staff on March 4, 1990 that Ricky was in critical but stable condition and could not be interviewed because he was on a

ventilator machine. (3/4/90 Supp. Report, Ex. C.)

      **Response:**   *Agreed.*

    14.    On March 7, detectives Sobolewski and Thezan contacted Northwestern and spoke to nurse Cynthia Hendricks ("Hendricks") who informed them that Ricky was conscious and alert and could be interviewed, that he could not talk due to his injuries, but that he could communicate and that she would assist in that process. (3/9/90 Supp. Report, Ex. D, p. 2.)

      **Response***:*   *Disputed.   Hendricks did not confirm that she would assist in the interview.  Hendricks was not asked about 3/7; both defense attorney Tate and prosecutor Levin start with 3/9 and Hendricks describes being present for an interview where Ricky communicates that he doesn't know who shot him. (People of the State of Illinois v. Lathierial Boyd, Case No. 90 CR 8602, Report of Proceedings, Trial Testimony of Cynthia Hendricks, October 23, 1990 ("Hendricks Tr.") (excerpts attached as **Plaintiff's Exhibit E**), 293:9-17.)  Additionally, Ricky was not able to move his arms, hands, or fingers to make any gestures that would assist in any photo identification. Ricky could only communicate by mouthing his most basic needs to his nurses, who would have learned to interpret the words that Ricky Warner was trying to mouth. (Meyer Dep., Plaintiff's Ex. D, 63:17-65:14.) It would not be possible for a stranger to come into the room and understand what Ricky was trying to communicate by mouthing words. (Meyer Dep., Plaintiff's Ex. D, 63:21-64:1.) It would not be possible for Ricky Warner to communicate on any higher intellectual level which would be required to describe the shooter or the crime scene.  (Jain Dep. 3/17/16, Plaintiff's Ex. B, 130:6-131:11; Meyer Dep., Plaintiff's Ex. D, 46:22-47:7; 47:17-48:6.) Ricky was able to respond to questions by shaking his head yes or no.  When Defendants Thezan and Sobolewski asked Ricky if he knew who shot him, he responded by*

*shaking his head no. (3/9/90 Supp. Report, Defendants' Ex. D, p. 2; People of the State of Illinois*
*v. Lathierial Boyd, Case No. 90 CR 8602, Report of Proceedings, Motion to Quash Identification*
*Hearing Testimony of Andrew Sobolewski, August 2, 1990 ("Sobolewski Tr. II") (excerpts*
*attached as **Plaintiff's Exhibit F**), 15:13-18; Ricky Tr., Defendants' Ex. F, 179:20-21.)*

15.     Detectives Sobolewski and Thezan interviewed Ricky on March 7, 1990 with
Hendricks' assistance. *(Id.)*

**Response:**     *Disputed. Ricky was not functioning at a cognitive level that would have*
*allowed him to communicate any information about the crime or the perpetrator as described by*
*Defendant Thezan in his recent deposition.  (Deposition of Lawrence Thezan, October 8, 2015*
*("Thezan Dep. II") (excerpts attached as **Plaintiff's Exhibit G**), 86:15-87:1.)  Hendricks did not*
*assist Sobolewski and Thezan in manipulating any equipment to allow Ricky to speak.  Such*
*manipulation would have necessarily involved deflating the cuff on Ricky's tracheostomy tube,*
*Ricky's respiratory condition prevented such deflating.  (Meyer Dep., Plaintiff's Ex. D, 31:23-*
*32:1; 32:19-33:10.)  Even if the cuff of Ricky's tracheostomy tube could have been deflated,*
*which it could not have been, it would have required a physician's order to do so and would*
*have been entered as a progress note.  (Meyer Dep., Plaintiff's Ex. D., 70:8-17; 88:24-89:1;*
*89:21-90:3.)  No such order was in Ricky's Northwestern Memorial Hospital Medical Records.*
*(Jain Dep. 3/17/16, Plaintiff's Ex. B, 163:10-164:11.)  Furthermore, Ricky  was not able to make*
*any gestures with his arms or hands. Ricky was not functioning at a cognitive level that would*
*allow him to make any identification of the shooter or describe the crime scene.  (Meyer Dep.,*

6

*Plaintiff's Ex. D, 46:11-13; 46:22-47:7; Jain Dep. 3/17/16, Plaintiff's Ex. B, 130:6-11; 131:1-11.)*

16.     Sobolewski and Thezan documented in their reports that Ricky told them the following, among other things, during their interview on March 7, 1990: that a person known as "the Godfather" or "Rat" might have been the person who shot him, that he owed "Rat" approximately $1,200 for an ounce of cocaine, that Rat had gone to his parents' home in Maywood, Illinois and threatened his family if he did not pay back the debt, that he had seen Rat in possession of a 9MM automatic gun (which Ricky believed to be a TEC-9 type of gun) which Rat carried in his car, that Ricky had given his brother, James Fleming, a telephone number where Rat could be reached, that Rat drove a black Corvette, that he thought Rat lived in Villa Park, and that he thought his parents could be of some assistance in trying to identify Rat. (3/9/90 Supp. Report, Ex. D, p. 2; 3/7/90 GPR, Ex. B.)

**Response:**     *Agreed that the March 7, 1990, report states what is documented in ¶16, but the content is completely fabricated because Ricky could not verbalize any words.  (Jain Dep. 3/17/16, Plaintiff's Ex. B, 170:20-22; 203:13-20; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24; Meyer Dep., Plaintiff's Ex. D, 31:23-32:1; 88:13-14; 91:23-92:5, 17-20.)*

17.     Sobolewski and Thezan documented in their reports that they showed Ricky a photo array containing a photo of Stanley Morgan, aka "Breeze," that Ricky identified Stanley Morgan as "Breeze" and related that he had Breeze's number because he was supposed to get him a Blaupunkt radio. (3/9/90 Supp. Report, Ex. D, p. 2; 3/7/90 GPR, Ex. B; Deposition of Lawrence Thezan, October 8, 2015 ("Thezan Dep.") (excerpts attached as **Exhibit E**) 117:2-24.)

**Response:**     *Agreed that the March 7, 1990, report states what is documented in ¶17, but the content is completely fabricated. Ricky could not verbalize any words.  (Jain Dep. 3/17/16, Plaintiff's Ex. B, 170:17-22; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24; Meyer Dep.*

*Plaintiff's Ex. D, 31:23-32:1; 42:18-19; 88:14.) Additionally, Ricky could not gesture with his arms or hands because he was a quadriplegic. Ricky could only communicate at a very basic level by mouthing words or shaking his head yes or no to his nurses who learned to understand the words mouthed. (Meyer Dep., Plaintiff's Ex. D, 42:18-20; 46:22-47:7; 63:21-64:1; 67:16-20; Jain Dep. 3/17/16, Plaintiff's Ex. B, 170:20-22; 172:19-20; 200:23-201:10.) When Defendants Thezan and Sobolewski asked Ricky if he knew who shot him, he responded by shaking his head no. Ricky was completely incapable of communicating the details about Breezo, his number, and the Blaupunkt radio at the time Defendants Sobolewski and Thezan allegedly interviewed him on March 7, 1990. (3/4/90 Supp. Report, Defendants' Ex. C; Meyer Dep., Plaintiff's Ex. D, 46:11-13; 46:22-47:7; Jain Dep. 3/17/16, Plaintiff's Ex. B, 130:6-11; 131:1-11; Ricky Tr., Defendants' Ex. F, 179:20-21.)*

18. Ricky testified at Boyd's subsequent criminal trial, while on a ventilator and from his hospital bed at Oak Forest Rehabilitation Center, that Boyd shot him. *(People of the State of Illinois v. Lathierial Boyd,* Case No. 90 CR 8602, Report of Proceedings, Oct. 16, 1990, Testimony of Ricky Warner ("Ricky Tr.") (excerpts attached as **Exhibit F**) 161:1-21, 167:15-21, 170:1-24, 210:1-4.)[1]

**Response:** *Disputed. Defendants only cite to excerpts that demonstrate that Ricky Warner testified at trial that Rat shot him. (Ricky Tr., Defendants' Ex. G, 210:1-4.) Ricky identified Plaintiff in open court but did not say the name Lathierial Boyd. (Ricky Tr., Defendants' Ex. F, 170:1-14.) Ricky was able to testify at trial because he had a Communi-Trach implanted prior to the trial, but after the police interviews at Northwestern Hospital, that allowed him to speak. (Northwestern Memorial Hospital Patient Progress Notes, Plaintiff's Ex.*

---

[1] Ricky's 1990 Testimony is admissible under Federal Rule of Evidence 804(a)(4) because Ricky is deceased.

*A, SAO 1092; 1102.) Ricky was misled by the detectives who told him that Plaintiff had shot him. Ricky could not have seen who shot him from his position on the ground and the angle of the shot. (Scene Report, Defendants' Ex. A, p. 3.) Ricky was unable to identify his shooter when he was first visited at the hospital by the defendants, but he was tricked and misled by the Defendants into believing that Plaintiff was his shooter when he was shown only Plaintiff's mugshot by Defendants Zuley and Murray. (Zuley Dep. 12/2/15, Defendants' Ex. M, 62:9-21; Deposition of John Murray, October 28, 2015 ("Murray Dep. II") (Excerpts attached as **Plaintiff's Exhibit H**), 68:11-14; 3/12/90 Supp. Report, Defendants' Ex. I, p. 2.) After Ricky had the Communi-Trach implanted, he testified consistently with the fabricated story fed to him by Defendants. The manipulation of Ricky by Defendants was revealed by his testimony in which he denied having ever said that he did not know who shot him. Sobolewski testified and reported Ricky had originally indicated he did not know who shot him. (3/9/90 Supp. Report, Defendants' Ex. D, p. 2.) Ricky claimed that he gave Defendant Zuley the Rat note, but Defendant Zuley testified that the two nurses gave him the Rat note in an envelope that had the Northwestern logo or address. (Zuley Dep. 12/10/15, Defendants' Ex. Y, 171:10-174:10.) Ricky never mentioned an envelope and clearly contradicted Defendant Zuley's testimony. Thus, Ricky's trial testimony was unreliable and was clearly the product of police manipulation. Ricky was so severely cognitively impaired that he could not remember the shooting but adopted false memories of it after being fed fabricated details by the Defendants.*

19.     Ricky testified at Boyd's criminal trial that he was interviewed by police officers at Northwestern. The officers asked Ricky if Ricky knew who shot him. Ricky told the detectives that Rat shot him. Ricky also testified that the detectives showed Ricky photographs, and Ricky identified Boyd from those photographs. (Ricky Tr., Ex. F, 174:15-175:11, 186: 11-17, 187:7-13, 217:2-4).

**Response:**     *Agreed to the extent that Ricky testified at Plaintiff's criminal trial that he was interviewed by police officers at Northwestern Hospital. Disputed as to the assertion that*

*"officers asked Ricky if Ricky knew who shot him. Ricky told the detectives that Rat shot him."*
*Ricky did not tell the officers anything because he could not verbalize any words. Ricky never*
*"told" the detectives that Rat shot him. (Jain Dep. 3/17/16, Plaintiff's Ex. B, 170:17-22; Jain*
*Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24; Meyer Dep., Plaintiff's Ex. D, 31:23-32:1; 42:18-19,*
*88:14.) Disputed that Ricky "identified Boyd from the photos" (that detectives showed him).*
*Ricky was unable to identify his shooter when he was first visited at the hospital by the*
*defendants, but he was tricked and misled by the Defendants into believing that Plaintiff was his*
*shooter when he was shown only Plaintiff's mugshot by Defendants Zuley and Murray. (Zuley*
*Dep. 12/2/15, Defendants' Ex. M, 62:9-21; Murray Dep. II; Plaintiff's Ex. H, 68:11-14; 3/12/90*
*Supp. Report, Defendants' Ex. I, p. 2.) Ricky never pointed out Plaintiff as Defendant Thezan*
*stated in his interview with the Assistant State's Attorney from the Wrongful Conviction Unit*
*because Ricky could not move his arms or hands. (Keane Dep., Defendants' Ex. JJ, 140:12-18;*
*Deposition of Shelley Keane, December 15, 2015 ("Keane Dep. II") (excerpts attached as*
***Plaintiff's Exhibit I**), 142:23-143:9.) Ricky was misled by the detectives into thinking he had*
*previously made a photo-identification of Plaintiff.*

20.     Ricky testified at Boyd's criminal trial that he stiffed Boyd in connection with a
cocaine transaction approximately seven months to one year before the shooting. (Ricky Tr., Ex.
F, 167:8-14, 183:9-12, 205:4-10.)

**Response:**     *Disputed. Ricky did not testify that Plaintiff ever threatened him in*
*relation to any drug debt. Ricky testified that Rat "told [his] parents." (Ricky Tr., Defendants'*
*Ex. F, 183:13-18). Plaintiff testified that he never threatened Ricky about anything. (Deposition*

10

*of Lathierial Boyd, July 22, 2015 ("Boyd Dep. 7/22/15 II") (excerpts attached as **Plaintiff's***

***Exhibit J**), 147:3-9.)*

21.     Ricky testified at Boyd's criminal trial that the police officers interviewing him

did not mention the name "Rat" to him, and that they did not have to provide Rat's name to him.

(Ricky Tr., Ex. F, 189:11-13.)

**Response:**     *Agreed to the extent that at one point in his testimony, Ricky made this*

*statement. Disputed because Defendant Zuley admitted at Plaintiff's trial that he was the one*

*who first mentioned the name Rat to Ricky during the photo array.   (People of the State of*

*Illinois v. Lathierial Boyd, Case No. 90 CR 8602, Report of Proceedings, Trial Testimony of*

*Richard Zuley, October 23, 1990 ("Zuley Tr.") (excerpts attached as **Plaintiff's Exhibit K**),*

*260:21-261:2.)*

22.     Ricky testified at Boyd's criminal trial that when he was first interviewed by

police officers at Northwestern, he "knew what [he] was talking about" and he "could see and

[he] could talk…." (Ricky Tr., Ex. F, 226:4-14.)

**Response:**     *Agreed that Ricky testified as stated in ¶22. Disputed - it was impossible*

*for Ricky to "talk" at the time of the interview and for him to have the cognitive ability to*

*describe the shooting, crime scene, or perpetrator. (Jain Dep. 3/17/16, Plaintiff's Ex. B, 130:6-*

*11; 131:1-11; 170:17-22; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24; Meyer Dep., Plaintiff's*

*Ex. D, 31:23-32:1; 42:18-19; 46:11-13; 46:22-47:7; 88:14.)*

23.     After interviewing Ricky, Sobolewski and Thezan went to Ricky's parents' home

located at 411 S. 17th Avenue in Chicago, Illinois and spoke to Ricky's father, Herbert Warner

("Herbert"). (3/9/90 Supp. Report, Ex. D, p. 2; 3/7/90 GPR, Ex. B; Thezan Dep., Ex. E, 119:10-

17.)

      **Response:** *Agreed.*

24.     Sobolewski and Thezan documented in their reports that Herbert told them the following during their March 7, 1990 interview: that a man who went by the nickname Rat had come to his home seven months to one year prior and threatened to kill the Warner family over a debt Ricky owed him, which he believed to be about $750; that Rat had come to his home in a white Jaguar with several men in the car at the time he made the threats; that the car had a license plate with "Rat" on it and some other numbers; and that he believed Rat's last name was "Chewing" or "Chewings. (3/9/90 Supp. Report, Ex. D, p. 2; 3/7/90 GPR, Ex. B; *People of the State of Illinois v. Lathierial Boyd,* Case No. 90 CR 8602, Report of Proceedings, Aug. 2, 1990 ("Sobolewski Tr.") (excerpts attached as **Exhibit G**) 12:16-14:10, 21:4-10; Thezan Dep., Ex. E, 136:14-21; TAC ¶ 46.)

      **Response:** *Disputed. The exact verbiage of the report is as follows:*

*"We went and interviewed WARNER'S father Herbert WARNER at his home at 411 S. 17th Maywood, He knows "RAT" only as "RAT CHEWINGS" he said RAT came by with 2 younger M/Bs. He told him that his son Rick owed him money and threatened his family and Ricky. Mr. WARNER said James FLEMING, Ricky's Brother might know "RAT." He took us to 313 6th Maywood. James was not cooperative. Mr. WARNER stated that "RAT" hangs with a Karry KELLY who across the street from him on 17th St." (3/7/90 GPR, Defendants' Ex. B, ¶4.)*

25.     Herbert testified during Boyd's subsequent criminal trial that Boyd had come to his home on two occasions and had threatened to kill members of Ricky's family over Ricky's debt. (*People of the State of Illinois v. Lathierial Boyd,* 90 CR 8602, October 2, 1990, Report of

12

Proceedings (excerpts attached as **Exhibit H**) ("Herbert Tr.") 75 :6-79:20, 89:18-90:2, 93:1-9).[2]
Herbert further testified that on one of the occasions Boyd came to Herbert's home with several
other men in the car with him who started to get out of the car while Boyd and Herbert were
talking *(id.* at 78:21-79:13). Herbert noticed that the car Boyd was driving had a vanity plate on
it with "Rat" *(id.* at 79:14-80:8.)

  **Response:**  *Agreed that Herbert testified as described in ¶25. Disputed because*
*Plaintiff testified in his deposition that he did not threaten Herbert and that he did not own a*
*white Jaguar. There is no evidence tying him to such a vehicle of license plate with "Rat."*
*(Boyd Dep. 7/22/15 II, Plaintiff's Ex. J, 162:13-15; 176:23-178:19; Continued Deposition of*
*Lathierial Boyd, September 14, 2015 ("Boyd Dep. 9/14/15 II") (excerpts attached as **Plaintiff's***
***Exhibit L**), 261:14-16; 315:15-16.)*

  26.  Herbert testified at Boyd's criminal trial that the car he saw Boyd driving was a
beige, Nova-like car, but had not mentioned any beige car or any Nova-like car to the detectives
investigating the shooting in any of his previous interviews. (Herbert Tr., Ex. H, 86:23-87:11;
3/9/90 Supp. Report, Ex. D, pp. 2-3; Supplementary Report, March 12, 1990 ("3/12/90 Supp.
Report" (attached as **Exhibit** I), pp. 2-3.)

  **Response:**  *Agreed that Herbert testified that Plaintiff was driving a beige, Nova-like*
*car and that he had not mentioned this to the detectives in any of his previous interviews. There*
*was no proof that Plaintiff ever owned a beige, Nova-like car. (3/9/90 Supp. Report,*
*Defendants' Ex. D, pp. 2-3; 3/7/90 GPR, Defendants' Ex. B; Thezan Dep., Defendants' Ex. E,*
*131:1-24.)*

  27.  Herbert then took Sobolewski and Thezan to his stepson, James Fleming's

---

[2] Herbert's 1990 testimony is admissible under Federal Rule of Evidence 804(a)(4) because
Herbert is deceased.

("Fleming"), house so the detectives could ask him whether he had a phone number for Rat, as Ricky had indicated. (3/9/90 Supp. Report, Ex. D, pp. 2-3; 3/7/90 GPR, Ex. B; Thezan Dep., Ex. E, 131:1-24.)

**Response:**   *Agreed.*

28.   Sobolewski and Thezan documented in their reports that Fleming indicated to them that he did not have the number. At first Fleming stated he did not know where he had placed it. He later stated that he had thrown the number away. (3/9/90 Supp. Report, Ex. D, p. 3; 3/7/90 GPR, Ex. B; Thezan Dep., Ex. E, 131:1-24).

**Response:**   *Agreed that Defendants Sobolewski and Thezan documented the above stated information in their report.*

29.   Sobolewski and Thezan followed up by requesting from the Illinois Secretary of State a list of license plate numbers in Cook and DuPage counties containing the prefix "RAT." (General Progress Report, March 8, 1990, attached as **Exhibit J;** Thezan Dep., Ex. E, 136:2-13.)

**Response:**   *Agreed.*

30.   Sobolewski and Thezan received a list of license plates from the Illinois Secretary of State, which indicated that no license plate containing the prefix "RAT" was registered to a white Jaguar or to Boyd; the list did not indicate that a license plate containing "RAT" was registered to an individual named William Edwards. (Thezan Dep., Ex. E, 137:1-138:12, Thezan Dep., Exhibit J, SA000817-00822 (attached as **Exhibit K**)[3]; TAC ¶ 51.)

**Response:**   *Agreed.*

31.   Boyd's criminal defense counsel, Emory Tate ("Tate"), testified on June 24, 1998 in connection with a petition for post-conviction relief filed by Boyd. Tate stated that that he was aware prior to trial, based on his review of the police reports and other discovery materials, that

---

[3] This document was produced by the Cook County State's Attorney's Office ("SAO") to the parties to this litigation pursuant to a subpoena.

the investigating detectives and prosecutors had not connected any license plate containing "RAT" to Lathierial Boyd. *(People of the State of Illinois v. Lathierial Boyd,* Case No. 90 CR 8602, Report of Proceedings, June 28, 1994 ("6/28/94 Tr.") ( excerpts attached as **Exhibit L)** 6:2-7:3, 10:2-11:14.)[4]

> **Response:** *Agreed.*

32.     Tate further testified that he did not consider the license plate testimony from Herbert to be a major part of the case. Tate did not issue a subpoena to confirm whether any license plate containing "RAT" could be linked to Boyd or to a white Jaguar, and did not otherwise introduce evidence at trial to rebut Herbert's testimony. (6/28/94 Tr., Ex. L, 5:21-7:3, 12:20-14:18.)

> **Response:** *Disputed. While Tate did not serve a subpoena for the information, he never testified he did not think the license plate testimony from Herbert was a major part of the case. Tate cross examined Herbert on that point. (Herbert Tr., Defendants' Ex. H, 141:12-16.)*

33.     On March 11, 1990, detectives Zuley and Murray went to Fleming's home to determine whether he would provide any more information regarding the identity of "Rat" or "the Godfather." (Deposition of Richard Zuley, Dec. 2, 2015 ("Zuley Dep. 12/2/15") (excerpts attached as **Exhibit M**) 53:12-54:8; Deposition of John Murray, Oct. 28, 2015 ("Murray Dep.") (excerpts attached as **Exhibit N**) 64:23-66:18.)

> **Response:** *Disputed. Defendant Zuley learned Rat's real name when he conducted an illegal search of Joey Kelly's house and took the following items: 1. The "Rat" note (Deposition of Joey Kelly, November 19, 2015 ("Kelly Dep.") (excerpts attached as **Plaintiff's Exhibit M),** 129:18-130:9; Exhibit Number 4 from Deposition of Joey Kelly, November 19, 2015 ("Rat*

---

[4] Tate's 1998 testimony is admissible under Federal Rule of Evidence 804(a)(4) because Tate is deceased.

*Note") (attached as **Plaintiff's Exhibit N**)); 2. a second note with the name "Godfather" (Id. at 128:4-7); 3. a picture of the Plaintiff next to the white Jaguar. (Id. at 117:3-14; Affidavit of Joey Kelly, May 18, 2000 ("Kelly Aff. 5/18/00") (attached as **Plaintiff's Exhibit O**), pp. 1-2; Affidavit of Joey Kelly, August 4, 2016 ("Kelly Aff. 8/4/16") (attached as **Plaintiff's Exhibit P**); Kelly Dep., Plaintiff's Ex. M, 219:19-220:11; Photograph of Lathierial Boyd next to a white Jaguar (attached as **Plaintiff's Exhibit Q**)). Defendant Zuley never writes a report of the search of Joey Kelly's house and he denies ever going to Joey Kelly's house in his deposition. (Deposition of Richard Zuley, December 10, 2015 ("Zuley Dep. 12/10/15 II") (excerpts attached as **Plaintiff's Exhibit R**), 187:9-20.)*

34.     Zuley and Murray learned from Fleming that Rat's real name was Lathierial Boyd. (Zuley Dep. 12/2/15, Ex. M, 59:6-60:14; Murray Dep., Ex. N, 64:23-66:18.)

**Response:**     *Disputed. Defendant Zuley learned Rat's real name when he conducted an illegal search of Joey Kelly's house and took the following items: 1. The "Rat" note (Kelly Dep, Plaintiff's Ex. M, 129:18-130:9); 2. a second note with the name "Godfather" (Id. at 128:4-7); 3. a picture of the Plaintiff next to a white Jaguar. (Id. at 117:3-14; Kelly Aff. 5/18/00, Plaintiff's Ex. O, pp. 1-2; Kelly Aff. 8/4/16, Plaintiff's Ex. P; Photograph of Lathierial Boyd, Plaintiff's Ex. Q.) Defendant Zuley never writes a report of the search of Joey Kelly's house and he denies ever going to Joey Kelly's house in his deposition. (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 187:9-20.)*

35.     Zuley and Murray subsequently obtained an I.R. photograph of Boyd (a mug shot maintained in CPD records), returned to Northwestern and re-interviewed Ricky with the assistance of nurse Anna Weissman. (Zuley Dep. 12/2/15, Ex. M, 62:9-62:21; Murray Dep., Ex.

N, 68:11-14; 3/12/90 Supp. Report, Ex. I, p. 2.)

  **Response:** *Agreed that Defendants Zuley and Murray only took the one photo of Plaintiff to the hospital and showed it to Ricky. Disputed as to the allegation that Nurse Anna Weissman assisted Defendants Zuley and Murray. There is no proof that a doctor's order was entered allowing Nurse Weissman to assist Defendants Zuley and Murray. (Meyer Dep., Plaintiff's Ex. D, 70:8-13; Jain Dep. 3/17/16, Plaintiff's Ex. B, 163:10-164:11.) Nurse Weissman never testified that she provided any assistance to Defendants Zuley and Murray.*

  36. Zuley and Murray showed Ricky a photo lineup containing the LR. photo of Boyd, and Ricky identified Boyd as "Rat," and as the man who shot him. (Zuley Dep. 12/2/15, Ex. M, 80:24-81:10; Murray Dep., Ex. N, 57:16-24, 58:18-59:3; 3/12/90 Supp. Report, Ex. 1, p. 2; General Progress Report, March 11, 1990 ("3/11/90 GPR") (attached as **Exhibit O.)**

  **Response:** *Disputed. Ricky could not talk or move his hands or arms so Ricky did not identify Plaintiff as Rat or as the man who shot him. (Jain Dep. 3/17/16, Plaintiff's Ex. B, 170:20-22; 203:13-20; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24; Meyer Dep., Plaintiff's Ex. D, 31:23-32:1; 88:13-14; 91:23-92:5; 92:17-20.)*

  37. Zuley and Murray documented in their reports that Ricky told them the following: Rat had previously threatened to kill him and members of his family over a drug debt that Ricky owed him; that Rat was a big narcotics dealer; and that Rat drove a white two-door Jaguar, a black two-door BMW, and a black Corvette. (Zuley Dep. 12/2/15, Ex. M, 81:11-81:23; 82:19-83:6; 83:22-84:6, 88:17-89:24; 3/12/90 Supp. Report, Ex. I, p. 2; 3/11/90 GPR, Ex. 0.)

  **Response:** *Agreed that Zuley and Murray documented this information in their report. Dispute the veracity of the report because Ricky could not talk or move his hands or arms so Ricky did not identify Plaintiff as Rat or as the man who shot him. (Jain Dep. 3/17/16,*

*Plaintiff's Ex. B, 170:20-22; 203:13-20; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24; Meyer*

*Dep., Plaintiff's Ex. D, 31:23-32:1; 88:13-14; 91:23-92:5, 92:17-20.)*

      38.     Ricky's testified to these same facts at Boyd's subsequent criminal trial. *(See ¶¶*

*18-22, supra.)*

      **Response:**    *Disputed. Ricky's testimony is inconsistent, impeached and nonsensical at*

*times. The testimony is materially different than the report. (Ricky Tr., Defendant's Ex. F, 167:*

*8-9; 186:11-187:15; 187:23-188:2; People of the State of Illinois v. Lathierial Boyd, Case No.*

*90 CR 8602, Report of Proceedings, Trial Testimony of Ricky Warner, October 16, 1990 ("Ricky*

*Tr. II") (excerpts attached as **Plaintiff's Exhibit S**), 171:1-9; 195:17-196:7; 198:20-199:17;*

*200:5-16; 202:10-204:19; 213:10-16; 215:5-17; 216:19-217:17; 218:20-219:10; Scene Report,*

*Defendants' Ex. A, p. 3-4; 3/9/90 Supp. Report, Defendants' Ex. D, p. 2; 3/13/90 Supp. Report,*

*Defendants' Ex. Q, p. 4-5; Deposition of Glenn Diamond, December 14, 2015 ("Diamond*

*Dep.") (excerpts attached as **Plaintiff's Exhibit T**), 31:4-33:4; People of the State of Illinois v.*

*Lathierial Boyd, Case No. 90 CR 8602, Report of Proceedings, Trial Testimony of David Lofton,*

*October 2, 1990 ("Lofton Tr.") (excerpts attached as **Plaintiff's Exhibit U**), 88:21-89:6.)*

      39.     That same day, on March 11, 1990, Zuley and Murray showed Herbert the photo

lineup at his home in Maywood, Illinois. Upon viewing the lineup, Herbert identified Boyd as

"Rat," and as the man who had come to his home and threatened to kill his family. (Zuley Dep.

12/2/15, Ex. M, 84:11-14, 100:19-101:7; Murray Dep., Ex. N, 64:18-22, 70:22-72:8; 3/12/90

Supp. Report, Ex. I, pp. 2-3; 3/11/90 GPR, Ex. 0.)

**Response:** *Disputed. Zuley and Murray only showed Herbert the photo of Plaintiff, so when Herbert views the line-up on March 12, he picked Plaintiff out of the line-up. (Murray Dep., Defendants' Ex. N, 71:22-72:1-8.)*

40.     Zuley and Murray documented in their reports that Herbert told them that Boyd had come to his home twice in the past eight to 12 months and made threats against the Warner family. Herbert further reported that he had come home and found Boyd talking on the porch with his wife. Boyd had claimed Ricky owed Boyd $700. Herbert responded Boyd would have to get the money from Ricky. Boyd replied that someone would get hurt if he didn't get the money. (3/12/90 Supp. Report, Ex. I, pp. 2-3 .)

**Response:** *Agreed this is documented but disputed as to the veracity of the reports. (Boyd Dep. 7/22/2015 , Defendants' Ex. P, 176:23-178:19.)*

41.     Zuley and Murray documented in their reports that Herbert told them that Boyd came to his house on a second occasion with several other men in the car with him. Boyd came to the door and demanded his money. Boyd then threatened to kill Herbert and his wife if he did not get his money. During the encounter, several of the men that were with Boyd started to get out of the car. They appeared to be drawing weapons before Boyd waved them off. (3/12/90 Supp. Report, Ex. I, pp. 2-3.)

**Response:** *Agreed this is documented in the report, but disputed as to the veracity of the report. Disputed, because Herbert did not know the identity of Plaintiff until he was shown the picture of Plaintiff by Zuley. (Boyd Dep. 7/22/15, Defendants' Ex. P, 176:23-178:19.)*

42.     Zuley and Murray documented in their reports that Herbert told them that when Boyd went back to his car to drive away, he noticed that the license plate on the car had the letters "RAT" written on it. (3/12/90 Supp. Report, Ex. I, p. 3; Zuley Dep. 12/2/15, Ex. M, 101:21-102:3.)

19

**Response:** *Agreed this is documented in the Zuley and Murray report (3/12/90 Supp. Report, Ex. I, p. 3), but disputed as to the veracity of this report because Defendants Thezan and Sobolewski confirmed on March 8 that neither the prefix "Rat" nor a white Jaguar was registered to the Plaintiff.* (3/8/90 GPR, Defendants' Ex. J; Thezan Dep., Defendant's Ex. E, 136:2-13; 137:1-138:12; SA000817-00822, Defendants' Ex. K; TAC ¶ 51.)

43.     Herbert testified consistent with his statements to Zuley and Murray at Boyd's subsequent criminal trial, with the exception of a discrepancy in his description of the car Boyd was driving when he threatened to kill the Warner family *(See ¶¶ 25-26, supra.)*

**Response:** *Disputed. Herbert Warner's testimony was inconsistent with the police reports. Herbert was inconsistent about when he identified "Rat" as the Plaintiff. Defendants Thezan and Zuley both claim that the identification of the Plaintiff as "Rat" was made to them independently. (Zuley Dep. 12/2/15, Defendant's Ex. M, 59:6-60:14; 3/9/90 Supp. Report, Defendant's Ex. D, p. 2.) Herbert was inconsistent in his allegations about the substance of the threat made by the Plaintiff to him and his family. At trial, Herbert testified that Plaintiff had threatened to kill him and his family over the drug debt. The police reports of his interviews do not mention the word "kill."* (3/9/90 Supp. Report, Defendants' Ex. D, p. 2.)

44.     That same day, on March 11, 1990, Zuley and Murray attempted to locate Boyd at several addresses, including at his parents' address at 4428 S. Leamington Avenue in Chicago, Illinois. (3/12/90 Supp. Report, Ex. I, p. 3; 3/11/90 GPR, Ex. O; TAC ¶ 59.)

**Response:** *Agreed.*

45.     While at Boyd's parents' home, Zuley and Murray spoke with Boyd's father, James C. Boyd ("James"). The detectives informed James of their investigation and that they

needed to speak with Boyd. Zuley and Murray confirmed with James that Boyd was his son and that he went by the nickname "Rat." (3/12/90 Supp. Report, Ex. I, p. 3, TAC ¶ 59.)

> **Response:** *Agreed.*

46. Boyd has gone by the nickname "Rat" since he was a child. (Deposition of Lathierial Boyd, July 22, 2015 ("Boyd Dep. 7/22/15") (excerpts attached as **Exhibit P**), 70:12-71:9.)

> ***Response:*** *Agreed that Rat was a nickname of Plaintiff since he was a child. It was not a gang name. (Zuley Dep. 12/2/15, Defendants' Ex. M, p. 101:15-20.)*

47. On the morning of March 12, 1990, Boyd went to the police station located at Belmont and Western Avenues accompanied by several members of his family. (Supplementary Report, March 13, 1990 ("3/13/90 Supp. Report") (attached as **Exhibit Q),** pp. 2-3; Boyd Dep. 7/22/15, Ex. P, 116:11-18, 129:6-23.)

> **Response:** *Agree*d

48. Boyd was arrested in connection with the shooting on March 12, 1990 at approximately 11:30 a.m. (3/13/90 Supp. Report, Ex. Q, p. 2.)

> **Response:** *Agreed.*

49. Detective Zuley interviewed Boyd several times on March 12, 1990 in connection with the shooting. (3/13/90 Supp. Report, Ex. Q, pp. 2-3; Zuley Dep. 12/2/15, Ex. M, 113:12-18, 117:24-118:7.)

> **Response:** *Agreed.*

50. During the interviews, Boyd denied knowing Ricky and denied having gone to the Warner's home about any debt. (3/13/90 Supp. Report, Ex. Q, pp. 2-3; TAC ¶ 61.)

**Response:**     *Disputed. Plaintiff did not know that the police were referring to Ricky because the police first mentioned the named "Louie" instead of Ricky. It was only when the police stated that Louie was a friend of Plaintiff's cousin that Plaintiff suspected that the police were talking about Ricky. To avoid the police misstating his response, Plaintiff decided not to respond to the police inquiries. (Boyd Dep. 7/22/15 II, Plaintiff's Ex. J, 20:5-22:7; 26:1-4; 143:3-20.)*

      51.    These statements to the investigating detectives were not true, as Boyd admitted at his recent deposition that he did know Ricky, that he had given Ricky cocaine to sell, and that Ricky never paid him for the cocaine. (Boyd Dep. 7/22/15, Ex. P, 104:19-107:6, 217:19-21; Deposition of Lathierial Boyd, September 14, 2015 (excerpts attached as **Exhibit R**) 256:7-257:21, Dep. Exhibit 7 (attached as **Exhibit S**), pp. 1-2.)

**Response:**     *Disputed. Plaintiff did not know that the police were referring to Ricky because the police first mentioned the named "Louie" instead of Ricky. It was only when the police stated that Louie was a friend of Plaintiff's cousin that Plaintiff suspected that the police were talking about Ricky. To avoid the police misstating his response, Plaintiff decided not to respond to the police inquiries. (Boyd Dep. 7/22/15 II, Plaintiff's Ex. J, 20:5-22:7; 26:1-4; 143:3-20.)*

      52.    Boyd also admitted that he did go to Herbert's home to address a debt that Ricky owed to him and that he had several friends with him who started to get out of the car while he was talking to Herbert. Boyd waved the men away before they approached Herbert's house. (Boyd Dep. 7/22/15, Ex. P, 176:23-179:13, 181:10-22, 183:4-184:8; Boyd Dep. 9/14/15, Exhibit 7, Ex. S, pp. 1-2.)

**Response:**    *Disputed,  Plaintiff was driving to his cousin's house to see what was going on, nothing made him go there (Boyd Dep. 7/22/15 II, Plaintiff's Ex. J, 175:12-176:4.)*

53.    After Boyd consented to a search of his apartment located at 525 N. Halsted Street in Chicago, Illinois, Zuley and Schorsch searched Boyd's apartment, accompanied by Boyd's sister, and recovered a .380 Browning semi-automatic pistol and photographs of various vehicles. (3/13/90 Supp. Report, Ex. Q, p. 2; Deposition of Steve Schorsch, Feb. 25, 2015 ("Schorsch Dep.") (excerpts attached as **Exhibit T**) 80:16-82:11; Schorsch Dep., Exhibit 5, attached as **Exhibit U**; Zuley Dep. 12/2/15, Ex. M, 114:19-115:3, 115:19-116:7.)

**Response:**    *Agreed.*

54.    Boyd did not register the .380 Browning semi-automatic pistol because he was not aware he was required to do that. (Boyd Dep. 7/22/15, Ex. P, 86:4-88:2.)

**Response:**    *Agreed to the extent that Plaintiff had not registered his gun in Chicago, but Plaintiff had a valid FOID card.   (Boyd Dep. 7/22/15 II, Plaintiff's Ex. J, 83:4-15; Boyd Dep. 7/22/15, Defendants' Ex. P, 86:13-22.)*

55.    On the evening of March 12, 1990, detectives Zuley, Schorsch, and Wayne Johnson ("Johnson") conducted a lineup which was viewed by nine of the eyewitnesses to the shooting and Herbert. (3/13/90 Supp. Report, Ex. Q, p. 4; Supplementary Report, 3/13/90 ("Lineup Report") (attached as **Exhibit V);** Zuley Dep. 12/2/15, Ex. M, 118:23-119:1, 120:10-15; Schorsch Dep., Ex. T, 93:22-95:9.)

**Response:**    *Agreed.*

56.    The following nine eyewitnesses to the shooting were brought in to view the lineup: David Lofton, Richard Kutchek, Boris Kaburov, Tishyra Ward, Jennifer Bonanno, David Heath, William Clohecy, Jeff Osborne, Glenn Diamond; Herbert also viewed the lineup. (Lineup Report, Ex. V, p. 2; Schorsch Dep., Ex. T, 95:3-8.)

**Response:**     *Agreed.*

57.     None of the nine eyewitnesses to the shooting identified Boyd as the shooter during the lineup. (Lineup Report, Ex. V, p. 3; Schorsch Dep., Ex. T, 99:17-20, Zuley Dep. 12/2/15, Ex. M, 120:21-23.)

**Response:**     *Agreed.*

58.     Herbert, on the other hand, identified Boyd as the man who came to his home on two occasions and threatened his family over the drug money Ricky owed to Boyd. (Lineup Report, Ex. V, p. 3; Schorsch Dep., Ex. T, 69:22-70:15, 99:21-100:5; Herbert Tr., Ex. H, 82:18-83:14.)

**Response:**     *Agreed that Herbert identified Plaintiff in the lineup but disputed that Plaintiff came to Herbert's home on two occasions and threatened his family over drug money owed to Plaintiff. (Boyd Dep. 7/22/15, Defendants' Ex. P, 176:23-178:19.)*

59.     The Lineup Report reflects that Boyd's attorney, Robert Schroeder ("Schroeder"), was present for the lineup. (Lineup Report, Ex. V, p. 2.)

**Response:**     *Agreed.*

60.     Schroeder signed an affidavit on February 22, 2002 which states: "I was not present at any lineup involving Boyd." (Deposition of Robert L. Schroeder, Oct. 21, 2014 ("Schroeder Dep.") (excerpts attached as **Exhibit W),** 59:9-15, Dep. Exhibit 11 (attached as **Exhibit X, ¶** 4.)

**Response:**     *Agreed.*

61.     Schroeder testified subsequently in a deposition that he has no reason to dispute the police reports indicating that he was present at the lineup and that it would be more appropriate for this affidavit to read that he does not recall being present for any lineup. (Schroeder Dep., Ex. W, 31 :1-32:1, 57:3-6, 59:9-60:11.)

24

**Response:**     *Agreed.*

62.     Schroeder also testified that, if the statement in the Lineup Report indicating that he was present at the lineup was untrue, that he would have brought that fact to court's attention during Boyd's criminal trial. (Schroeder Dep., Ex. W, 62:20-63:7.)

**Response:**     *Agreed that Schroeder made the statement in ¶62, but Schroeder's affidavit also states: "Until 2002, I did not know that an eyewitness to the shooting named Jennifer Bonanno had viewed a lineup that included Boyd..." (Affidavit of Robert Schroeder, Defendants' Ex. X.)  While Schroeder does testify in his deposition that "if [the lineup report] came to [his] attention back in 1990 and it had an untrue statement about [his] presence at the line-up that [he] would have brought it to Mr. Tate's and the Court's attention," Schroeder has no recollection of seeing this report in 1990.  (Schroeder Dep., Defendants' Ex. W, 62:1-10; 63:1-5.)  Additionally, if he had seen this report in 1990, he would have been aware that Jennifer Bonanno had viewed a lineup that included Lathierial Boyd, which Schroeder flatly denies. (Affidavit of Robert Schroeder, Defendants' Ex. X.)*

63.     After the lineup, the night of March 12, 1990, the detectives contacted the Felony Review Unit of the SAO and went to Northwestern, along with Assistant State's Attorney Jeff Ryan ("Ryan"). Ryan interviewed Ricky in the presence of nurse Suellen Grimshaw. (3/13/90 Supp. Report, Ex. Q, p. 4; Zuley Dep. 12/2/15, Ex. M, 140:14-23, 142:21-143:1; Deposition of Richard Zuley, Dec. 10, 2015 ("Zuley Dep. 12/10/15") (excerpts attached as **Exhibit Y)** 159:13-23.)

**Response:**     *Disputed.  Defendants do not support this assertion with any affidavits or testimony from ASA Ryan or Nurse Grimshaw.  Ricky could not talk.  (Jain Dep. 3/17/16,*

*Plaintiff's Ex. B, 170:20-22; 203:6-20; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24; Meyer*

*Dep., Plaintiff's Ex. D, 31:23-32:1; 88:14, 22-23; 91:23-92:5; 92:17-20.)*

64.     During that interview, Ryan and Zuley showed Ricky a photo array from the

lineup conducted that evening, and Ricky again identified Boyd both as "Rat," and as the

shooter. Ricky again described various cars that he believed Boyd drove. (3/13/90 Supp. Report,

Ex. Q, pp. 4-5; Zuley Dep. 12/10/15, Ex. Y, 159:13-23, 161 :8-20, 162:14-163:1.)

**Response:**     *Disputed. Defendants do not support this assertion with any affidavits or*

*testimony from ASA Ryan or Nurse Grimshaw. Ricky could not verbalize any words. (Jain Dep.*

*3/17/16, Plaintiff's Ex. B, 170:20-22; 203:13-20; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24;*

*Meyer Dep., Plaintiff's Ex. D, 31:23-32:1; 88:13-14; 91:23-92:5, 92:17-20.)*

65.     After interviewing Ricky on the evening of March 12, 1990, and reviewing the

results of the investigation, Ryan approved charges of First Degree Murder and Attempted

Murder. (3/13/90 Supp. Report, Ex. Q, p. 5.)

**Response:**     *Disputed. The Ryan police report was fabricated because it is*

*indisputable that Ricky could not talk and did not make the identification described in this*

*report. Neither Ryan nor Grimshaw testified at trial as to this identification and neither has*

*given an affidavit confirming the veracity of this police report. (Jain Dep. 3/17/16, Plaintiff's Ex.*

*B, 170:20-22; 203:13-20; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24; Meyer Dep., Plaintiff's*

*Ex. D, 31:23-32:1; 88:14; 91:23-92:5, 92:17-20.)*

66.     At Boyd's criminal trial, Ricky testified that a State's Attorney was present for an

interview of him at Northwestern when he told a police officer that Boyd shot him. (Ricky Tr.,

Ex. F, 187:2-13.)

**Response:**     *Agreed. Ricky testified to this at trial. Specifically, Ricky testified that Defendant Sobolewski and the State's Attorney were present when he said Plaintiff shot him. (Ricky Tr., Defendants' Ex. F, 186:11-187:3.) This completely contradicts the testimony of all Defendants, as no other witness testified that Sobolewski interviewed Ricky in the presence of any State's Attorney. Further, Defendant Sobolewski testified and reported that Ricky indicated in his interview that Ricky did not know who shot him. (Sobolewski Tr. II, Plaintiff's Ex. F, 15:13-16; 3/9/90 Supp. Report, Defendants' Ex. D, p. 2.) As stated above in the response to ¶65, the report is false for all of the above-described reasons.*

67.     In approximately April or May 1990, Zuley received a call from Northwestern stating that Ricky wanted to see him. (Supplementary Report, July 11, 1990 ("7/11/90 Supp. Report") (attached as **Exhibit Z),** pp. 1-2; Zuley Dep. 12/10/15, Ex. Y, 170:16-171:1.)

**Response:**     *Disputed. Defendant Zuley, in his deposition, testified, "There had been a call made to the -- to our office by somebody from the hospital saying that they had something that Ricky had given them to give to us, and I responded to that. I went out to the hospital." (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 164:11-15.) Defendant Zuley stated that two nurses gave him an envelope that had the Northwestern logo or address. (Zuley Dep. 12/10/15, Defendants' Ex. Y, 171:10-174:10.) Defendant Zuley admitted in his deposition that his report regarding his visit to Ricky does not indicate that he inventoried the envelope with the "Rat" note. (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 177:22-178:15.) The date of Defendant Zuley's report is July 11, 1990. The inventory slip states that the envelope and Rat note were supposedly recovered on May 6 of 1990, but the inventory slip is dated July 11, 1990. The envelope was never produced to the Plaintiff's defense prior to trial or at any of the post-conviction*

27

*proceedings. Defendant Zuley testified that he may have discarded the envelope at the hospital in May of 1990. (Zuley Dep. 12/10/15, Defendants' Ex. Y, 174:11-14; Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 176:4-6.) Zuley fabricated his reports and testimony regarding the alleged call from the hospital about the Rat note. Defendants have not produced any witness from Northwestern Hospital that claimed to have called Zuley about the note. Defendants have not produced any witness from Northwestern Hospital that claimed Ricky gave them a note to give to the police. Joey Kelly will testify that he observed Defendant Zuley take the Rat note, Godfather note and other items from his home when Defendant Zuley searched it on March 9, 1990. (Kelly Dep., Plaintiff's Ex. M, 219:19-221:13; Rat Note, Plaintiff's Ex. N.)*

68.     Zuley went to Northwestern and upon his arrival, hospital staff gave him an envelope containing a piece of paper with "Rat" written on it along with two pager numbers and various prices and amounts of cocaine. (7/11/90 Supp. Report, Ex. Z, p. 2; Zuley Dep. 12/10/15, Ex. Y, 171:6-14, 173:17-174:3, 180:18-23, 184:3-9.)

**Response:**     *Disputed. Ricky was searched at the time of the shooting and the note was not found after a thorough search. Ricky could not move to give the note to anyone. Hendricks denied she gave the paper to the police. (Hendricks Tr., Plaintiff's Ex. E, 299:8-10). Joey Kelly said he saw Defendant Zuley take the note during the search. Defendant Zuley learned Rat's real name when he conducted an illegal search of Joey Kelly's house and took the following items: 1. The "Rat" note (Kelly Dep., Plaintiff's Ex. M, 129:18-130:9); 2. a second note with the name "Godfather" (Id. at 128:4-7); 3. a picture of the Plaintiff next to a white Jaguar. (Id. at 117:3-14). Defendant Zuley never writes a report of the search of Joey Kelly's house, and he*

28

*denies ever going to Joey Kelly's house in his deposition. (Zuley Dep. 12/10/15 II, Plaintiff's Ex.
R, 187:9-20.)*

69.     Ricky indicated to Zuley that he had sold cocaine for Boyd and that the piece of
paper showed prices for various amounts of cocaine and numbers where Boyd could be reached.
(7/11/90 Supp. Report, Ex. Z, p. 2; Zuley Dep. 12/10/15, Ex. Y, 180:18-23.)

**Response:**     *Disputed. As stated above, Plaintiff will show the entire Exhibit 20 story
is fabricated. Defendant Zuley fabricated his reports and testimony regarding the alleged call
from the hospital about the Rat note.    Defendants have not produced any witness from
Northwestern Hospital that claimed to have called Defendant Zuley about the note.    Defendants
have not produced any witness from Northwestern Hospital that claimed Ricky gave them a note
to give to Defendant Zuley, any Defendant or the police.  Joey Kelly will testify that he observed
Defendant Zuley take the Rat note, the Godfather note and other items from his home when
Defendant Zuley searched it on the day of the line ups. (Kelly Dep., Plaintiff's Ex. M, 219:19-
221:13.)   In addition, Ricky testified that he gave Exhibit 20 to Detective Zuley.   (Ricky Tr.,
Defendants' Ex. F, 179:16-180:5) but this contradicts the story told by Zuley, that he received
Exhibit 20 from Northwestern Personnel.   (Zuley Tr., Plaintiff's Ex. K, 245:18-246:11.)   Ricky
also testified that he gave Exhibit 20 to Rat (Ricky Tr., Defendants' Ex. F, 180:6-8), showing his
testimony demonstrating the story is fabricated.*

70.     In his report of this interview with Ricky, Zuley noted Ricky "had been fitted with
a valve in his respirator which made it much easier for him to communicate." (7/11/90 Supp.
Report, Ex. Z, p. 2; Zuley Dep. 12/10/15, Ex. Y, 190:7-20.)

**Response:**     *Agreed that Defendant Zuley wrote that in his report.*

29

71.     Zuley inventoried the slip of paper on July 11, 1990. (Zuley Dep. 12/10/15, Ex. Y, 180:3-13; Zuley Dep. Exhibit 21 (attached as **Exhibit AA).**

**Response:**     *Agreed that he inventoried only the slip of paper and not the envelope. (7/11/90 Supp. Report, Defendants' Ex. Z, p. 1.)*

72.     Zuley has never been aware whether the pager numbers on Exhibit 20 were registered to Boyd. (Zuley Dep. 12/10/15, Ex. Y, 191 :23-192:1.)

**Response:**     *Agreed that Defendant Zuley testified to the information in ¶72, but disputed as to the veracity of his statement because Defendant Zuley admitted that the police could not confirm that the pager number on  Exhibit 20 was linked to Plaintiff.  (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 189:3-10.)*

73.     Ricky testified at Boyd's criminal trial that he saw Boyd write Exhibit 20, that Exhibit 20 contains Rat's beeper number and Rat's partner's beeper number along with amounts and prices for cocaine, that Boyd gave it to him with cocaine to sell, and that he gave Exhibit 20 to police officers investigating the shooting. (Ricky Tr., Ex. F, 177:13-18, 178:6-179:5, 179:16-180:1, 180:9-18, 181:19-182:16, 204:14-19.)

**Response:**     *Agreed that Ricky testified to the information in ¶73, but disputed because Ricky never gave Exhibit 20 to the police investigating the shooting.  Ricky did not have possession of the Rat note, only the Breezo note. (Illinois Masonic Medical Center Patient Belongings Checklist, February 24, 1990 (attached as **Plaintiff's Exhibit V)).  Ricky could not move his arms or hands to give Exhibit 20 to the police.  (Jain Dep. 3/17/16, Plaintiff's Ex. B, 170:20-22; 203:13-20; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296:22-24; Meyer Dep., Plaintiff's*

*Ex. D, 31:23-32:1; 88:13-14; 91:23-92:5; 92:17-20.) The beeper number on Exhibit 20 was never connected to Plaintiff. (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 189:3-10.)*

74.     Boyd admitted that he wrote Exhibit 20 and other similar slips of paper like it, and that it is possible he gave Exhibit 20 to Ricky when he gave him cocaine to sell. (Boyd Dep. 7 /22/15, Ex. P, 208:7-15, 209:8-11, 215:21-216: 19, 218:2-15.)

**Response:**     *Disputed. Plaintiff testified that the last time he saw Exhibit 20 would have been at Joey Kelly's house and that Ricky was not present. Plaintiff wrote the information, contained in Exhibit 20, on a memo pad for Joey Kelly. (Boyd Dep., 7/22/15 II, Plaintiff's Ex. J, 217:11 -219:1, 220:2-19.)*

75.     Ricky passed away on May 26, 1993 while still a patient at Oak Forest Hospital. (Zuley Dep. 12/2/15, Ex. M, 99:3-5.)

**Response.**     *Agreed.*

### Boyd's Trial and Conviction

76.     Boyd was tried in a bench trial before Judge Shelvin Singer, was convicted of murder, attempted murder, and aggravated battery, and was sentenced to 82 years in prison on December 10, 1990. *(People of the State of Illinois v. Lathierial Boyd, Case No. 90-8602, Report of Proceedings, October 2, 1990 (attached as* **Exhibit BB),** pp. 1-14; *People of the State of Illinois v. Lathierial Boyd, Case No. 90-8602, Report of Proceedings, October 24, 1990 (attached as* **Exhibit CC);** *People of the State of Illinois v. Lathierial Boyd, Case No. 90-8602, Report of Proceedings, December 10, 1990 (attached as* **Exhibit DD.)** Judge Singer's decision was largely predicated on Ricky's and Herbert's testimony. *(See id.) (PRDUF ¶ 11, 14, 15, 17, 18, 19, 20, 24, 32, 34, 36, 38, 39, 43, 50, 51, 52, 63, 64, 65, 67, 68, 69, 74, 76, 78, 79).*

**Response.** *Disputed. Judge Singer relied on corroboration of Ricky by Zuley as to identifications allegedly made by Ricky in the hospital. This reliance shows that Defendants' pretrial fabrication of evidence caused Plaintiff to be found guilty by Judge Singer.*

### Boyd's Subsequent Attempts to Vacate His Conviction

77.     Boyd filed a Petition for Post-Conviction Relief on August 3, 1993 arguing, among other things, that Tate's failure to investigate and introduce evidence that no license plate containing "RAT" was registered to Boyd, failure to investigate and introduce evidence that the pager numbers on Exhibit 20 were not registered to Boyd, failure to otherwise investigate Exhibit 20 and introduce evidence that would have questioned its origin, and failure to impeach Ricky and Herbert at trial concerning their testimony about what car Boyd was driving amounted to ineffective assistance of counsel. *(People of the State of Illinois v. Lathierial Boyd,* Case No. 90 CR 8602, Petition for Post-Conviction Relief, Aug. 3, 1993 (attached as **Exhibit EE),** pp. 8-18.) Boyd's Petition was denied, and that decision was confirmed on appeal. *(People of the State of Illinois v. Lathierial Boyd,* Case No. 90 CR 8602, Summary Order, Jan. 31, 1996 (attached as **Exhibit FF).**

**Response.** *Agreed that the Summary Order, Jan. 31, 1996 (Defendants' Ex. FF) rejected Plaintiff's ineffective assistance of counsel argument.*

78.     Boyd filed a Successor Petition for Post-Conviction Relief on March 6, 2002 arguing that evidence of Bonanno's description of the shooter and statements she allegedly made to Defendants during the lineup were suppressed in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). *(People of the State of Illinois v. Lathierial Boyd,* Case No. 90 CR 8602, Successor Petition for Post-Conviction Relief, March 6, 2002 (attached as **Exhibit GG),** pp. 15-19.) The court denied Boyd's Successor Petition for Post-Conviction Relief on September 15, 2004 holding that Defendants' account of the lineup procedure was most credible and that Boyd had not established a *Brady* violation. *(People of the State of Illinois v. Lathierial Boyd,* Case No. 90

CR 8602, Memorandum of Opinion and Order (attached as **Exhibit HH**), pp. 3-4.) That decision was affirmed on appeal. *(People of the State of Illinois v. Lathierial Boyd,* Case No. 90 CR 8602, Order, May 12, 2006 (attached as **Exhibit II**)).

    ***Response.*** *The Court Order denying the Successive Petition for Post-Conviction Relief referred to the corroboration of Ricky's identification because of Plaintiff's alleged threats to the victim's family about money owed to Plaintiff by Ricky. The court found that even if Bonanno's testimony was credible, there was not a reasonable probability of a different finding because of the corroboration of Plaintiff's alleged connection to Ricky. (People of the State of Illinois v. Lathierial Boyd, Case No. 90 CR 8602, Memorandum of Opinion and Order, Defendants' Ex. HH, p. 4.) Plaintiff's alleged connection to Ricky prior to the shooting is disputed. Plaintiff testified that he never threatened Ricky about anything. (Boyd Dep. 7/22/15 II, Plaintiff's Ex. J, 147:3-9.) The Rat note was never given to the Defendants by Ricky but was taken during the illegal search of Joey Kelly's house. (PRDUF ¶ 67-69.) Defendant Zuley never writes a report of the search of Joey Kelly's house and he denies ever going to Joey Kelly's house in his deposition. (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 187:9-20.)*

**Conviction Integrity Unit Investigation**

    79.    The Conviction Integrity Unit of the Cook County State's Attorney's Office began reviewing Boyd's case in 2012 and did not uncover any new evidence in the course of its investigation. (Deposition of Shelley Keane, Dec. 15, 2015 ("Keane Dep.") (excerpts attached as **Exhibit JJ**) 82:8-83:6, 90:8-93:4, 101:2-7, 110:13-18, 126:16-127:4, 138:22-140:7.)

    **Response.**    *Disputed. Shelley Keane, in her deposition, admitted that there was new evidence that she obtained from Defendant Thezan in her interview of him. Specifically,*

*Defendant Thezan told Ms. Keane that Ricky had signed a photo array, and that was inconsistent with what she knew to be Ricky's condition. Keane also admitted that no witness had ever made this statement before in any of the witnesses' prior interviews. (Keane Dep. II, Plaintiff's Ex. I, 143:2-14.)*

80.    On September 10, 2013, Cook County State's Attorney Anita Alvarez moved to vacate Plaintiff's conviction and dismissed the charges against him. (TAC ¶ 88; *People of the State of Illinois v. Lathierial Boyd,* Case No. 90-CR-8602, Petition for Relief From Judgment, Sept. 10, 2013 (attached as **Exhibit KK).** Boyd filed a Petition for a Certificate of Innocence on September 13, 2013. (TAC ¶ 90.) The State did not object to the Petition, and it was granted on September 25, 2013. *(Id.)*

**Response.**    *Agreed.*

## PLAINTIFF'S UNDISPUTED MATERIAL FACTS

**MOTIVE FOR THE CRIME**

1.  Defendant Schorsch testified that prior to his becoming a detective in 1988, 2 years prior to this shooting, he worked with narcotics in the Wrigleyville area, and there were a lot of different gang factions in the area that sold drugs. Schorsch testified that in the specific location around the Exedus, the Jamaican Posse was present along with the Traveling Vice Lords who controlled the area. The Gangster Disciples, the African Rastafarians, and the Latin Eagles were also present in that area. No follow-up was done to determine if the shooting was done by a particular gang. (Deposition of Steve Schorsch, February 25, 2015 ("Schorsch Dep. II") (excerpts attached as **Plaintiff's Exhibit W**), 44:8-22; 45:1-3, 19-22.)

2. Ricky's pockets were searched by Detective Kowalski at Illinois Masonic Hospital and the Breezo note was recovered but not the Rat note. Breezo was identified as Stanley Morgan, a Vice Lord. (General Progress Report authored by Sikorski and Kowalski, February 24, 1990 ("2/24/90 GPR by Sikorski and Kowalski") (attached as **Plaintiff's Exhibit X**), #6; Property Inventory Slip No. 733941, February 24, 1990 ("Breezo Inventory Slip") (attached as **Plaintiff's Exhibit Y**); General Progress Report authored by T. Johnson and Schorsch, February 24, 1990 ("2/24/90 GPR by T. Johnson and Schorsch") (attached as **Plaintiff's Exhibit Z**), #6; Scene Report, Defendants' Ex. A, p. 7; 3/7/90 GPR, Defendants' Ex. B.)

3. Ricky had a 5-pointed star, which was identified as a "possible symbol of the 4-Corner Hustlers." (Scene Report, Defendants' Ex. A, p. 2.) The 4-Corner Hustlers was not one of the gangs present in the Wrigleyville area as identified by Defendant Schorsch. (Schorsch Dep. II, Plaintiff's Ex. W, 44:8-22; 45:1-3, 19-22.)

4. "Per Det. Sikorski the wife of Luther THOMAS called about the well being of her husband Mrs. THOMAS related that her husband is the owner of the Boogaloo Tavern at Cornelia & Clark St. and he did not return home last night. He allegedly was chased by a group of Jamaicans at the time of the incident." (2/24/90 GPR by T. Johnson and Schorsch, Plaintiff's Ex. Z, #5; 2/24/90 GPR by Sikorski and Kowalski, Plaintiff's Ex. X, #5.) No follow-up interview was conducted with Luther Thomas about the group of Jamaicans that allegedly chased him at the time of the incident.

5. Defendant Johnson agreed that the Jamaican Shower Posse were quite notorious between 1987 and 1992. (Deposition of Wayne Johnson, October 27, 2015 ("Johnson Dep.") (excerpts attached as **Plaintiff's Exhibit AA**), 50:6-12.)

6. Defendant Schorsch contacted the Organized Crime Division Narcotics Section on February 26 and requested that they compile a list of narcotic dealers and offenders from the area of the incident and send same to Area 6 Violent Crimes office as soon as possible. The names of the victims were also submitted for profiles. (Schorsch Dep. II, Plaintiff's Ex. W, 50:16-23.)

7. Defendant Schorsch testified "we were looking for we believe it to be either a gang-related or narcotic-related shooting, and if they could help us out in any way, show us any kind of names specifically from that area, no matter what gang it was or anything else like that, just if they had anything at all to send us to the area." (*Id.* at 51:18-24.)

8. Defendant Schorsch testified that he never saw a specific list and he never followed up with the Narcotics and Gang Organized Crime Section despite the fact that there were a lot of narcotics dealers in the area. Defendant Schorsch told the Unit that he suspected that the murder involved a transaction of marijuana or cocaine. (*Id.* at 53:2-5; 54:7-18; 59:5-10.)

9. The shooter's weapon was described as a Tec-9 by one of the eyewitnesses after reviewing a page of photos of like weapons. (Scene Report, Defendants' Ex. A, p. 8.)

10. At the scene, 9mm PMC Luger casings were found. No such gun was ever linked to the Plaintiff. (Scene Report, Defendants' Ex. A, p. 4.) Plaintiff was only linked to a .380

pistol, which was not connected to the shooting. (*Id.*; Zuley Dep. 12/2/15, Defendants' Ex. P, 114:19-24; 115:1-8; Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 197:21-23.)

11. Charisse Parker ("Charisse"), Michael Fleming's girlfriend, was interviewed by the police. She stated that, on the evening of the shooting, Ricky and Michael Fleming had been watching television and observed a large crowd at Wrigley Field. They had been selling narcotics in the area, particularly near the Wild Hare Tavern, for some time. (Supplemental Report, 2/24/1990 ("2/24/90 Supp. Report") (attached as **Plaintiff's Exhibit BB**), pp. 2-3.)

12. Charisse also stated, "the manager of the White Hare tavern had told Michael not to hang around. She surmised that he knew what Michael and Ricky were doing." (*Id.* at p. 3.)

13. Charisse reported Michael and Ricky left on the elevated train at 10 p.m. Charisse did not report that Michael or Ricky had planned to go to Wrigleyville that night before watching television. (*Id.*)

14. Charisse said they would approach people around the tavern and sell marijuana and cocaine. They were small dealers just trying to make a little money. (*Id.*)

15. Charisse reported to the police that Michael told her that "he had a problem with three (3) black guys to whom he had sold some fake cocaine, and that he had some altercation with some white guys for the same reason." Charisse, on the evening of the shooting, "observed both Ricky and Michael take some marijuana in a plastic bag, and also when they both were crushing some white pills into a powder, which resembled cocaine." (*Id.*) Defendants never pursued the information provided by Charisse that the shooting of

Michael and Ricky was motivated by the fact that they had been selling fake cocaine in the Wrigleyville area.

16. Witnesses told police that Ricky and Michael had approached them on the night of the shooting and asked the witnesses "to buy some 'buds.'" (Scene Report, Defendants' Ex. A, p. 8.)

17. Defendant Zuley admitted that he never asked Ricky about selling fake cocaine in the Wrigleyville area. (Zuley Dep. 12/2/15, Defendants' Ex. M, 100:1-7.) Ricky was shot after Michael Fleming. Fleming appeared to be the target of the shooter. (Scene Report, Defendants' Ex. A, p. 4.)

18. Plaintiff had no known gang affiliations. (Deposition of Richard Zuley, December 2, 2015 ("Zuley Dep.12/2/15 II") (excerpts attached as **Plaintiff's Exhibit CC**), 63:6-9; Thezan Dep. II, Plaintiff's Ex. G, 80:6-10.)

**EYEWITNESS DESCRIPTION OF SHOOTER AND HIS CAR:**

19. The description of the shooter provided by the witnesses given to Detectives Kowalski and Sikorski at the scene did not match Plaintiff. The shooter was described as being in his mid-to-late 20's. (Scene Report, Defendants' Ex. A, p. 2.) The shooter's height was described as 5'8"-5'10". (*People of the State of Illinois v. Lathierial Boyd,* Case No. 90-8602, Report of Proceedings, January 12, 2004 ("Bonanno Hearing") (excerpts attached as **Plaintiff's Exhibit DD**), 24:20-25:7.) The shooter was described as weighing 170-190 pounds. (Scene Report, Defendants' Ex. A, p. 2.) The shooter was described as having a flat nose with a moustache. (*Id.*) The shooter was described as having a "very prominent

38

square chin that was very large." (Affidavit of Jennifer Bonanno, February 28, 2002 ("Bonanno Aff.") (attached as **Plaintiff's Exhibit EE**), ¶5; Deposition of Jennifer Bonanno, February 3, 2003 ("Bonanno Dep.") (excerpts attached as **Plaintiff's Exhibit FF**), 45:18-20; Bonanno Hearing, Plaintiff's Ex. DD, 25:4-5.) The shooter's complexion was described as "midnight black" with a "very very dark" complexion. (Bonanno Aff., Plaintiff's Ex. EE, ¶5; Bonanno Dep, Plaintiff's Ex. FF, 45:18-20; Bonanno Hearing, Plaintiff's Ex. DD, 24:23.) Plaintiff was 24 years old at the time of the shooting. (Lineup Report, Defendants' Ex. V, p. 2.) Plaintiff was 6'2". (3/13/90 Supp. Report, Defendants' Ex. Q, p. 1.) Plaintiff weighed 220 pounds. (Arrest Report, March 12, 1990 ("Arrest Report") (attached as **Plaintiff's Exhibit GG**)). Plaintiff's nose was not flat and he did not have a moustache. (Schorsch Dep. II, Plaintiff's Ex. W, 62:23-63:18; Plaintiff's Mugshot (attached as **Plaintiff's Exhibit HH.**) Plaintiff did not have a large, prominent chin. (*Id.*) Plaintiff has a light complexion (*Id.*)

20. Bonanno stated in a WGN interview that the shooter looked like a mugshot of Yuri Smith, a Jamaican gang member. (WGN News Investigates "Reasonable Doubt," February 2, 2006 (attached as **Plaintiff's Exhibit II**), pp. 3-4.)

21. Shooter's car was described as "possible — brown, maroon or copper colored late model, possibly a Grand AM or Riviera." (Scene Report, Defendants' Ex. A, p. 4.) Plaintiff was never linked to a brown, maroon, or copper colored late model Grand AM or Riviera.

**RICKY'S PRE-TRIAL IDENTIFICATION OF PLAINTIFF WAS FABRICATED:**

22. Plaintiff was tried in a bench trial. Judge Singer found him guilty based upon Ricky's in-court identification of him which Judge Singer believed was corroborated by Ricky's two pre-trial photo identifications and the testimony of Herbert Warner as to threats allegedly made by Plaintiff to Herbert. (Report of Proceedings, October 24, 1990, Defendants' Ex. CC, 10:6-16.) Judge Singer's opinion was affirmed on appeal. (Summary Order, Jan. 31, 1996, Defendants' Ex. FF.)

23. ASA Shelley Keane ("Keane") of the Conviction Integrity Unit of the Cook County State's Attorney's Office, admitted in her deposition that she uncovered new evidence in her interview of Defendant Thezan about Ricky's photo array identification. Specifically, Defendant Thezan told Keane that Ricky had **signed** a photo array. Ms. Keane knew that this was impossible because Ricky was a quadriplegic who could not move his arms or his hands. (Keane Dep. II, Plaintiff's Ex. I, 143:2-14)

24. ASA Keane attempted to interview Defendant Zuley about his investigation but despite her repeated attempts to interview him, Defendant Zuley did not want to speak with her. (*Id.* at 123:13-124:1.)

25. The trial court relied on the fabricated hospital photo identification of Plaintiff to corroborate the in-court identification of Plaintiff by Ricky. (Report of Proceedings, October 24, 1990, Defendants' Ex. CC, 8:3-7.) Defendant Zuley admitted at Plaintiff's trial that, during the photo array, he told Ricky to pick out "Rat". (Zuley Tr., Plaintiff's Ex. K, 260:24.)

40

26. The supplementary report of March 9, 1990 (3/9/90 Supp. Report, Defendants' Ex. D) and the pre-trial testimony of Defendant Sobolewski (Sobolewski Tr., Defendants' Ex. G; Sobolewski Tr. II, Plaintiff's Ex. F) are fabricated because Ricky Warner was not able to speak as of March 9, 1990, and he never made the statements attributed to him in the March 9 supplementary report by Defendant Sobolewski at the trial. (3/9/90 Supp. Report, Defendants' Ex. D; Jain Dep. 3/17/16, Plaintiff's Ex. B, 170:17-22; Jain Dep. 4/4/16, Plaintiff's Ex. C, 296: 6-24; Meyer Dep., Plaintiff's Ex. D, 31:20-24; 32:1-18; 42:2-20, 88:13-14.)

27. In early March of 1990, Ricky had altered mentation, meaning he was not able to think clearly and his memory was impaired. (Meyer Dep, Plaintiff's Ex. D, 43:21-44:1; 46:11-13.) Ricky's sensorium was altered and his cognitive ability was compromised. (Jain Dep. 3/17/16, Plaintiff's Ex. B, 130:18-131:11; 134:1-12.)

28. On March 11, 1990, immediately before the alleged interview by Defendants Zuley and Murray that established probable cause for Plaintiff's arrest, Ricky became disconnected from the ventilator and lost consciousness for a period of time. According to Paul R. Meyer, M.D. ("Dr. Meyer"), Ricky's treating physician as Northwestern, Ricky had a "significant alteration in his mentation at this particular episode" which further impaired his thought process and memory according to Dr. Meyer. (Meyer Dep., Plaintiff's Ex. D, 73:22-24.)

41

29. Defendants knew from their police reports that Dr. Paul Meyer was Ricky's treating physician but they never contacted Dr. Meyer. (3/4/90 Supp. Report, Defendants' Ex. C, p. 1.)

30. Defendants Zuley, Murray and Thezan's testimony about taking Ricky off the ventilator and covering the trach opening in his throat so he could speak is demonstrably false because Ricky could not be taken off a ventilator for even a short period of time without losing consciousness. (Jain Dep. 4/4/16, Plaintiff's Ex. C, 271:16-24.) Ricky's blood gases were "dangerously low, indicating that he is hypoxic." (*Id.* at 276:16-18.)

31. As of his interview on 3/11/90, Defendant Murray claims that Ricky was "weaned off" of the ventilator. (Murray Dep. II, Plaintiff's Ex. H, 56:15-17.) Ricky was never removed from the ventilator before his death.

32. Ricky's seriously-impaired memory was demonstrated at trial when he testified that he had never told any investigator after he was shot that he did not know who shot him. (Ricky Tr., Defendants' Exhibit F, 187:7-188:2.)

**CONTRADICTIONS IN REPORTS THAT SHOW FABRICATION:**

Without waiving the argument that Ricky could not speak, Plaintiff cites the following contradictions in the police reports that also demonstrate the fabrication of Ricky's identification of Plaintiff:

33. Defendants Thezan and Sobolewski interviewed Ricky on 3/7/90 and produced contradictory reports. Defendant Sobolewski documented that Ricky told them that he did not know who shot him; then, when asked again who shot him, Ricky said it might have

42

been the Godfather. (3/9/90 Supp. Report, Defendants' Ex. D, p. 2.) Despite Defendant Sobolewski's version of what Ricky communicated, Defendant Thezan documented in his General Progress Note ("GPR") that Ricky told them that "Rat" shot him because he owed "Rat" for an ounce of dope.  (3/7/90 GPR, Defendants' Ex. B.) At his deposition, Defendant Thezan testified that Sobolewski must have made a mistake in his report because Ricky told them who shot him.  (Thezan Dep. II, Plaintiff's Ex. G, 74:4-16.) Defendant Thezan claimed that his second interview of Ricky was on March 13, even though the report was dated March 12, and that he had made another mistake.  (*Id.* at 178:10-179:5.)

34. Ricky, according to both Defendants Thezan and Sobolewski, said Rat lived in Villa Park and drove a black corvette.  (3/7/90 GPR, Defendants' Ex. B.) On 3/8/90, Defendants Thezan and Sobolewski confirmed that the Maywood police did not know Rat.  They also sent a message to the Secretary of State for a list of Rat license plates. (General Progress Report, March 8, 1990, Defendants' Ex. J.) No license plate  was linked to Rat.  (3/9/90 Supp. Report, Defendants' Ex. D, p. 2; General Progress Report authored by Villardita and Johnson, March 8,  1990 ("3/8/90 GPR by Villardita/Johnson") (attached as **Plaintiff's Exhibit JJ**)). Plaintiff did not live in Villa Park or drive a black Corvette. (*Id.*; 3/9/90 Supp. Report, Defendants' Ex. D, p. 2.)

35. Defendants Thezan and Sobolewski interviewed Herbert Warner on 3/7/90 and created two different version of the same interview. Only Defendant Thezan's GPR states the following: 1. that Breezo did not shoot him; 2. that Rat visited Herbert's house with two

43

younger black males; 3. that Ricky owed Rat an unspecified amount of money; 4. that James Fleming was uncooperative; 5. that Rat hung out with Kerry Kelly who lived across the street; 6. that James Fleming was Ricky's brother. (3/7/90 GPR, Defendants' Ex. B.)

36. Only Defendant Sobolewski's report states the following: 1. that Ricky owed Rat exactly $750. 2. That the threat had been made one year or seven months ago; 3. That Herbert told Rat that he knew nothing about the debt and he wasn't going to give him anything. 4. That Rat was driving a white Jaguar with a license plate containing "RAT" and other numbers that he couldn't recall. 5. That the victim's mother wouldn't speak to the detectives. 6. That James Fleming is Ricky's half-brother. (3/9/90 Supp. Report, Defendants' Ex. D, p. 2.)

37. At the time Defendant Sobolewski wrote up his report on 3/9/90, both Defendant Thezan and he already knew that there was no "Rat" license plate. (3/9/90 Supp. Report, Defendants' Ex. D, p. 2; 3/8/90 GPR by Villardita/Johnson, Plaintiff's Ex. JJ.) Plaintiff did not own or have access to a white Jaguar at the time he allegedly threatened Herbert Warner. (Boyd Dep. 9/14/15 II, Plaintiff's Ex. L, 261:11-16.)

38. Defendant Zuley denied being the lead detective in the Fleming/Warner case. (Zuley Dep. 12/2/15 II, Plaintiff's Ex. CC, 42:11-15.) However, his partner, Defendant Murray, said that Defendant Zuley was the lead detective and that this was his case. (Murray Dep. II; Plaintiff's Ex. H, 36:22-24.)

39. Defendant Zuley claimed he obtained the name Rat after "3 maybe 4 interviews of Ricky Warner" (Zuley Dep. 12/2/15 II, Plaintiff's Ex. CC, 44:9-10.) But Defendant Zuley only produced two reports of the Ricky interviews. (3/12/90 Supp. Report, Defendants' Ex. I; 3/11/90 GPR, Defendants' Ex. O.)

40. Defendant Zuley claims that Herbert told him about the Rat license plate even though it is documented in Defendant Sobolewski's report that he and Defendant Thezan had learned of the Rat license plate from Herbert. (Zuley Dep. 12/2/15, Defendants' Ex. M, 101:21-102:3; 3/9/90 Supp. Report, Defendants' Ex. D, p. 2.)     At the time Defendant Sobolewski wrote up his report on 3/9/90, both Defendant Thezan and he already knew that there was no "Rat" license plate. (3/9/90 Supp. Report, Defendants' Ex. D, p. 2; 3/8/90 GPR by Villardita/Johnson, Plaintiff's Ex. JJ.)

41. Defendant Murray testified that Zuley visited Ricky independently of him prior to March 11 but Zuley prepared no report of that interview. (Murray Dep. II, Plaintiff's Ex. H. 54:18-24.) Defendant Zuley had visited Ricky independently prior to March 11 and allegedly obtained an identification from Ricky of Rat as his shooter.  (*Id.* at 54:10-24.) Defendant Murray admitted there was no report of Defendant Zuley's visit. (*Id.* at 53:14-54:8; 3/12/90 Supp. Report, Defendants' Ex. I, p. 2.)

42. Defendant Zuley prepared his own report of the March 11 interview of Ricky, wherein he claimed that Ricky had positively identified the Plaintiff as his shooter.  Defendant Zuley stated in his report. "We got Boyd identified positively by Ricky Warner as the shooter in this case. Herbert Warner Sr. also identified Boyd as the person who threatened the

family over money owed." (3/11/90 GPR, Defendants' Ex. O.) Defendants Zuley and Murray subsequently obtained an I.R. photograph of Plaintiff (a mugshot maintained in CPD records), returned to Northwestern and re-interviewed Ricky with the assistance of nurse Anna Weissman. (Zuley Dep. 12/2/15, Defendants' Ex. M, 62:9-21; Murray Dep. II, Plaintiff's Ex. H, 68:11-14; 3/12/90 Supp. Report, Defendants' Ex. I, p. 2.)

43. Defendant Zuley testified that he was incorrect when he testified at trial that he had visited Ricky on March 7th or 8th. (Zuley Tr., Plaintiff's Ex. K, 233:5-234:1; Zuley Dep.12/2/15 II, Plaintiff's Ex. CC, 44:16-45:7.) Defendant Zuley denied that he was the person who obtained the nickname Rat from Ricky after it had been obtained by Defendant Sobolewski and Defendant Thezan. (*Id.* at 45:20-46:2.) This directly contradicts Defendant Zuley's trial testimony that he obtained the name Rat. (Zuley Tr., Plaintiff's Ex. K, 261:18-23.) Defendant Zuley testified at his deposition that when he reviewed the second page of their report, he had "misput it into my report."(Zuley Dep.12/2/15 II, Plaintiff's Ex. CC, 46:9-13.)

44. Defendant Zuley claimed in his deposition that he kept the name James Fleming confidential after Fleming allegedly linked the nickname Rat as to Plaintiff. (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 167:9-14.) Defendant Zuley admitted that James Fleming's name was never mentioned in either version of Zuley's police reports (3/11/90 GPR, Defendants' Ex. O; 3/12/90 Supp. Report, Defendants' Ex. I, p. 2) even though Defendant Zuley claims that it was Fleming who identified Plaintiff as Rat. Defendant Zuley claims that when his report stated "in continuing this investigation, the R/D's

46

attempted to identify Rat who was named as the offender by Ricky Warner. As a result of the R/D's efforts, one Lathierial Boyd was identified as Rat." (3/12/90 Supp. Report, Defendants' Ex. I, p. 2.) Defendant Zuley's testimony directly contradicts the report of Defendants Thezan and Sobolewski that Fleming was uncooperative. (Zuley Dep. 12/2/15 II, Plaintiff's Ex. CC, 59:20-60:2; 3/7/90 GPR, Defendants' Ex. B.)

45. Defendants obtained the name of Lathierial Boyd when they illegally searched Joey Kelly's house on March 9, 1990. Defendant Zuley searched through the desk and took a picture of a white Jaguar with Plaintiff standing next to it. Defendant Zuley fabricated the white Jaguar story that was attributed to Herbert Warner. (3/9/90 Supp. Report, Defendants' Ex. D, p. 2.) Defendant Zuley also took the Federal Express memo pad / paper with the names of two people and two beeper numbers on it. (Kelly Aff. 8/4/16, Plaintiff's Ex. P; Kelly Aff. 5/18/00, Plaintiff's Ex. O, pp. 1-2; Kelly Dep., Plaintiff's Ex.. M, 219:19-220:11; Photograph of Lathierial Boyd next to a white Jaguar, Plaintiff's Ex. Q.) Defendant Zuley never wrote a report of the search of Joey Kelly's house and he denies ever going to Joey Kelly's house in his deposition. (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 187:9-20.)

46. Eyewitnesses Jennifer Bonanno and Glenn Diamond specifically advised Defendants that Plaintiff was not the shooter, but Defendants concealed that information. (Bonanno Aff., Plaintiff's Ex. EE, ¶11; Bonanno Dep., Plaintiff's Ex. FF, 80:24-82:18; Affidavit of Glenn Diamond, September 15, 2015 ("Diamond Aff.") (attached as **Plaintiff's Exhibit KK**), ¶17; Diamond Dep., Plaintiff's Ex. T, 85:15-86:11; 88:2-14.)

47. Although Judge Singer denied Plaintiff's Motion To Suppress the identification of Plaintiff by Herbert Warner as a person that threatened him prior to the trial, Judge Singer held that there "is really very little to connect [Plaintiff] to the shooting at this juncture in the case." (*People of the State of Illinois v. Lathierial Boyd*, Case. No. 90 CR 8602, Report of Proceedings, August 2, 1990 (excerpts attached as **Plaintiff's Exhibit LL**), 44: 1-2.)

48. In finding Plaintiff guilty, the trial court relied on the alleged pre-trial identifications made by Ricky while in the hospital in March, 1990 as testified to by Ricky and Defendant Zuley - the trial court specifically found Defendant Zuley corroborated Ricky's identification. Defendant Zuley (misidentified as "Detective Siley" in transcript) told of Ricky being shown a number of photographs and Ricky selected the defendant, photograph of the defendant, as the shooter. Defendant Zuley then described a second photograph identification a week or so later, and once again Ricky identified Plaintiff as the shooter. (Report of Proceedings, October 24, 1990, Defendants' Ex. CC, 4:13-5:4; 8:3-18; 10:7-16.)

49. Plaintiff testified at his deposition that "nothing made me go to the Warner home. I was on my way to see my cousin Kerry Kelly, at his place. And you have to drive down 17th Avenue in Maywood to get there and out of nowhere, I just said, you know, stop, see if he's home, see what's going on. Maybe he's worked things out. Maybe there's some business out here. Maybe -- who knows?" (Boyd Dep. 7/22/15 II, Plaintiff's Ex. J, 175:16-23.)

50. In his deposition, Defendant Zuley describes a visit to Herbert Warner on March 11 with Defendant Murray and that he showed a photo assortment including a photo of Plaintiff to Herbert Warner who identified him as Rat, the person who had threatened his family on two occasions. (Zuley Dep. 12/2/15, Defendants' Ex. M, 84:11-14; 100:19-101:11; 101:21-102:15; Zuley Dep. 12/2/15 II, Plaintiff's Ex. CC, 96:1-97:1; Murray Dep. II, Plaintiff's Ex. H, 70:22-77:18.)

51. Defendant Zuley prepared the reports and signed Defendant Murray's name (Murray Dep. II, Plaintiff's Ex. H, 36:20-21; 53:1-6.)

52. Defendant Zuley claims to have made a social visit to Ricky sometime between March and mid-April. There is no report of his visit. (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 163:21-164:3.)

## LINE-UP IDENTIFICATIONS

53. The original police report of the eyewitnesses to the shooting did not document that any of these eyewitnesses were intoxicated. (Scene Report, Defendants' Ex. A, pp. 1-5; Schorsch Dep. II, Plaintiff's Ex. W, 64:16-19.) Defendant Schorsch testified in his deposition that he remembered the women specifically telling him "We were pretty drunk. I don't think I can make an identification." (*Id.* at 101:11-12.) Defendant Schorsch did not write a report about this conversation but Defendant Zuley, who was not present for the conversation, did write such a report. (3/13/90 Supp. Report, Defendants' Ex. Q, p. 4.) Defendant Zuley's report specifically identified Jennifer Bonanno and Tishyra

Ward as stating that they had been drinking and didn't know if they could make any identification. (*Id.*)

54. Defendant Zuley's report of the line-up did not reflect that Bonanno and Diamond had advised the Defendant Officers that Plaintiff was not the shooter. (3/13/90 Supp. Report, Defendants' Ex. Q, p. 4.) Bonnano advised the Defendant Officers at the line up that Plaintiff was not the shooter even after the Defendant Officer pointed to Plaintiff as the line-up participant the Defendant Officer wanted her to pick. (Bonanno Dep., Plaintiff's Ex. FF, 79:18-82:23.)

55. Diamond advised the Defendant Officers at the line up that Plaintiff was not the shooter even after the Defendant Officer gestured to where Plaintiff was standing in the line-up. Instead, Diamond told Defendant Officers that if he had to identify one of the line-up participants as the shooter, it would be Participant #3, who, at 5'11" and 150 lbs., did not resemble Plaintiff. (Diamond Dep., Plaintiff's Ex. T, 81:4-12; 82:9-16; 85:2-86:3; Lineup Report, Defendants' Ex. V, p. 2.)

## FABRICATED STORY SURROUNDING RAT NOTE

56. Defendant Zuley took a post-it note that said "Rat" with phone numbers on it and a post-it note that said "Godfather" on it when he searched the home of Joey Kelly on March 9, 1990. (Kelly Dep., Plaintiff's Ex. M, 216:19-217:12; 219:15-220:14; Kelly Aff. 5/18/00, Plaintiff's Ex. O, pp. 2-3.) Defendant Zuley never writes a report of the search of Joey Kelly's house and he denies ever going to Joey Kelly's house in his deposition. (Zuley Dep. 12/10/15 II, Plaintiff's Ex. R, 187:9-20.)

57. Defendant Zuley's supplementary report (7/11/90 Supp. Report, Defendants' Ex. Z) reflecting that he was given the "Rat note" by Northwestern Hospital personnel is false. Nurse Cynthia Hendricks testified that she was given a piece of paper (Trial Exhibit 20, the Rat note) to give to the police but that she did not give the piece of paper to the police. (Hendricks Tr., Plaintiff's Ex. E, 298:19-22; 299:8-10.)

58. Even if Assistant State's Attorney Ryan did approve charges against the Plaintiff, Ryan was not told that Bonanno and Diamond had specifically stated Plaintiff was not the shooter at the line ups, because the police concealed that information. (Bonanno Aff., Plaintiff's Ex. EE, ¶11; Bonanno Dep., Plaintiff's Ex. FF, 80:24-82:18; Diamond Aff., Plaintiff's Ex. KK, ¶17; Diamond Dep., Plaintiff's Ex. T, 85:15-86:11; 88:2-14; Zuley Dep. 12/2/15 II, Plaintiff's Ex. CC, 119:16-122:5.)

**RICKY WARNER DENIED PLAINTIFF SHOT HIM SHORTLY BEFORE HE DIED**

59. Ricky told Joey Kelly shortly before his death that he had been strongly pressured by the police to identify Plaintiff as the person that shot him. Ricky made it clear he did not know who shot him. (Kelly Dep., Plaintiff's Ex. M, 218:13-219:10.)

**PLAINTIFF WAS NOT CHARGED WITH ANY CRIME WHEN RICKY DIED**

60. Plaintiff was not charged with Ricky's death on May 26, 1993. (Supplementary Report, May 29, 1993 (attached as **Plaintiff's Exhibit MM**)). Defendant Johnson was assigned to approach felony review ASA Brian Suth to determine if there was going to be a second murder charge against Plaintiff. The cause of death was labeled "ventilatory failure." (Supplementary Report, August 27, 1993 (attached as **Plaintiff's Exhibit NN**), p. 2.) He

51

was informed that the process would take some time. On 8/25/93, Area 3 Violent Crimes

was contacted by ASA Gary Howard, Chief of Felony Review, who informed Sergeant

Keane that "no further charges would be placed and a bar to prosecution was ordered."

(Johnson Dep., Plaintiff's Ex. AA, 59:6-11.)

Respectfully submitted,

Lathierial Boyd

/s/ Kathleen T. Zellner
Kathleen T. Zellner (Attorney No. 6184574)
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois 60515
Ph: (630) 955-1212
Email: kathleen.zellner@gmail.com