# PLAINTIFF'S EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LATHIERIAL BOYD,                          )
          Plaintiff,                      )
     vs.                                  ) Case No. 13 C 7152
CITY OF CHICAGO; CHICAGO                  )
POLICE OFFICER RICHARD                    )
ZULEY, Star No. 15185;                    )
CHICAGO POLICE OFFICER                    )
LAWRENCE THEZAN, Star                     )
No. 9419; CHICAGO POLICE                  )
OFFICER STEVE SCHORSCH,                   )
Star No. 8955; CHICAGO                    )
POLICE OFFICER JOHN                       )
MURRAY, Star No. 3175;                    )
CHICAGO POLICE OFFICER                    )
WAYNE JOHNSON, Star No.                   )
4266; AND RAY KAMINSKI,                   )
as special                                )
representative of the                     )
Estate of former Chicago                  )
police officer ANDREW                     )
SOBOLEWSKI,                               )
          Defendants.                     )

          The video deposition of MANU JAIN, M.D.,
called for examination pursuant to the Rules of
Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before WENDY A. KILLEN, CSR Number 84-003772,
a Certified Shorthand Reporter in the State of
Illinois, at 77 West Wacker Drive, 31st Floor,
Chicago, Illinois, on March 17, 2016, at the hour
of 8:54 a.m.

Page 130

1  cognitive ability to remember details surrounding
2  the events of the shooting, do you see that?
3     A.  I do.
4     Q.  Let's start with compromised his cognitive
5  ability.
6         Define cognitive ability for me.
7     A.  It's a higher-level functioning of the
8  brain to communicate details about events, specific
9  feelings you might be having, sort of a
10 higher-level functioning of the brain, I guess, is
11 probably the simplest way to put it.
12    Q.  Anything else you would put in that
13 definition?
14    A.  Ability to reason, to be logical.
15    Q.  Anything else?
16    A.  I think that would be a good definition.
17    Q.  And so you mention here -- strike that.
18        So tell me how -- what evidence you have
19 or what you saw in the records to support your
20 conclusion that his compromised cognitive ability
21 impacted his ability to remember details
22 surrounding the events?
23        What did you see to show that he couldn't
24 remember details about the events?

Page 131

1  A. Well, there's no indication that he spoke
2  or communicated -- he never spoke -- but that he
3  communicated to anyone about the events of the
4  shooting. The only indications are that he could
5  communicate about the fact that he was hungry or
6  thirsty, in pain, or unhappy.
7  I saw nothing in the chart that indicated
8  that he remembered specific details about the
9  shooting or communicate any sort of emotion related
10 to what he had gone through. I saw nothing in the
11 medical record about that.
12 Q. Is that something you would have expected
13 to see in a medical record, details about the
14 shooting?
15 A. He was getting ongoing evaluation by a
16 social worker. And one of the goals of the social
17 worker is to help somebody cope with what they're
18 going through. So I would expect some sort of
19 communication around that with the social worker.
20 Q. Would you have expected some communication
21 around that with a nurse necessarily?
22 A. Potentially, depending on what kind of
23 relationship the nurse and the patient developed.
24 So it's possible, but not necessary, I suppose.

Page 134

1   Q.   And would you say that his sensorium was
2   altered to a reasonable degree of medical
3   certainty?
4   A.   Yes.
5   Q.   Based on the definition that you provided
6   earlier of a reasonable degree of medical
7   certainty?
8   A.   Correct.
9   Q.   And same question, would you say that his
10  cognitive ability was compromised to a reasonable
11  degree of medical certainty?
12  A.   Correct.
13  Q.   Now, if we had the benefit, say, of
14  speaking with the social worker and he indicated
15  that, in fact, he had discussed the shooting with
16  Mr. Warner, would that change your opinion as to
17  his compromised cognitive ability?
18  A.   It depends on what the conversation was
19  and what he communicated about it.
20  Q.   What do you think he would need to do in
21  order for you to think that his cognitive ability
22  was appropriate under the circumstances?
23  A.   Well, I mean I think it would depend on
24  what he remembered about it and the events

Page 163

1  have to generate enough air to have it pushed
2  through your vocal cords.  If his diaphragm is
3  completely paralyzed, it's possible that he's not
4  able to generate enough air to be audible.
5       Q.   And if he could generate some air, that
6  would be a situation where they could make audible
7  noise because the air would be passing through the
8  vocal cords, correct?
9       A.   It's possible.
10      Q.   So you're assuming that the cuff was never
11 deflated even for short periods of time because you
12 didn't see a notation of that in the record,
13 correct?
14      A.   That is correct.
15      Q.   Did you see anything in the records
16 indicating -- affirmatively indicating it is not
17 advisable to deflate this patient's cuff, anything
18 like that, to speak to that issue?
19      A.   I think there were notations made that
20 patient has no spontaneous ventilations, and that,
21 in addition, there were notations of the FVS, or
22 fully ventilator dependent.  To me, that means that
23 a judgment has been made that it's not advisable to
24 deflate the cuff.

Page 164

1  Q. But you never saw any express reference to
2  deflating the cuff one way or the other?
3  Whether it's advisable, whether they did
4  it, it wasn't in there at all?
5  A. Are you asking like did I see something
6  specific that said we deflated the cuff and he did
7  very poorly, we inflated it? I did not see any
8  notation like that, if that's what you're asking.
9  Q. Did you see any notation at all about
10  deflating the cuff at all anywhere?
11  A. I did not.
12  Q. Now, you just said something that I
13  thought was interesting. You said to make sounds,
14  you have to generate enough air to pass through the
15  vocal cords, right?
16  A. Yes.
17  Q. And that's basically what you're saying,
18  is it not, in Paragraph 9 of Exhibit 4?
19  A. Correct.
20  Q. He would have had -- well, I'll just read
21  the whole thing. The second sentence of
22  Paragraph 9 says, Even if the cuff had been
23  deflated at this time, Mr. Warner would not have
24  had the strength to push air through his vocal

Page 170

1   in. Spinal cord injury patients can live for many,
2   many years, decades even. And a patient who has
3   had a tracheostomy in for five, ten years is much
4   different than somebody who is just a week from
5   their acute injury. So somebody who doesn't have
6   an infection, which compromises your ability to
7   generate -- you know -- your strength and your
8   ability to have adequate ventilation, because one
9   of the things we know is that when you have an
10  infection, your ventilatory requirements go up.
11  And if you're not infected, they're not as high.
12  So your ability to ventilate is easier.
13          So there are other factors that impact how
14  much air you can move through the vocal cords, but
15  how much residual strength is probably going to be
16  the most important factor.
17      Q.  Did you see anything in the records
18  indicating that Mr. Warner ever was able to
19  verbalize words throughout his stay?
20      A.  I didn't see anything in the record that
21  he was audible. He was mouthing words. That was
22  noted.
23      Q.  Now, in Paragraph 11, you said -- looking
24  at -- I don't know -- about halfway down, maybe

Page 172

1  three-word phrases, anything beyond how he -- that
2  he's hungry, he's thirsty, that he's in pain, you
3  would not put in that high-level category?
4      A.   I mean I don't think it's black or white.
5  What I saw in the medical record was that he was --
6  it was noted that he mouthed that I'm hungry,
7  mouthed I'm thirsty, I'm in pain.  That was about
8  the limit of what I saw in the medical record with
9  respect to what he was able to mouth and it was
10 understandable for the caregivers.
11     Q.   Okay.  So I guess what I'm getting at --
12 I'm struggling -- is I think I have a good sense --
13 because I think you've repeated -- you've testified
14 rather a couple times about what is not high-level
15 communication.  Maybe I'm a little bit less clear
16 on what is high level.
17     What is it that you are saying he could
18 not do?
19     A.   To me, what he was doing in the medical
20 record was communicating his basic immediate needs.
21 When I say high level, I mean to talk about things
22 that would recall him to remember detail about
23 events, about temporal relationship of one to the
24 other.

Page 200

1  to be in like the tens of thousands, right?
2      A.   Yeah.  I mean we're going back to 1989
3  when I started my residency, so that's a span of
4  27 years.  So we're talking about several
5  thousands.
6      Q.   Okay.  So going back to that first
7  sentence, you said, It is true that a
8  ventilator-dependent patient with an inflated cuff
9  can learn to mouth words which nursing staff might
10 be able to interpret.
11          You said nursing staff.  Can anyone
12 besides nursing staff interpret these words?
13     A.   Yes.  I should have been more inclusive.
14 Nursing staff, social workers, physicians, other
15 personnel can understand.  It's not just the
16 nursing staff.
17     Q.   What about non-hospital personnel?
18     A.   Yeah.  I think family members are often
19 very helpful to help discern what the patient is
20 trying to say.
21     Q.   What about friends, close friends?
22     A.   Possible.
23     Q.   Do you think that somebody who kind of
24 walks in off the street, who doesn't necessarily

Page 201

1  have a whole lot of contact with the
2  ventilator-dependent patient, do you think they
3  would be able to communicate and learn to
4  communicate with a ventilator-dependent patient?
5      A.   I think it would be difficult, unless you
6  have some experience.  I won't say that's
7  definitely not possible, but I think it's going to
8  be difficult for a person who is not used to that
9  kind of communication to just be -- to understand
10 what somebody is saying cold turkey.
11     Q.   Now, you testified earlier that you didn't
12 see anything in the medical records to indicate
13 that Mr. Warner had spoken about his -- the
14 shooting, right?
15     A.   I saw nothing in the medical record about
16 that, that's right.
17     Q.   Did you read anything indicating that
18 Mr. Warner, while he was at the hospital, talked
19 about the shooting?
20     A.   I didn't read anything about that.
21     Q.   Did you read the police reports?
22          Didn't you read two supplemental police
23 reports?
24     A.   I didn't -- oh, okay.  I thought you were

Page 203

1 and to speculation of it.
2      THE WITNESS: Can you repeat the question?
3      MS. FORDYCE: Let me rephrase it because I
4 think it was a poorly-worded question.
5 BY MS. FORDYCE:
6      Q.   You did review some documentation that
7 indicated that Mr. Warner was speaking -- or not
8 speaking -- but was communicating at the hospital,
9 correct?
10      A.   I reviewed -- I reviewed the police
11 report, yes, if that's what you're referring to.
12      Q.   Yes.
13           And the police report indicated a higher
14 level of communication than what I think you are
15 opining Mr. Warner was capable of at that time; is
16 that correct?
17      A.   What I'm opining is that I saw nothing in
18 the medical record that would lead me to believe
19 that he was able to have that level of cognitive
20 ability, yes.
21      Q.   But if you were to credit the police
22 reports as being accurate, if you gave the police
23 reports the same level of authority that you are
24 giving the Northwestern medical records, then you

Veritext Legal Solutions
www.veritext.com                                    888-391-3376