# PLAINTIFF'S EXHIBIT D

Page 1

1            IN THE UNITED STATES DISTRICT
            NORTHERN DISTRICT OF ILLINOIS
2                EASTERN DIVISION
3            ~~~~~~~~~~~~~~~~~~~~~~
4    LATHIERIAL BOYD,
5              Plaintiff,
6        vs.              Case No.  13 C 7152
7    CITY OF CHICAGO, et al.,
8              Defendants.
            ~~~~~~~~~~~~~~~~~~~~~~
9
10
11            Videotaped Deposition of
            PAUL R. MEYER, JR., M.D.
12
            April 22, 2016
13              10:52 a.m.
14              Taken at:
            GREENBERG TRAURIG, LLP
15        77 West Wacker Drive, Suite 2500
              Chicago, Illinois
16
17
18
19
20
21        JENNIFER L. BERNIER, CSR, RPR, CRR
22
23
24

Page 31

1    his own so you can't put your finger over a

2    tube.

3         Q.    So my confusion, I guess -- he

4    can't breath on his own.  I understand that.

5    And so he's on the ventilator, which I thought

6    is the thing that's helping the patient inhale

7    because this patient can't inhale.

8         A.    That's correct.

9         Q.    But, as I understand it, you're

10   saying, but you still need some sort of

11   external pressure, like pushing the chest, or

12   bagging, or something?

13        A.    We live in one atmosphere

14   pressurewise.  So when we breath, we forcefully

15   inhale.  And what's happening is, the diaphragm

16   is contracting and pulling air in.  But in the

17   one atmosphere in which we live on earth, the

18   chest just automatically closes by itself, so

19   the air comes out.

20        Q.    It's a passive event, exhaling?

21        A.    It's a passive event.  So it's an

22   active event to get the air in.  It's a passive

23   event when it's coming out.  But the patient

24   has no muscle contraction, so the air would be

1   ineffectual in verbalizing.  So you have to

2   take whatever the air is in the lung and push

3   it out so that it goes by the vocal cords.

4       Q.   So it's not a natural event, once

5   the cuff is deflated, for the air to naturally

6   direct itself past the vocal cords to create

7   that audible sound?

8       A.   That's right.  It's not a natural

9   event.  The patient can't -- see, you and I

10  would use our abdominal muscles, you know, to

11  strain.  And what we do is, we use our

12  abdominal muscles to push the air out.

13       But this patient has no motor or

14  sensory function below this level.  So he can't

15  push any of the air that went into the lung out

16  except just it just seeps out.  There's no

17  force to it.  And without force, you can't

18  verbalize.

19       So you would have to have someone

20  standing at the bedside, a trained respiratory

21  therapist or a trained nurse, to push on the

22  abdomen and to push on the diaphragm to force

23  whatever air there is in the lung out for a

24  patient to verbalize.

Page 33

1              Now, that wouldn't happen with the

2      standard tracheostomy tube.  It would only

3      happen with a fenestrated tube.

4              Q.    What kind of tube did Mr. Warner

5      have?

6              A.    He had a standard tube; a standard

7      tracheostomy tube, not fenestrated.

8              Q.    Fenestrated, meaning there's little

9      holes in the tube?

10             A.    Holes in the tube.

11             Q.    And did you see something in the

12     records that indicated that Mr. Warner had a

13     standard tube?

14             A.    All I read about was a standard

15     tube.

16             Q.    So this whole process that you're

17     discussing about Mr. Warner's -- strike that.

18             This whole process you're

19     discussing about a quadriplegic potentially

20     being able to verbalize with the cuff deflated,

21     in this process that we've talking about,

22     you're saying can only happen with a

23     fenestrated tube; is that right?

24             A.    A fenestrated tube and a tube where

1    the tube can be -- the cuff can be deflated so

2    that the air can pass through either around and

3    through the fenestrated tube getting air across

4    the vocal cords.

5         Q.    Would you expect that Mr. Warner,

6    as time went by, got stronger and that he may

7    have been able to verbalize later on in his

8    life?

9         A.    Well, that's a hypothetical

10   question because I do not have any information

11   about Mr. Warner after he departed the hospital

12   to Oak Forest.  So knowing what I know right

13   now, I would say that it would be very unlikely

14   unless he had some sort of support to

15   verbalize, external support to verbalize.

16        Q.    Right.  Still ventilator-dependent?

17        A.    Still.

18        Q.    But, perhaps, with some -- what

19   would be the external support that he would

20   need; is it what we've been talking about?

21        A.    Having a respiratory therapist, or

22   a nurse, or someone to push on his abdomen and

23   push the air out of his lungs so that the air

24   went through the trachea and by way of the

Page 42

1  that.

2          On page 2 of Exhibit 2, it says, It

3  is his opinion that Ricky Warner's primary way

4  to communicate was to mouth words and blink his

5  eyes.  Do you see that?

6          A.    Yes.  That was -- that's two ways;

7  to blink his eyes, mouth his mouth, and to move

8  his head around side to side.

9          Q.    And it says primary way.  I know

10  that you didn't write this, but is it your

11  opinion that there were other ways he could

12  communicate besides the three that you've just

13  described?

14          A.    No.

15          Q.    Back in March, early March of 1990,

16  what sorts of things do you believe Ricky could

17  communicate?

18          A.    I have no idea.  He was never

19  communicating except by mouthing, if that's

20  what you mean.

21          Q.    I guess I'm trying to get a sense

22  of, do you think -- do you think that

23  Mr. Warner's cognitive ability was impaired in

24  any way?

Page 43

1        A.      Absolutely not.

2        Q.      Why do you say that?

3        A.      Well, first of all, stop and think

4    for a moment that he received a gunshot wound

5    to the neck and wasn't breathing for probably

6    several minutes.  Let's just say that it took

7    five minutes for the ambulance to get to him.

8    There's five minutes where he went without

9    breathing.

10              The patient had, according to his

11   medical records, a history of drugs, cocaine,

12   heroine, and other drugs.  That would alter his

13   mental status.  The patient had extreme

14   frustration with his inability to control any,

15   any, of his environment.  The patient, at some

16   particular point in time, was found to be

17   disconnected from his ventilator, and that

18   would produce a second opportunity for loss of

19   ability to breath for a variable period of

20   time.

21              So the overall answer to your

22   question is, yes, he had altered mentation.

23        Q.      What does that mean?  Can you

24   define that for me, altered mentation?

1      A.    He wasn't able to think clearly.  I

2 apologize for that.

3      Q.    So in light of your opinion that he

4 had altered mentation, what sorts of things do

5 you think Ricky could communicate in March of

6 1990?

7      A.    I think we've been talking about

8 the fact that he couldn't communicate except by

9 mouthing all along.

10     Q.    Right.  And I don't mean the

11 mechanics.  I think I mean more conceptually.

12 Are there certain things you feel that he could

13 understand and certain things he couldn't

14 understand because of his altered mentation?

15     A.    Well, if you have reviewed his

16 records day by day by day by day by day, you

17 would find, as I noted a moment ago, that he

18 had an extremely high level of anxiety, an

19 extremely high level of anger, an extremely

20 frustrating inability to control any of his

21 bodily functions any longer, was very often

22 abusive to the people who were trying to take

23 care of him, used, apparently, foul language by

24 mouthing, and eventually even had to be

1   seemed to me that a psychiatrist noted, in the

2   psychiatric report, that he had some alteration

3   in his behavioral traits before he was

4   admitted.  I could be in error there.

5          Q.    Okay.  But aside from potentially a

6   psychiatric record, you don't have any

7   knowledge of what Mr. Warner was like before he

8   was shot and admitted into Northwestern

9   Hospital?

10         A.    No.

11         Q.    Do you think that Mr. Warner, his

12  memory was impaired?

13         A.    You asked me that.  I said, yes.

14         Q.    I don't think I asked you about his

15  memory.

16         A.    Well, that's part of --

17         Q.    But I apologize if I did.

18         A.    -- that's part of mentation,

19  okay --

20         Q.    Okay.

21         A.    -- his ability to think.

22         Q.    Okay.  It has been opined in this

23  case that Mr. Warner could only communicate on

24  a very basic level -- I'm summarizing.  I

Page 47

1    appreciate this isn't word for word -- but that
2    he could communicate that he was hungry, that
3    he was in pain, that he was sad, that he was
4    tired.  But he couldn't have higher-level
5    discussions.  Would you agree with that --
6         A.    I do.
7         Q.    -- assessment?
8              And when you say that his memory
9    was impaired, can you just provide a little bit
10   more detail for me so I understand the degree
11   to which Mr. Warner's memory was impaired?
12        A.    No.  As a physician, I didn't give
13   him any testing to determine any of those
14   characteristics that one would go through
15   psychologically to test ones memory.  So the
16   answer is, no, I cannot.
17        Q.    So what's your basis for
18   determining that Mr. Warner's memory was
19   impaired?
20        A.    Well, he was off the ventilator
21   between the time he was shot and the ambulance
22   arrived, which was a loss of probably some
23   central nervous system function.  And I
24   would -- at this point, it would be cerebral

1    function, and that he was disconnected from the

2    ventilator on another occasion, which would be

3    cerebral insult, and that he had a projected

4    period where it was known that he was on drugs,

5    which would be another reason for altered

6    ability.

7         Q.    And you're referring to the heroine

8    and the cocaine that you testified to earlier?

9         A.    As read in the chart.

10        Q.    Do people who take heroine and

11   cocaine, does that affect their memory in the

12   long term?

13        A.    Doesn't the TV say all of the time

14   you're burning your brain up when you're taking

15   heroine and cocaine?  I mean, I think the

16   knowledge is out there --

17        Q.    So that's a yes?

18        A.    -- it's destructive to brain

19   function.

20        Q.    Okay.  So, presumably, he had some

21   sort of sensory impairment as a result of this

22   drug use prior to the shooting.  Is that your

23   opinion?

24        A.    I cannot vouch for the remainder,

Page 63

1   communication patterns?

2       A.      Yes.

3       Q.      Could you describe the style of

4   communicating that you're talking about, or are

5   you just strictly talking about mouthing?

6       A.      For the record, I'm only --

7   everything that I'm saying is mouthing.

8       Q.      Okay.

9       A.      For the record.

10      Q.      Thanks for clarifying that.

11  Because when I read this, it just struck me

12  that communication patterns -- I thought maybe

13  there was a reference to something broader than

14  that.  But it's just mouthing?

15      A.      That's mouthing on the part of the

16  patient.

17      Q.      Right.  And the nurse would be

18  talking.  Is it your opinion that only nurses

19  could understand the mouthing, or could others

20  understand it, too?

21      A.      It's very, very, very, very

22  difficult for a neophyte, an individual, even a

23  parent, to attempt to talk to a loved one who

24  is in this condition and understand anything

1   that they're saying. And the nurses who are at

2   the bedside 24 hours a day develop a second

3   sense as to what the patient is saying when

4   they're attempting to communicate by mouthing.

5   It's almost being intuitive.

6         Q.    I see. Did family members of

7   quadriplegics -- over the course of your

8   career, could family members ever speak with

9   their loved ones? Did you ever witness that?

10        A.    Of course.

11        Q.    So it was probably more difficult

12   for them, but it was possible?

13        A.    Well, you asked me did I ever find

14   where family members spoke with the patient.

15   The family members had no speak -- no problem

16   speaking.

17        Q.    Okay.

18        A.    The problem is in the

19   interpretation of what the patient is saying,

20   and that's what the nurses develop intuitively

21   is the ability to interpret what the patient is

22   trying to impart.

23        Q.    Did you ever witness non-nurses,

24   such as family members or friends, communicate

Page 65

1    with your quadriplegic patients effectively?

2         A.    Oh, myself.   Even myself, when I

3    would attempt to have some sort of discussion

4    between myself and a patient, it had to be at

5    the very basic, basic level because, A, the

6    patients could not carry on a conversation; B,

7    they were on a ventilator; C, they were unable

8    to verbalize.   The only thing they could do was

9    mouth.

10             And I have never really been taught

11   to mouth read before.   It's almost like

12   understanding hand signs.   You have to be

13   trained to sort of do it for a while, and

14   that's what the nurses developed.

15        Q.    Can you do one thing for me?   Can

16   you flip through here -- and I'm going -- I'll

17   go ahead and mark this.

18             THE REPORTER:   4.

19                  -   -   -   -   -

20             (Thereupon, Deposition Exhibit 4,

21             Consultation Records, was marked for

22             purposes of identification.)

23                  -   -   -   -   -

24        Q.    Can you flip through here?   And

Page 67

1  you know, how a patient is doing, essentially,
2  how they're progressing?
3      A.    Well, I would do a neurological.  I
4  would do chemistry tests.  I would do
5  respiratory tests.  I would do a discussion
6  test.  You know, all of those things go into
7  the assessment of the patient.
8      Q.    Tell me about those discussion
9  tests.
10     A.    The what?
11     Q.    Discussion tests.
12     A.    Well, you and I -- you're testing
13 me right now.  I'm having a discussion with
14 you, so I would have a discussion with the
15 patient.
16     Q.    And the patient -- if the patient
17 was a quadriplegic, they would respond back to
18 you by mouthing words, correct?
19     A.    They would do it on the very basic
20 level.
21·    Q.    And, generally, you were able to
22 complete these assessments in a way that was
23 satisfactory to you; is that right?
24     A.    No.  It would never be satisfactory

Page 70

1    and they have to be sucked out to get those

2    secretions out.

3        Q.    Got it.

4        A.    You know, it's very, very

5    difficult.  I'm speaking from me.

6        Q.    Right.  Just in your experience?

7        A.    In my experience.

8        Q.    If a nurse were to deflate the cuff

9    of a quadriplegic patient at Northwestern back

10   in March of 1990, would you expect the nurse to

11   make a note of that in the progress --

12       A.    Yes.

13       Q.    -- report?

14             Did a nurse have to seek permission

15   from a physician before they did something like

16   that?

17       A.    Yes.

18       Q.    You've spoken a couple of times

19   about Mr. Warner becoming disconnected from the

20   ventilator in March.  Do you remember that?

21       A.    I do.

22             THE REPORTER:  This is 5.

23                  -   -   -   -   -

24             (Thereupon, Deposition Exhibit 5,

1       Q.    Does it say anything else?  Are

2  there any specific medical details that are

3  provided in Exhibit 5 that you could summarize

4  for me?

5       A.    Well, I'm not sure what it is that

6  you're looking for or at.

7       Q.    I'm just looking for you to tell me

8  what this says.

9       A.    Yes.  It says, Call to see if the

10  patient became disconnected from the ventilator

11  unnoticed.  Secondary era.  Alarm malfunctioned

12  for one or two minutes per the nurse.  In

13  arriving, the patient awake.  And I don't know

14  what the next couple of words are.  AMBU bag,

15  ventilated.  So they had to connect him up to a

16  bag and ventilate him under pressure.

17       Q.    Does this -- I'm sorry.  Were you

18  done?

19       A.    I am.

20       Q.    Does this record indicate whether

21  or not Mr. Warner lost consciousness?

22       A.    It does.  It does reveal that he

23  had a significant alteration in his mentation

24  at this particular episode because there was a

Page 88

1      Q.    Well, that was going to be my

2  question.  What was your takeaway?  What was

3  your conclusion?

4      A.    I've asked that question all along.

5  Why am I here?

6      Q.    And --

7      A.    I don't know where you want to go.

8  I have no idea.

9      Q.    Did they ask you specific

10  questions?  You know, did you have any sort of

11  follow-up, Hey, Dr. Meyer, what did you think,

12  or can he phonate, or --

13      A.    No.  I've answered that repeatedly

14  over and over.  He couldn't phonate.

15      Q.    Right.  But my question is, did you

16  ever have some discussions about your

17  conclusions with Ms. Zellner's office?  I mean,

18  presumably, you said they provided this to you

19  at some point.  So there had to have been --

20      A.    Yeah.  I suspect, in the discussion

21  of could he phonate, the answer is, res ipsa

22  loquitur.  It's right here before you.  I don't

23  think that he could phonate.  And I know he

24  never had a PEG.  And I know that they never

Page 89

1    deflated his cuff.  And those are my -- those

2    are my opinions.

3            Q.     And to that point, looking

4    at page 2 on Exhibit 2, I think the

5    second-to-last sentence says, Dr. Meyer will

6    testify to his opinion that if a PEG is

7    surgically implanted, the cuff can be deflated

8    and the patient can phonate.  Do you see that?

9            A.     Yes.

10           Q.     But that's not quite accurate,

11   right?  If I understand your testimony earlier,

12   you said that surgical insertion of the PEG is

13   unrelated to deflating the cuff, right?

14           A.     Well, you put in a PEG so that

15   you're not ever going to have food going down

16   into the trachea.  So they're related in that

17   you don't want the patient to drown in his

18   fluid, own fluids.

19           Q.     But you can -- and correct me if

20   I'm wrong.  I just want to make sure I

21   understood you earlier correctly.  I thought

22   you had said that you can deflate the cuff and

23   you can assist a ventilator-dependent patient

24   to phonate?

Page 90

1          A.      If he had a fenestrated tube --

2          Q.      Right.

3          A.      -- which he didn't have.

4          Q.      Right.  But without the PEG?  You

5    don't need the PEG for that?

6          A.      You don't need the PEG for that.

7          Q.      Did Ms. Zellner's office ever

8    provide you a copy of the complaint?

9          A.      I don't -- I don't think so.  I

10   don't think that I've got -- got the complaint.

11         Q.      And have you independently done any

12   research about the underlying facts of this

13   case?

14         A.      Yes.

15         Q.      What did you do?

16         A.      I pulled up the patient's name, the

17   plaintiff in this case's name on the Web, to

18   get some background information, and that's

19   where I got my education.

20         Q.      What sorts of documents on the Web

21   did you review?

22         A.      What is it, Guardian, Guardian

23   News?

24         Q.      Did you review anything else?

Page 91

1       A.    No.  I didn't have anything else.

2       Q.    And did you do that on your own

3   volition, or did someone suggest that you look

4   that up?

5       A.    My daughter suggested that I look

6   it up.

7       Q.    Is it your opinion that what you

8   read, in that Guardian Newspaper Website, was

9   accurate, or do you have an opinion on that one

10  way or the other?

11      A.    Well, that's a loaded question.

12  You know, one and one is still two.  And so

13  here was an individual who was accused and then

14  the same individual was exonerated, so you draw

15  some conclusions.  And from -- as a result of

16  that, I've drawn some conclusions, but that's

17  where I got my information.

18      Q.    What sorts of conclusions have you

19  drawn?

20      A.    That Mr. Boyd was wrongfully

21  identified.

22      Q.    By whom?

23      A.    Well, I would say, from the medical

24  records, that the question exists as to who

Page 92

1    pointed out Mr. Boyd because I could find no

2    evidence, in the medical -- in the medical

3    nursing progress records, that anyone had ever

4    come to the patient's bedside and had

5    Mr. Warner point out Mr. Boyd.

6         Q.    Did you get -- you didn't receive

7    any trial testimony transcripts, did you?

8         A.    Trial testimony?

9         Q.    From Mr. Boyd's criminal trial?

10        A.    No.  No.

11        Q.    You didn't get any of those?

12        A.    No.

13        Q.    Okay.  So you weren't aware that a

14   nurse who was there when the police officer

15   were there testified at Mr. Boyd's criminal

16   trial?

17        A.    I never saw any nursing note at

18   all, in the nursing records at Northwestern

19   Memorial Hospital, that an officer was at the

20   bedside.

21        Q.    Do you -- does that cause you to

22   question whether or not the officers were ever

23   at the bedside?  Is that something --

24        A.    I'm just telling you that I've