# PLAINTIFF'S EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LATHIERIAL BOYD,            )
                            )
        Plaintiff,          )
                            )
    vs.                     ) No. 13-cv-7152
                            )
CITY OF CHICAGO, et al.,    )
                            )
        Defendants.         )

    The deposition of JOHN MURRAY, called for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before KELLY A. BRICHETTO, CSR No. 84-3252, a Notary Public and Certified Shorthand Reporter, of the State of Illinois, taken at Suite 650, 1901 Butterfield Road, Downers Grove, Illinois, on the 28th day of October, 2015, at 10:00 a.m.

1  through this so you've got this in front of you.  But can
2  you tell me what you remember reviewing in preparation
3  for the deposition today?
4      A.   Do you want me to use your guide?
5      Q.   If you need to, yes.  You could tell me off
6  the top of your head, and then as we go you can say I
7  reviewed that too.  I mean tell me what you remember
8  looking at.
9      A.   The date of the shooting, the general
10 statement in the original report and the detective's
11 scene report and then any report with my name on it.
12     Q.   And when you reviewed the reports with your
13 name on it, did you recognize your signature?
14     A.   Actually, I'll have to revisit that.  I've
15 never been asked that before.
16     Q.   Okay.  So I mean we'll do that on each one.
17 You can tell me if that's your signature.  Tell me in
18 general were you required to sign the reports?
19     A.   The first officer who's the lead is required
20 to sign it.  It was very common for us to sign both
21 people's names.  Go ahead.
22     Q.   So just clarify that for me.  So there would
23 be a lead detective.  Would that be Detective Zuley?
24     A.   Yes.  In this case, yes.

Page 53

1  Q.    Yeah.  So he'd try to assemble everything,
2  type it up.  And then before you signed it would you sit
3  down and just read through it or --
4  A.    No.
5  Q.    Because you trusted him --
6  A.    Yes.
7  Q.    -- to have it accurate?
8        And you're working on your own report; right?
9  A.    Yes.
10 Q.    Okay.  So this one says:  "In continuing this
11 investigation, the RDs attempted to identify Rat who was
12 named as the offender by Ricky Warner"?
13 A.    Yes.
14 Q.    Okay.  Now, this is what I want to ask you.
15 This says that Ricky Warner has already identified the
16 shooter as Rat at the time your report was written.  So
17 am I correct there would -- there should be a prior
18 report about the first identification made by Ricky
19 Warner of Rat?
20        MR. MICHALIK:  Objection, foundation.
21 BY MS. ZELLNER:
22 Q.    Just if you read the language.  "In
23 continuing this investigation, the RDs attempted to
24 identify Rat who was named as the offender by Ricky

1 Warner"?
2  A. Um-hum.
3  Q. You would agree with me that Ricky Warner has
4 identified Rat by the time this report is written on the
5 12th?
6  MR. MICHALIK: Objection, foundation.
7 BY THE WITNESS:
8  A. Yes.
9 BY MS. ZELLNER:
10  Q. "As a result of the RD's efforts, one
11 Lathierial Boyd was identified as being Rat. The RDs
12 then obtained an I.R. photo of Boyd and proceeded to
13 Northwestern Memorial Hospital to re-interview Ricky
14 Warner and show him an assortment of photos including the
15 photo of Boyd." So this report indicates that this is a
16 re-interview of Ricky Warner; would you agree?
17  A. Yes.
18  Q. All right. So my question is: Were you and
19 Detective Zuley -- did you conduct a prior interview of
20 Ricky Warner?
21  A. I did not.
22  Q. But Detective Zuley went to see him;
23 correct --
24  A. Yes.

Page 56

1   Warner?
2       A.   Yes.
3       Q.   Okay.  And do you remember when you got to
4   the ICU unit signing in?
5       A.   I don't remember.
6       Q.   Okay.  Do you remember what the room looked
7   like at all that Ricky Warner was in?
8       A.   No.
9       Q.   Do you remember that Ricky Warner had a
10  ventilator?
11      A.   I have to qualify that.  Of course, he had a
12  ventilator as a result of his injuries.  Whether he still
13  had the ventilator which as I understand breathes for you
14  when we went, I don't believe so.
15      Q.   Okay.  So you think maybe by that point he
16  was off the ventilator?
17      A.   Had been weaned off of it, yeah.
18      Q.   All right.  And he had had a tracheostomy?
19      A.   Yes.
20      Q.   And that involves as you know making an
21  incision below the voice box --
22      A.   Um-hum.
23      Q.   -- into the throat?
24      A.   Um-hum.

Page 68

1    A.    Then when, when we locate the Boyd that in
2 all probability may be the one we want, we went down to
3 get the picture.
4    Q.    Okay.
5    A.    So that would be all before going to see
6 Ricky.
7    Q.    Okay.
8    A.    On the same day, so timewise, I -- now I'm
9 lost. I'm guessing that it was 10 o'clock out to James'
10 house, but I don't know about times after that.
11    Q.    And then do you think -- did the photo of
12 Boyd, did that come from the Police Department or a Boyd
13 family member, do you know?
14    A.    Police Department. The I.R. photo.
15    Q.    Because those are always police photos that
16 they've got?
17    A.    Well, you want them to look like the whole
18 photo array, so you want all I.R. photos. You don't want
19 a private of Aunt Sally photo in there and --
20    Q.    Right. So what you did -- so your
21 preparation then is, of course, to talk to James Fleming.
22 You get that information. You get the photo. You also
23 go though and talk to Herbert Warner, don't you, the
24 father so that you'll be prepared with Ricky Warner when

Page 70

1   questions that a detective would ask besides the name.
2   The report indicates that he came up with cars that he's
3   seen Lathierial use in the past.
4           Q.    Right.
5           A.    Other than that, I don't know.  Did I hear
6   it?  No.
7           Q.    Is it Fleming then who also discloses to you
8   that Boyd is a narcotics dealer or does that come from
9   Ricky?
10          A.    Well --
11          Q.    It comes from the cars?
12          A.    -- we're kind of like pretty sure that that's
13  what this incident was all about without anybody telling
14  us, but, yes, the report indicates that, that he gave a
15  description on who he was.
16          Q.    And does Ricky or does James also talk about
17  the drug debt and the threats to the family in that
18  conversation?
19          A.    I don't recall.
20          Q.    Okay.
21          A.    I have no independent memory of that.
22          Q.    So if we go back to the document then, on
23  1385 -- so after you see Ricky as you were just pointing
24  out then you go see Herbert Warner.  Do you see that?  It

Page 71

1  says: "He was re-interviewed and shown the photo
2  assortment. Mr. Warner positively identified the photo
3  of Boyd as the person he knew as Rat and the person who
4  had threatened his family on two occasions in the past
5  year." Now, it says that he was re-interviewed.
6     A.    Um-hum.
7     Q.    But that's the first time you're there with
8  him --
9     A.    Yes.
10     Q.    -- correct?
11     A.    That particular day is, is me and Dick.
12     Q.    Right. But at some point --
13     A.    Prior to that it's different people and --
14     Q.    Right. But at some point Dick's also gone to
15  Ricky Warner without you? That's what you said earlier.
16  There was an initial interview.
17     A.    I don't recall.
18     Q.    We've got it --
19     A.    Yeah, I --
20     Q.    Whatever you testified to --
21     A.    That's what I remember you saying.
22     Q.    We'll deal with that with him, right. So
23  this -- back with Herbert Warner at this re-interview,
24  then you've got the photo of Rat, and then he -- do you

Page 72

1  recall that he describes that Rat has been to the house
2  on two occasions and --
3      A.    You know, then we had the picture of Boyd --
4      Q.    Boyd.
5      A.    -- for reading purposes.
6      Q.    Yes. He's identifying Rat as Lathierial
7  Boyd?
8      A.    Yeah. Yeah.
9      Q.    And he describes -- if we look at 1385, it
10 says -- the first -- there were two incidents. "The
11 first occurred on a Thursday between eight months and a
12 year ago. Mr. Warner had arrived at home and found his
13 wife on the porch talking to a male black. He approached
14 the porch, and his wife told him that there was a
15 problem. She further related that the man who he then
16 knew as Rat had said that Ricky owed him $700.
17 Mr. Warner told Rat, Boyd, that it was Ricky's debt and
18 he would have to get the money from him. Boyd told
19 Mr. Warner, Sr., "You'll get the money or someone is
20 going to have to get hurt." It's your recollection that
21 that's the accurate -- he's saying it's a summary of that
22 interview?
23     A.    Yes.
24     Q.    And --

Page 73

1    A.   It's -- I'm reading it.  I have no
2 independent recollection.
3    Q.   I understand.  But there isn't anything in
4 reading it that makes you say that I'm sure that didn't
5 happen --
6    A.   Oh, no.
7    Q.   -- or it wasn't said?
8    A.   No.
9    Q.   If quotation marks are put in even though
10 he's saying it's a summary but not verbatim, that means
11 that's exactly what was said; right?
12         MR. MICHALIK:  Objection, foundation.
13         MS. RALPH:  Join.
14 BY MS. ZELLNER:
15    Q.   You know what quotation marks mean, don't
16 you?
17    A.   Not necessarily.  In literature I understand
18 what it's used for.  We sometimes use it for different
19 purposes depending on the readership.
20    Q.   Okay.  So you could use quotations and it
21 would not be the precise words?
22    A.   Yes.  Yeah.
23    Q.   Okay.
24    A.   Even though it should be just one mark and

Page 74

```
 1    not a full quotation.
 2         Q.    Okay.  So you'd -- and you don't have an
 3    independent recollection of that statement?
 4         A.    No.
 5         Q.    Okay.  It says:  "Sometime later on a
 6    Saturday Boyd came by again with three or four teenage
 7    male blacks in the car with him.  Boyd came to the door
 8    again, made demands for the money and said," and again
 9    we've got quotes "how would you and your wife like to
10    wind up dead."  So, again, do you remember those exact
11    words being said --
12         A.    No.
13         Q.    -- by Mr. Warner?
14         A.    No.
15         Q.    Again, even though I'm seeing quotations,
16    those may not be quotations?
17         A.    They may not be quotations.
18         Q.    That may not be an exact quote.  "While Boyd
19    was speaking, the male black youths started to get out of
20    the vehicle and appeared to be drawing weapons."  Do you
21    remember that?
22         A.    I don't.
23         Q.    "Boyd then called them off.  They got back in
24    the car.  When Boyd left the porch and returned to his
```

1  vehicle, he drove past the house, down the alley several
2  times. It was then that Mr. Warner noticed the license
3  plate had the letters R-A-T displayed on it." Do you
4  remember him mentioning the license plate?
5      A.   I don't remember that. What I remember is
6  being in the area and somebody contacting the Secretary
7  of State's Office, so I am -- I have independent
8  recollection of that, and by reading this, it tells me
9  why that was done. I didn't know the father had come up
10 with specific plate numbers nor was I concerned because,
11 once again, we had a living, breathing victim.
12     Q.   Right. But you didn't -- you weren't the one
13 who checked out the --
14     A.   No.
15     Q.   -- license plate; correct?
16     A.   No. No.
17     Q.   And just so that's crystal clear in the
18 record, you don't remember that specific statement? I'm
19 not saying that didn't occur, but you don't remember that
20 specifically; correct?
21     A.   That would be accurate.
22     Q.   And did you attend -- you did not testify at
23 the trial?
24     A.   No.

Page 76

1  Q. And did you attend any part of the trial?
2  A. No.
3  Q. Okay. Do you know as you sit here today
4  whether Herbert Warner testified that there was a license
5  plate with the word Rat on it?
6  A. I can say that I know nothing about what was
7  testified at the trial at all.
8  Q. Okay. So then it goes on and explains that
9  the detectives are trying to locate Boyd at a number of
10 different locations. Did you participate in that with
11 Detective Zuley?
12 A. I have no independent recollection.
13 Q. Okay. Now, I want to have you look at this
14 very last paragraph.
15         MS. ZELLNER: She's got three minutes. Do you
16 want to break?
17         MS. RALPH: Yeah.
18         MS. ZELLNER: Because I'm going to start on a
19 different area.
20         MS. RALPH: Yeah. Let's take a break.
21         MS. ZELLNER: What time is it now? It's 10 to
22 12.
23         THE VIDEOGRAPHER: End of videotape number
24 one. Off the record at 11:35.

Page 77

1    (WHEREUPON, a lunch break
2    was taken.)
3    Beginning of videotape number two. Back
4    on the record at 12:31.
5    BY MS. ZELLNER:
6    Q.  We could go back to the exhibit that we
7    were -- where we left off. We were in this report from
8    Exhibit 1. It's 1386 at the bottom, that last paragraph.
9    We talked about the visit to Herbert Warner.
10   A.  1386? I'm sorry, counselor.
11   Q.  Yeah, it's right --
12   A.  1385 is the bottom.
13   Q.  Yeah. Go to here.
14   A.  Next page.
15   Q.  Yeah, in that very last paragraph.
16   A.  So 1386.
17   Q.  Yeah. So we talked about your visit with
18   Detective Zuley to Herbert Warner, and then it said
19   that -- the sentence says: "The RDs returned to Area 6
20   and began procedures for obtaining an arrest warrant."
21   Would you agree that you had probable cause for the
22   arrest of Lathierial Boyd at that point based on the
23   identification of Ricky Warner?
24   MS. RALPH: Just object to the extent it calls