# PLAINTIFF'S EXHIBIT J

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                  EASTERN DIVISION
 3    LATHIERIAL BOYD,              )
                                    )
 4              Plaintiff,          )
                                    )
 5         vs.                      )    No. 13 C 7152
                                    )
 6    CITY OF CHICAGO; CHICAGO      )
      POLICE OFFICER RICHARD ZULEY, )
 7    Star No. 15185; CHICAGO       )
      POLICE OFFICER LAWRENCE       )
 8    THEZAN, Star No. 9419;        )
      CHICAGO POLICE OFFICER STEVE  )
 9    SCHORSCH, Star No. 8955;      )
      CHICAGO POLICE OFFICER JOHN   )
10    MURRAY, Star No. 3175;        )
      CHICAGO POLICE OFFICER WAYNE  )
11    JOHNSON, Star No. 4266;       )
      UNKNOWN CHICAGO POLICE        )
12    OFFICERS; and RAY KAMINSKI,   )
      as special representative of  )
13    the Estate of former CHICAGO  )
      POLICE OFFICER ANDREW         )
14    SOBOLEWSKI, Star No. 16498,   )
                                    )
15              Defendants.         )
16           The videotaped deposition of LATHIERIAL
17    BOYD, called for examination, taken pursuant to the
18    Federal Rules of Civil Procedure of the United States
19    District Courts pertaining to the taking of
20    depositions, taken before Lynn A. McCauley, CSR
21    No. 84-003268, RPR, a Certified Shorthand Reporter
22    of the State of Illinois, at 77 West Wacker Drive,
23    Suite 2500, Chicago, Illinois, on July 22, 2015, at
24    9:16 a.m.
```

1   interpret it; is that fair?

2          A.   Yes.  And I did that.

3          Q.   Did you do that?

4          A.   Yes, I did.

5          Q.   It's your testimony that when you were

6   interviewed by the police in your initial interview

7   at the police station, you gave them the complete

8   unvarnished truth without any lies?

9          A.   Regarding which questions?

10         Q.   All of them.

11         A.   I'm going to answer your question.

12              I was asked if I knew a person by

13  the name of Ricky Warner.  My response was, "No.  I

14  have no idea who a Ricky Warner is."  That was the

15  truth.  That was a fact.

16         Q.   At some point through the questioning,

17  isn't it true that you connected Ricky Warner with a

18  person you knew as Louie?

19         A.   No.  The police gave me that name, Louie,

20  and it still didn't register.

21         Q.   Is it your testimony you told them the

22  complete unvarnished truth about your relationship

23  with Louie and/or Ricky Warner in that initial

24  interview?

Page 21

1          A.   May I finish responding to your question?

2          Q.   Sure.

3          A.   Again, that was the absolute truth and a

4     fact, that when the police gave me the name Louie, it

5     didn't register.

6                    Into the interrogation, the police

7     said, "Louie is a guy who works with or hangs

8     around -- he's a friend of your cousin, Kerry Kelly,

9     in Maywood."

10                   At that point, it registered.  It

11    hit me.  I know who he's talking about.

12                   And then when they went into, this

13    person accused you of shooting or something, I kind

14    of had nothing else to say about that.

15                   And my position on that was whatever

16    is going on here, whatever this Louie or this Ricky

17    Warner guy said, I'm going to step back, because

18    there's some trickery going on here, and I'm not

19    going to get caught up in it.

20                   Bottom line is, yes, at that moment,

21    when he said Kerry Kelly, he is a friend of his, I

22    knew.

23                   My thinking, again, being green,

24    having never gone through anything like that, was the

1    fact that I knew that there was no way humanly

2    possible that I could be connected with or charged

3    with any crime committed against this person.

4                    So ask.  Do whatever you want.  At

5    the end of the day, I haven't done anything to

6    anybody, and I'm not going to let you tie me into

7    something and trick me.

8                    And I knew that much from television

9    and movies.  I've never been through the experience,

10   but I -- I saw where things were going.

11                   And I did not have an attorney

12   present with me to help me with those questions,

13   because I didn't think I had anything to worry about,

14   nor did my family, nor did a Cook County sheriff

15   deputy, who told me.

16                   And he feels guilty today.  He cries

17   that he was supposed to protect me.  I didn't protect

18   you.  I told you to go there and talk to them,

19   because they knew it would be a mistake.

20       Q.   Mr. Boyd, this is a deposition, which

21   it's a question and answer format.  We have to -- I

22   ask questions that are designed to get an answer.

23                   I'll -- you can talk as much as you

24   want.  I'm not going to cut you off, but we only have

1    said that you -- your answer was that you told the

2    cops the unvarnished truth in relation to your

3    relationship with Ricky Warner, also known as Louie.

4         A.    Yes, I did.

5         Q.    Did she say that right?

6         A.    Yes, she did.

7         Q.    How do you feel about people who lie?

8         A.    I don't feel very much about people that

9    lie.  I don't think you have to lie, unless your life

10   is at stake because of lies and hate and ignorance

11   and racism.

12        Q.    Do you feel lying reflects a guilty mind

13   of the person who utters the lie?

14        A.    Do you feel torturing people at

15   Guantanamo Bay is a good thing to do?

16        MR. GIBBONS:  I'm going to move to strike.

17   It's nonresponsive.

18        THE WITNESS:  Do you want to ask your

19   question again?

20        MR. GIBBONS:  Sure.

21   BY MR. GIBBONS:

22        Q.    Do you feel that people who lie reflects

23   a guilty mind of the person who's uttering the lie?

24        A.    I believe people who lie are weak, are

Page 83

1      Q.    Are you aware, either they told you or

2   you saw, that they had weapons?

3      A.    My mom carried a gun her whole life,

4   still does, and she's 80.  My brother, Archie, I

5   remember him getting a gun card, purchasing two guns,

6   and he would take me to the gun range with him to

7   practice shooting.

8              One of those guns he had was a

9   Browning .380.  It fit, and I was able to use it

10  well.  At age 18, my mom signed for me to get a gun

11  card.

12             I don't know.  Maybe a year or two

13  later, I bought that same gun.  So that's where the

14  Browning .380 came from that I told detectives was

15  under my bed and that they could go and get it.

16             As far as me being aware that I was

17  to no longer have that gun, my ignorance, I never

18  read that and -- who else did I see with a gun out of

19  those four people?  My brother.  I know Kerry had a

20  gun.  I saw a gun he had.

21             This may come as a shock.  I carried

22  sometimes this .380, knowing I couldn't carry it or

23  it wasn't supposed -- it was supposed to either be in

24  the glove compartment or in the trunk on your way to

Page 84

1    or from the gun range.

2                  Not that I had problems with

3    anybody, but sometimes that gun was in my car with

4    me.  And I knew the only way I would use that gun,

5    because it's registered to me.  And if somebody -- if

6    I use it, it's going to come back to me.

7                  So I knew the only way I'd ever

8    shoot somebody or harm somebody would be if somebody

9    was trying to take my life.  And, of course, the gun,

10   it would be traced right back to me.

11                  You don't carry a registered gun

12   when intentions on using it, knowing it will come

13   right back to you.  I never had to use it.

14        Q.    So let me flush out a couple things.  You

15   said you carried the gun --

16        A.    Sometimes.

17        Q.    -- from time to time, even though you --

18        A.    Sometimes it was in my car, glove

19   compartment.  I'm sorry.

20        Q.    We're going to kill her.  Let me start.

21                  If I heard your answer, you carried

22   the gun from time to time on your person or in your

23   glove box to and from wherever you worked to the gun

24   range.

Page 96

```
 1    I heard you say is, the relationship was interrupted
 2    in or about 1988, because Kerry Kelly became addicted
 3    to heroin or drugs of some kind; is that right?
 4          A.   Correct.
 5          Q.   And so what I'm curious about is, when
 6    Kerry Kelly stopped being one of the four people that
 7    you were selling quarters to, was he replaced in any
 8    way?
 9          A.   No.
10          Q.   And then how did you deal with the
11    quarters?  Did you give more to the other three, or
12    how did that work?
13          A.   You know, it slowed down.  It slowed
14    business down.  There wasn't anybody else.  So it
15    took longer.  It slowed that down.  That, I remember.
16          Q.   And when business slowed down, that meant
17    that you would have earned less per month; is that
18    fair to say?
19          A.   Yes and no, because it kind of -- I want
20    to say my brother probably took up the slack of that.
21          Q.   Now, the person we were talking about
22    earlier, Ricky Warner, was also known as Louie; is
23    that right?
24          A.   Yes.
```

1          Q.    So if I use either Ricky Warner or Louie

2     today, you'll know we're talking about the same

3     person?

4          A.    Now I do, of course.

5          Q.    Right.  It's just for purposes of today.

6          A.    Yes.

7          Q.    I'm likely to keep calling him Ricky

8     Warner; is that fair?

9          A.    Fair.

10         Q.    It's my understanding that Ricky Warner

11    at times hung out with or is associated with Kerry

12    Kelly; is that right?

13         A.    Correct.

14         Q.    And Ricky was sometimes there, physically

15    there, when you met with Kerry Kelly; is that right?

16         A.    Correct.

17         Q.    How often, prior to your arrest in 1990,

18    had you come into contact with Ricky Warner?

19         A.    How often prior to the arrest?

20               Prior to the arrest, I think the

21    last time I saw Ricky, Louie, was, again, at my

22    cousin's.  I want to say '88, 1988.

23         Q.    When did you first meet him or see him?

24         A.    I don't know if it was right in the

Page 100

1   him with Ricky?

2         A.    No, no.

3         Q.    Why not?

4         A.    Well, it didn't -- first of all, he was

5   just a runner, and those weren't his customers, I

6   guess.  And, you know, you're talking about a runner,

7   somebody just delivering packages.  That's not

8   somebody that you can give large amounts to.  You

9   know what I mean?

10        Q.    No, I don't.  That's what I'm asking you

11  to explain.

12        A.    Well, if you're a runner and you're

13  delivering -- I don't know -- whatever it was Kerry

14  was selling to his customers, grams or whatever --

15  and you got to keep in mind.  Kerry was getting

16  quarter kilos from me.

17              And so if this guy is only selling

18  small amounts to Kerry's customers, you can't give --

19  you can't consider giving this guy a quarter key of

20  cocaine to deliver.

21              I don't know -- I didn't know who he

22  knew or what he could do or -- and even though my

23  cousin was strung out and -- you kind of just don't

24  cross people like that.  You don't do that to them.

Page 101

1          Q.   When you say you don't cross people like

2     that, what do you mean by that?

3          A.   Well, that was my cousin, you know.  I

4     was working with him.  And because he had the

5     problem, you don't want to let somebody else step in

6     and take what money was coming to him and forget

7     about your cousin like that.  You just -- you just

8     don't do that.

9          Q.   Kind of a trust thing?

10         A.   Well, loyalty, fair.

11         Q.   Respect thing?

12         A.   You know, you don't -- that kind of stuff

13    hurts people, you know.

14         Q.   I presume that those that you were

15    dealing with -- and you've already given me who they

16    are.

17         A.   Yeah.

18         Q.   -- paid you timely for the cocaine that

19    you were delivering to them; is that fair to say?

20         A.   Yeah.  But not always.  There were

21    different times when I lost money, a couple hundred

22    grand, but you let it go.  You let it go, because,

23    you know, it's not worth it, and you don't -- it's

24    not worth it.  You just don't do it.

Page 102

1             Although I was doing what I was

2   doing, we were not brought up that way to hurt -- to

3   kill somebody.  That's too much.

4       Q.   Let's talk about the way it should have

5   worked.  The way it should have worked was, you would

6   get your kilo or so from the Cuban?

7       A.   Yeah.

8       Q.   You would -- or your brother would break

9   it into quarters.  You would sell it to the customers

10  you talked about.  And they would sell it to their

11  customers and then pay you; is that right?

12      A.   Correct.

13      Q.   That was the kind of model?

14      A.   Yeah.

15      Q.   There were times, are you saying, that

16  they did not pay you back for the quarters you had

17  delivered to them?

18      A.   Well, there were -- you know,

19  throughout -- you know, you meet different people,

20  and sometimes you -- well, I guess my one cousin, you

21  know.

22           He -- I don't know what case it was

23  he got, but he lost a bunch of money.  And that money

24  was mine.  And you let it go.  What can you do about

Page 143

1    the -- to the wall or ground?

2         A.    Yes.   It was -- yes.

3         Q.    At some point during the interview, one

4    of the detectives asked you about Ricky Warner; did

5    they not?

6         A.    Yes.

7         Q.    And at some point in that line of

8    questioning, you did come to understand that the

9    person you knew as Louie was indeed Ricky Warner; is

10   that right?

11        A.    Correct.

12        Q.    And when you made that connection, that

13   they were questioning you about Louie/Ricky Warner,

14   did you then lie to the police officers about not

15   knowing that person?

16        A.    No.

17        Q.    Did you tell them the truth?

18        A.    Yes.

19        Q.    What did you tell them?

20        A.    The truth.

21        Q.    Tell me what you -- tell me what you told

22   them.

23        A.    That I did not know who Ricky Warner was,

24   did not know who Louie was.

Page 147

1  threatened him, his name -- last name was Chewings,

2  C-H-E-W-I-N-G-S, and that he lived in Villa Park.

3         Q.   Did they ask you, sir, whether you had

4  ever gone to the Warner premises and threatened the

5  Warner family?  Did they even ask you the question?

6         MS. ZELLNER:  Objection.  Asked and answered.

7  BY MR. GIBBONS:

8         Q.   You can answer.

9         A.   No.

10        Q.   Had you, in fact, now that you know that

11 Burnout is actually Ricky Warner --

12        A.   Burn Up.

13        Q.   Had you -- or Burn Up.

14             Had you, in fact, been to the Warner

15 family residence prior to February of 1990?

16        A.   Prior to 1990?  My aunt lived directly

17 across the street from the Warners.  I never even

18 knew that the Warners lived there until later on.

19        Q.   When did you first learn that the Warners

20 actually lived across the street from your aunt?

21        A.   I couldn't tell you that.

22        Q.   Prior to your arrest in 1990?

23        A.   Well, I couldn't have learned about it

24 after I was arrested, but I'd go to my aunt's, and

1    he's going to do a second lineup.  And that's when

2    Mr. Herbert Warner came in.

3                   And they did the second lineup, and

4    he picked me out from seeing me in the neighborhood,

5    not from the scene, but saying that I came and

6    threatened him two years prior to the shooting,

7    driving a white Jag, with a vanity plate on the back.

8                   He distinctively remembered that

9    back plate.  That's the one with the sticker on it.

10   That's not a cosmetic plate that goes on the front.

11                   Two separate occasions.

12        Q.   Could you see --

13        A.   That day they had me in the police

14   station, they ran a check.  The plate nor the car

15   existed in '89.

16        Q.   Sir, I'm asking about the lineup.  I got

17   a lot of the other things.

18        A.   Okay.

19        Q.   Here's what I want to know.

20                   Could you see through the glass?

21        A.   No.

22        Q.   Okay.  So you couldn't actually see who

23   was looking at the lineup; is that fair to say?

24        A.   Well, that's how that goes, I guess, if

1      A.   Because I -- I said belonged -- belonged

2  to her, as in past tense. She bought a new car, and

3  I bought that one off of her as a spare car.

4      Q.   Now, did you tell the State's Attorney's

5  Office, the integrity unit, during your discussions

6  there, that you went to see if Ricky would be

7  interested in getting some marijuana in the

8  neighborhood?

9      A.   I've never told a state's attorney that.

10  I've never sold marijuana in my life. So that's a

11  misprint or a mis -- I don't know.

12      Q.   Did you tell the State's Attorney's

13  Office during these interviews at the integrity unit

14  that it was your greed that made you go to the

15  Warners' home?

16      A.   Again, it did not -- nothing made me go

17  to the Warners' home. I was on my way to see my

18  cousin, Kerry Kelly, at his place. And you have to

19  drive down 17th Avenue in Maywood to get there.

20              And out of nowhere, I just said, you

21  know, stop, see if he's home, see what's going on.

22  Maybe he worked things out. Maybe there's some

23  business out here. Maybe -- who knows? Let's see.

24              And, of course, if he have some

1    money and he wants to pay you a few hundred bucks,

2    accept it, but let's see what's going on out here,

3    since Kerry wasn't involved anymore.  And that was

4    the extent of that.

5         THE VIDEOGRAPHER:  Counselor, could you slide

6    your microphone up just a little bit for me?

7         MR. GIBBONS:  Sure.

8         THE VIDEOGRAPHER:  For some reason, after

9    lunch, it's not effective.  Thank you.

10   BY MR. GIBBONS:

11        Q.   And when you stopped by to see what was

12   going on with Ricky, was one of the factors that you

13   told the state's attorneys about was greed?

14        A.   Of course.  Greed always plays a factor

15   in -- when you're doing something like that.

16        Q.   And when you visited -- strike that.

17             When you stopped by to see what was

18   going on --

19        A.   Uh-huh, yes.

20        Q.   -- you were still dealing cocaine at that

21   time; were you not?

22        A.   Yes.

23        Q.   Describe what happened when you stopped

24   by, got out of your car, and went up to the

Page 177

1  residence.

2      A.   I had a friend of mine that was in the

3  back seat, and I had another buddy of mine that was

4  in the front seat, who was just with me.  We were

5  just out, just out driving.

6              And I parked in front of their

7  house, walked up the front few steps, knocked on the

8  door.  A woman answered the door, who I assume was

9  his mother.

10              I asked if Ricky was home.  She said

11  no.  And before I could turn around and leave,

12  Mr. Herbert Warner walked up behind me.

13              And if you want me to continue, I'll

14  continue.

15      Q.   Yeah.  Continue, please.

16      A.   And he -- he asked me -- and I was -- I

17  was startled, I mean, because who -- he asked me --

18  well, he didn't ask me.

19              He said, "What do you want with my

20  son?  He owes you some money for some drugs, doesn't

21  he?"

22              I was taken aback.  How do you

23  respond to somebody's parents about something like

24  that?  So the only thing I could think of at that

Page 178

1   moment.  I said, "No.  I loaned him some money to

2   help him get a car."

3                   Mr. Warner's response was, "I don't

4   pay my son's drug debts."

5                   I said, "I'm not asking you to pay

6   anybody's drug debt."

7                   And I proceeded to go back to my

8   car, thinking this old guy is off his rockers.  And

9   before I could get to the car, a friend of mine, who

10  was in the passenger's seat, I noticed he opened the

11  door and stuck one foot out.  And he was pointing

12  like behind me.

13                  I'm like, "What's wrong?"

14                  And the old man is walking behind me

15  to the car.

16                  And I told him, "Get back.  Close

17  the door.  Put your foot in the car, man.  Let's go.

18  This guy is out of his mind."

19                  That was the extent of it.

20      Q.   Mr. Warner, based on your answer there,

21  asked you if Ricky owed you money for drugs; is that

22  right?

23      A.   Yes, he did.

24      Q.   That was --

Page 217

1          He didn't get out of bed and go get

2     it.  It didn't come from James Fleming.  How did it

3     get to the hospital for Zuley to get it?

4          Q.   Who else did you give these slips of

5     paper like this to?

6          A.   Probably one or two guys from my old

7     neighborhood that I grew up with.

8          Q.   Who?

9          A.   I couldn't tell you their names, man.

10    It's 40 years ago.

11         Q.   So is it fair to say that you might have

12    given Ricky Warner Exhibit No. 6 at or about the time

13    you gave him cocaine to sell as a test case?

14         A.   In what year?

15         Q.   Well, let's put the year aside for a

16    second.

17         A.   Oh, but it's important for me to be able

18    to answer your question.

19         Q.   How many times did you give Ricky Warner

20    cocaine to sell for you?

21         A.   Once.

22         Q.   Okay.  That's the time I'm talking about.

23         A.   He got it.

24         Q.   Since it only happened once --

1      A.   '87, '88 maybe.

2      Q.   Okay.  Whatever the time, is it possible

3  you gave Ricky Warner Exhibit No. 6 when you gave him

4  the cocaine to sell as a test case?

5      A.   It's possible, but it's also possible

6  that I only gave it to the Curtis guy.  And since

7  they were buddies, Curtis would be the one that would

8  call.

9           I don't see why -- these were

10  running buddies.  I don't understand why it would --

11  I don't know why I'd give them both the same number

12  when they're out there together, running buddies, day

13  and night.

14          So is it possible?  Absolutely.  Can

15  I say with 100 percent certainty?  No, I can't.

16     Q.   When is the last time you would have seen

17  either Exhibit No. 6 or something similar to it in

18  relation to your arrest?

19     A.   I'm so glad you asked that question.

20     Q.   Well, there you go.  See, we're starting

21  to get along.

22     A.   Yeah, yeah.

23          Remember, I had not seen Ricky until

24  the time I found out he was shot.  I hadn't seen him

Page 219

1   since, I want to say, '87 or early '88 maybe.

2                    And because I was out of this

3   business and this could have only been lying around,

4   stuck in something in my desk or in one of my old

5   briefcase or at Joey's, Kelly's place, the last time

6   I saw this exhibit, I was in court, trial, in the

7   basement of Oak Lawn -- Oak Forest Hospital.

8                    And my attorney -- that -- yeah.

9   And I saw it when -- out of nowhere, the state's

10  attorney, Prosecutor Laurie Levine, held it up and

11  asked Ricky to identify what's on here.

12                   And that was my first time even

13  knowing that they had this as an exhibit.

14        Q.    Fair enough.  My question, though, kind

15  of eliminated that.

16        A.    Okay.

17        Q.    I asked you prior to your arrest.  So

18  February of 1990.

19        A.    The last time I --

20        Q.    The last time you had seen Exhibit 6 or

21  something similar to it.

22        A.    '87, '88.

23        Q.    Where did you see it?

24        A.    At my cousin Joey's and Kerry Kelly, at

```
                                               Page 220
 1    their house.
 2           Q.    Was Ricky Warner there?
 3           A.    The last time I saw that?
 4           Q.    Correct.
 5           A.    I don't believe so.  I don't believe so.
 6    Again, Kerry was strung out.  And so I was upstairs
 7    in the second apartment to the two-flat that they own
 8    with Joey, his brother.
 9                       And that was the last time I saw
10    that memo pad.  And I remember writing that stuff
11    down for Joey also.
12           Q.    Was Joey, at some point, involved in
13    selling cocaine for you?
14           A.    No, no.  Again, that was in case he knew
15    somebody or wanted to get involved.
16           Q.    So is it your testimony that you gave
17    either Exhibit 6 or something that looks like
18    Exhibit 6 to Joey?
19           A.    Absolutely.
20           Q.    And he is one of the six people or so you
21    would have given this type of information to?
22           A.    Yes.
23           Q.    So we've got Joey.  We have Ricky and
24    maybe Curtis.
```