# PLAINTIFF'S EXHIBIT R

Page 150

1         IN THE UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF ILLINOIS
3                   EASTERN DIVISION
4
    LATHIERIAL BOYD,                  )
5                                     )
              Plaintiff,              )
6                                     )
         vs                           ) No. 13 C 7152
7                                     )
    CITY OF CHICAGO, et al.,          )
8                                     )
              Defendants.             )
9
10          The continued deposition of RICHARD ZULEY
11  called for examination pursuant to notice and
12  pursuant to the Federal Rules of Civil Procedure for
13  the United States District Courts pertaining to the
14  taking of depositions taken before JO ANN LOSOYA,
15  Certified Shorthand Reporter within and for the
16  County of Cook and State of Illinois at 1901 West
17  Butterfield Road, Downers Grove, Illinois, on
18  December 10, 2015 at the hour of 9:00 o'clock a.m.
19
20
21
22
23
24

Page 163

1     A. Yes.
2     Q. After that interview is completed with
3 Ricky Warner, do you visit him again in March?
4     A. I believe I did. There was a social
5 visit in there. I don't know the date.
6     Q. So, we have the report. Your first visit
7 was March 11, correct?
8     A. Yes.
9     Q. And then your second visit is the
10 March 12th visit?
11     A. 12th, right.
12     Q. Okay. And then when do you think the
13 third visit is?
14     A. I really don't know. Sometime between
15 then and mid April.
16     Q. Okay. Is it the third visit that you're
17 given the note, I'll call it the Rat note, or is
18 that just another contact with him?
19     A. No. I think the note came in mid April
20 sometime.
21     Q. So there's probably a third visit, right,
22 after the first two?
23     A. Well, there was a social visit.
24     Q. Okay. And the social visit wasn't

Page 164

1  written up as a report, right?
2      A.  No.  By this time, the case had been
3  cleared and closed, and it was just a social visit.
4      Q.  Tell me about -- you said you are not
5  sure when the date is.  It's sometime before mid
6  April when you get the note?
7      A.  I don't know the date exactly.  My best
8  guess is mid April.
9      Q.  All right.  And tell me what you remember
10 about that visit?
11     A.  There had been a call made to the -- to
12 our office by somebody from the hospital saying that
13 they had something that Ricky had given them to give
14 to us, and I responded to that.  I went out to the
15 hospital.
16     Q.  But my point was, that is when you get
17 the note, right --
18     A.  Yes.
19     Q.  -- when you go out?
20         But there's a social visit.  Whenever
21 it was, can you describe for me that visit.
22     A.  I just stopped out there to see him and
23 see how he was doing.
24     Q.  But tell me about it.  Was he in the same

Page 167

1 1384. I didn't see any reference to James Fleming.
2     A.    Well, it doesn't identify him, no; but it
3 does say --
4     Q.    What page are you on, just so I know.
5     A.    1385. "As a result" --
6     Q.    1385.
7     A.    "As a result of the RD's efforts, one,
8 Lathierial Boyd was identified."
9     Q.    Okay. So, why would you not have
10 mentioned the meeting with James Fleming
11 specifically in that entry?
12     A.    Because James Fleming did not want to
13 have his name included in the report or in the
14 investigation.
15     Q.    Okay. And would you -- would there be a
16 reason that you don't record that fact that there's
17 a witness that doesn't want his name mentioned?
18     A.    Once it's recorded in there, he's now
19 involved in the investigation. So there would be no
20 confidentiality.
21     Q.    Okay. But why would your reports not
22 reflect that James Fleming had asked for -- why
23 wouldn't it say that a witness has asked not to be
24 identified but has provided certain information?

Page 176

1 envelope?
2 A. After it is given to me and I take it in
3 to Ricky to have him explain it.
4 Q. Do you discard the envelope at the
5 hospital?
6 A. I don't know. I don't recall.
7 Q. Well, the inventory number doesn't
8 indicate, does it, that there's an envelope,
9 correct?
10 A. That's correct, yes.
11 Q. So would you assume that it was discarded
12 before then?
13 MR. NOLAND: Objection, foundation.
14 BY THE WITNESS:
15 A. I wouldn't make any assumption on when it
16 was discarded. I don't know.
17 BY MS. ZELLNER:
18 Q. And so you have absolutely no
19 recollection of when it was discarded?
20 A. When it was thrown out, no.
21 MR. NOLAND: Objection, foundation.
22 BY MS. ZELLNER:
23 Q. You know the term "chain of custody,"
24 correct? You're familiar with that?

Page 177

1     A.    Yes.

2     Q.    What is chain of custody? What does that
3 mean?

4     A.    From the moment the evidence is
5 recovered, a continuous chain from that point to
6 when it is inventoried.

7     Q.    And you would agree with me that it would
8 be important where the evidence came from, correct,
9 the location of it?

10    A.    Yes.

11    Q.    So knowing that the location where you
12 received the evidence or found the evidence or
13 discovered the evidence is important, why would the
14 envelope from Northwestern be discarded?

15         MS. FORDYCE: Objection, misstates the
16 documents. The inventory slip, in fact, indicates
17 that a Northwestern envelope was inventoried.

18         MS. ZELLNER: Which page are you
19 referring to?

20         MS. FORDYCE: SOA 01609.
21 BY MS. ZELLNER:

22    Q.    Yea, but there is no indication that it's
23 inventoried under 767575, correct?

24    A.    No.

Page 178

1  Q. Right. So, when you inventoried it, you
2  did not inventory the envelope obviously, correct?
3  A. That is correct.
4  Q. And the envelope was never --
5  MR. NOLAND: Objection, hold on.
6  BY MS. ZELLNER:
7  Q. -- was never used at trial, correct?
8  MR. NOLAND: Objection, that misstates
9  the record.
10  MS. ZELLNER: Could you please answer my
11  question?
12  BY MS. ZELLNER:
13  Q. So, I'm correct, though, that inventory
14  number 767575 did not include the envelope, correct?
15  A. You're correct, yes.
16  Q. You have reviewed your trial testimony
17  and your post conviction testimony, correct?
18  A. I have reviewed it superficially.
19  Q. Right. And you would agree with me that
20  the envelope was never introduced into evidence at
21  the trial?
22  MS. FORDYCE: Objection, speculation,
23  foundation.
24

Page 187

1  suddenly appeared at Northwestern Hospital?
2             MS. FORDYCE:  Objection to the form.
3  BY THE WITNESS:
4       A.    My assumption was that somebody brought
5  the note that he had spoken of, somebody brought the
6  note to the hospital.  Whether he asked them to
7  bring it, I don't know.
8  BY MS. ZELLNER:
9       Q.    Did you ever search Joe Kelly's home?
10      A.    No.
11      Q.    Were you ever in Joe Kelly's home?
12      A.    I don't even know where Joe Kelly's home
13 is.
14      Q.    So it's your testimony that you did not
15 ever search Joe Kelly's home?
16      A.    No.
17      Q.    I'm assuming it is also your testimony
18 that if you searched his home, you didn't take
19 anything from his home, right?
20      A.    I never searched his home.
21      Q.    You're positive you never searched his
22 home?
23            MS. FORDYCE:  Objection, asked and
24 answered.

Page 189

1 he explains the other numbers as being weights and
2 measures for narcotics.
3     Q.    Did you check out the phone number to see
4 if it was active?
5     A.    No.
6     Q.    Why didn't you do that?
7     A.    At this point, the case was closed, and
8 it was in the State's Attorney's hands at that
9 point. I felt if they wanted to pursue that, they
10 could have done that with their investigators.
11     Q.    When do you notify the State's Attorney's
12 about the note?
13     A.    I don't notify them.
14     Q.    Okay. Is the note turned over to them at
15 some point?
16     A.    I believe I signed it out and gave it to
17 the State's Attorney for the trial.
18     Q.    And do you have any understanding of
19 whether the note was used at the trial?
20     A.    I believe it was, yes.
21     Q.    It was actually referred to, wasn't it,
22 by the judge as corroborative evidence that
23 established a link between Boyd and Ricky Warner?
24     A.    I don't know what the judge said about

Page 197

```
 1   right, in the past about --
 2        A.    Yes.
 3        Q.    -- about this case?
 4        A.    Yes.
 5        Q.    So, after the note is inventoried in
 6   July, do you ever see the note again after that
 7   before trial?
 8        A.    No.  Well, until I signed it out for the
 9   State's Attorney.
10        Q.    Right.  Are you ever asked about where
11   the envelope is?
12        A.    No.
13        Q.    It says that in this interview of Ricky
14   Warner on 664 that he was again questioned about the
15   shooting, and he told you they were on the east side
16   of the street and he saw Boyd come up and suddenly
17   pulled a weapon that looked like a Tec 9.  Warner
18   didn't remember anything said before Boyd opened
19   fire on both he and Fleming, correct?
20        A.    Yes.
21        Q.    And the Tec 9 is never connected to Boyd,
22   right?
23        A.    No.
24        Q.    A Tec 9 is never connected to him.  Okay.
```