# PLAINTIFF'S EXHIBIT W

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2             NORTHERN DISTRICT OF ILLINOIS
3                  EASTERN DIVISION
4

   LATHIERIAL BOYD,                      )
5                                        )
                Plaintiff,               )
6                                        )
      vs                                 )   No. 13 C 7152
7                                        )
   CITY OF CHICAGO, CHICAGO POLICE)
8  OFFICER ZULEY, Star No. 15185, )
   CHICAGO POLICE OFFICER LAWRENCE)
9  THEZAN, Star No. 9419, CHICAGO )
   POLICE OFFICER STEVE SCHORSCH, )
10 Star No. 8955, CHICAGO POLICE  )
   OFFICER JOHN MURRAY, Star No.   )
11 3175, CHICAGO POLICE OFFICER    )
   WAYNE JOHNSON, Star No. 4266,   )
12 UNKNOWN CHICAGO POLICE OFFICERS)
   and RAY KAMINSKI, as special    )
13 representative of the Estate    )
   of the former Chicago Police    )
14 Officer ANDREW SOBOLEWSKI,      )
   Star No. 16498,                 )
15                                 )
                Defendants.        )
16
17          The deposition of STEVE SCHORSCH called
   for examination pursuant to notice and pursuant to
18 the Federal Rules of Civil Procedure for the United
   States District Courts pertaining to the taking of
19 depositions taken before JO ANN LOSOYA, Certified
   Shorthand Reporter within and for the County of Cook
20 and State of Illinois at 1901 Butterfield Road,
   Chicago, Illinois, on February 25, 2015 at the hour
21 of 10:25 o'clock a.m.
22
23
24

Page 44

1    prior to lineup, did a consent to search on

2    Mr. Boyd's apartment.

3         Q.    Okay.  Let me backup just a minute.

4    With this reference to a Jamaican gang, what did

5    you know -- what general knowledge did you have at

6    that time about Jamaican gangs in that area?  Were

7    they doing drugs?  What were they --

8         A.    Prior to my becoming a detective in

9    1988, three years prior to that, I worked with

10   narcotics, with NIPS, Narcotic Impact Program.  We

11   made street buys up in that area, different areas

12   of the city with the Jamaicans, Africans, Vice

13   Lords, Travelling Vice Lords, Gaylords, Gangster

14   Disciples.  There were a lot of different gang

15   factions up in that area around Wrigleyville that

16   sold drugs on a regular basis.

17        Q.    What about right in that specific

18   location around the Exodus?

19        A.    There were probably about four or five

20   factions.

21        Q.    Who were they?

22        A.    Once again, the Jamaican Posse.

23        Q.    They were the lead faction though,

24   right?

Page 45

1       A.      Not really.  They had the Travelling

2   Vice Lords that probably controlled that area

3   pretty much.

4       Q.      Breezo was a Vice Lord, is that correct?

5       A.      I don't know.

6       Q.      Well, assume that he was.  Stanley

7   Morgan was a Vice Lord?

8               MS. RALPH:  Objection, speculation.

9               MR. NOLAND:  If you'd let him answer the

10  question.  Just a second ago, I think you cut him

11  off.

12              MS. ZELLNER:  Excuse me.

13  BY MS. ZELLNER:

14      Q.      Do you recognize the name Stanley

15  Morgan?

16      A.      No.

17      Q.      But you said the Vice Lords were also in

18  that area?

19      A.      The Vice Lords, the Gangster Disciples,

20  the Jamaican Posse.  There were a bunch of African

21  Rastafarian people that started coming in there.

22  You had Latin Eagles.

23      Q.      I'm talking about that specific area.

24      A.      That's what I'm talking about.

Page 50

1    Q.    Okay.   So at some point in time, though,

2    early in the investigation one of your assignments

3    is to make a list of narcotic dealers, right?

4    A.    Yes.

5    Q.    Let me get that.   Let me just hand you

6    this one.

7                        (WHEREUPON, document marked as

8                        Deposition Exhibit No. 3.)

9    BY MS. ZELLNER:

10    Q.    Let me just hand you this report and ask

11    you if you can first identify your signature on it.

12    A.    That's my signature.

13    Q.    And then if you go to the second page,

14    that last paragraph, could you just read that into

15    the record?

16    A.    Reporting detective then contacted the

17    Organized Crime Division Narcotics Section and

18    requested that they compile a list of narcotic

19    dealers and offenders from the area of the incident

20    and send same to Area 6 Violent Crimes office as

21    soon as possible.   The names of the victims were

22    also submitted for profiles and will also be sent

23    when ready.

24    Q.    Do we know -- I'm assuming that you did

Page 51

1    that, correct?

2         A.    Yes, I made that phone call.

3         Q.    And is that around what -- what's the

4    date?  When did you do that?

5         A.    That would have been on the 26th of

6    February.

7         Q.    And so you make a phone call to the

8    Organized Crime Division?

9         A.    Yes.

10        Q.    Tell me about that phone call that you

11   made?

12        A.    Tell them about what happened, tell them

13   about the accident that we had, and I asked them if

14   they had any missions going on in the area,

15   specifically where they were targeting anybody

16   specific, and then I asked them to compile, if they

17   knew of anybody, to talk to their guys, told them

18   what we were looking for.  We were looking for we

19   believe it to be either a gang-related or

20   narcotic-related shooting, and if they could help

21   us out in any way, show us any kind of names

22   specifically from that area, no matter what gang it

23   was or anything else like that, just if they had

24   anything at all to send us to the area.

1    Division?

2         A.    Once again, I never saw a specific list.

3    They may have called the area back, talked to

4    somebody at the desk and said we got nothing, we

5    got nothing up there.

6         Q.    But there would be a report of that,

7    correct?

8              MR. NOLAND:  Objection, calls for

9    speculation.

10             MS. RALPH:  Answer.

11   BY THE WITNESS:

12        A.    Not necessarily.

13   BY MS. ZELLNER:

14        Q.    There would not be a report if they

15   called back and gave a list of names, there would

16   not be a report?

17             MR. NOLAND:  Objection, asked and

18   answered.

19             MS. ZELLNER:  No.  Let him answer.

20   BY THE WITNESS:

21        A.    If there was a list of names, then they

22   would have sent us a list of names.  But if it was

23   negative, somebody would have just -- it's not

24   unusual to get a call and say we got nothing up

1    there.

2    BY MS. ZELLNER:

3        Q.    But why wouldn't there be a report if

4    there was nothing up there?  Why wouldn't there be

5    a report in the file?

6        A.    Because narcotics and gangs in the

7    organized crime section, they don't always generate

8    reports.  I can't speak for their policies or what

9    they do.

10        Q.    You had that experience before of

11    calling in and they didn't generate reports?

12        A.    I don't work for those units.

13        Q.    What about on your end, the person that

14    took the call, why would they not have generated --

15        A.    On their end?  I don't know.

16        Q.    But you never followed up on it,

17    correct?

18        A.    Me, personally, no.

19        Q.    When you made the phone call, did they

20    say, we can check it right now?

21        A.    No.

22        Q.    What did they say to you?

23        A.    Just we will check on it.

24        Q.    And they had your name, correct?

Page 59

1      A.     No.

2      Q.     Did you tell them what time the shooting

3  occurred?

4      A.     Yes.

5      Q.     Did you tell them that you suspected

6  that it involved some type of drug transaction?

7      A.     Yes.

8      Q.     Did you tell them that it involved

9  marijuana or cocaine?

10     A.     Yes.

11     Q.     Did you tell them anything about

12  Warner's background?

13     A.     Them?  No.

14     Q.     Did you know about Warner's background

15  at that point?

16     A.     No.

17     Q.     Did you tell them anything about

18  witnesses at the scene?

19     A.     No.

20     Q.     Did you tell them what kind of weapon

21  was used?

22     A.     I may have.

23     Q.     Did you tell them anything or mention

24  anything about Jamaicans at the scene?

Page 62

1              MS. ZELLNER:   Let me show you the

2    witness identification involving this.

3                        (WHEREUPON, document marked as

4                        Deposition Exhibit No. 4.)

5    BY MS. ZELLNER:

6         Q.     I've handed you Plaintiff's Exhibit 4.

7    What do you recognize this document to be?

8         A.     This is a supplementary report prepared

9    by Detective Sikorski and Kowalski.

10        Q.     You said they were the officers at the

11   scene, correct?

12        A.     Correct.

13        Q.     And they interviewed witnesses?

14        A.     It appears so, yes.

15        Q.     At the scene, right?

16        A.     Yes.

17        Q.     If you look on the second page of this

18   document, SAO1366 or LB83, there is a description

19   provided of the shooter.  Do you see that?

20        A.     I do.

21        Q.     Could you read that into the record,

22   please?

23        A.     No. 1, male black, mid-to-late 20s,

24   5-foot-10 to 6-foot tall, 170 to 190 pounds,

1    well-built, unknown black hair, flat nose with

2    moustache, medium dark, wore either a black leather

3    baseball cap or ski cap, waist length dark brown or

4    black leather jacket, blue jeans, gym shoes, no

5    further description.  No. 2, additional offenders

6    in vehicle described subsequently.

7        Q.    Now, is it your understanding that this

8    description came from the witnesses at the scene?

9        A.    It lists in parentheses underneath,

10   above description came from interviews of all known

11   witnesses.

12       Q.    And those were interviews that Kowalski

13   conducted, right?

14       A.    Kowalski and Sikorski.  I don't know if

15   there were any other detectives that were assigned

16   at the time interviewing people, but it would have

17   came during the interviews of the people that are

18   listed there.

19       Q.    Do you know what Lathierial Boyd's

20   height was at that time?

21       A.    I don't.

22       Q.    Do you know what his weight was?

23       A.    I don't.

24       Q.    Do you know if he had a moustache?

Page 64

1      A.     I don't.

2      Q.     Do you know if he had a flat nose?

3      A.     I don't.

4      Q.     You would agree with me the witnesses

5  were able to give a description of the shooter,

6  though, to some extent?

7           MS. RALPH:  Objection, foundation.

8  BY MS. ZELLNER:

9      Q.     The report indicates there's a

10  description given by the witnesses, right?

11      A.     I don't know if the description is by

12  all the witnesses.

13      Q.     Okay.  But the description is coming

14  from witnesses, right, whether it's one or many?

15      A.     Yes.

16      Q.     Just looking through this report, do you

17  see any reference in this report to any of the

18  witnesses being intoxicated at the scene?

19      A.     No, it does not.

20      Q.     Okay.  Did you notice when you were --

21  would you expect that if the witnesses were

22  intoxicated, that the officers interviewing them

23  would have made note of that?

24           MR. NOLAND:  Objection to the extent

1    about, you know, your interaction with the

2    witnesses or Mr. Warner?

3        A.    The two girls.  And some of the sailors.

4    The two girls specifically.  They told me -- they

5    were very scared.  I told them, don't worry about

6    it.  Nobody can see you.  They said, nah, that's

7    not what we're scared about.  We were in a bar.  We

8    shouldn't have been in a bar.  We were drinking.

9    We are underage, stuff like that.  I don't want to

10   get in trouble.  It doesn't matter.  I don't really

11   want to -- we were drinking.  We were pretty drunk.

12   I don't think I can make an identification.  I

13   said, I don't really care about that.  I don't care

14   if you were drunk.  I don't care if you were

15   drinking.  I'm not going to tell your mom and dad

16   if you were buying reefer or you were playing with

17   the sailors.  That's not why we're here.  Just do

18   your best.  If you can identify anybody, fine.  If

19   you can't, you can't.  They viewed it very quickly,

20   a matter of seconds.  I don't see anybody.  Then

21   they were put in the other room and the next person

22   was brought up.

23       Q.    And did the other detectives in addition

24   to yourself, did they have interaction with these