IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LATHIERIAL BOYD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  13 C 7152 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| CITY OF CHICAGO; CHICAGO POLICE | ) | |
| OFFICER RICHARD ZULEY, Star No. 15185; | ) | |
| CHICAGO POLICE OFFICER LAWRENCE | ) | |
| THEZAN, Star No. 9419; CHICAGO POLICE | ) | |
| OFFICER STEVE SCHORSCH, Star No. 8955; | ) | |
| and CHICAGO POLICE OFFICER JOHN | ) | |
| MURRAY, Star No. 3175, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lathierial Boyd filed a nine count third amended complaint on July 12, 2016, asserting various claims against the defendant officers and the City of Chicago.  On July 11, 2016 the defendants filed a motion for summary judgment on all counts.[1]  For the reasons stated below, the court grants defendants' motion for summary judgment in its entirety.

**BACKGROUND**[2]

On December 10, 1990, plaintiff was convicted of first-degree murder, attempted first-degree murder, and aggravated battery following a bench trial in the Circuit Court of Cook County.  The trial court found that on February 24, 1990, petitioner fired a Tec-9 or "Uzi-style" assault rifle into a crowd outside a bar on Chicago's north side.  One individual was killed, one

---

[1]Although plaintiff had not yet filed his third amended complaint, defendants filed their motion for summary judgment based on plaintiff's draft third amended complaint, which was attached as an exhibit to his request for leave to file a third amended complaint.  That request was filed on May 2, 2016, and granted on May 4, 2016.

[2]The following facts are taken from the parties' L.R. 56.1 statements.

was rendered a quadriplegic, and three others were wounded. The court sentenced plaintiff to 55 years' imprisonment for first-degree murder and a consecutive 27 years' imprisonment for attempted murder, in addition to 5 years' imprisonment for aggravated battery, to run concurrently.

For the next two decades plaintiff maintained his innocence and filed several unsuccessful appeals. In 2012 the Cook County State's Attorney's Conviction Integrity Unit re-investigated the case and, ultimately, on September 10, 2013, Cook County State's Attorney Anita Alvarez moved to vacate plaintiff's conviction and dismissed the charges against him. On September 13, 2013, plaintiff filed an unopposed Petition for Certificate of Innocence, which was granted on September 25, 2013. Plaintiff then moved to California and filed this lawsuit against the City of Chicago and the homicide detectives who investigated the shooting.

## THE SHOOTING, INVESTIGATION, AND TRIAL

In the early morning hours of February 24, 1990, Ricky Warner and Michael Fleming were on North Clark Street near Wrigley Field attempting to sell drugs to people leaving nearby bars. At around 2:00 a.m. somebody approached them with an uzi-like machine gun and opened fire. When the police arrived at the scene, Michael Fleming was dead, Ricky Warner lay on the sidewalk (he survived, but was rendered a quadriplegic and died three years later), and three bystanders had minor injuries. The investigating officers interviewed witnesses at the scene and their investigation began.

The major focus of the investigation was the surviving victim, Ricky Warner ("Ricky") and his father, Herbert Warner ("Herbert"). During the investigating officers' first interaction with Ricky, just days after the shooting, Ricky relayed to the officers that he did not know who

shot him, but that he owed an individual named "Rat" some money for a drug debt. The officers

followed up on this information by interviewing Ricky's father, Herbert, who confirmed that an

individual named Rat had come to the Warner home and threatened Herbert and the entire

Warner family over the debt. The officers subsequently learned that Rat is Lathierial Boyd's

childhood nickname. As the days progressed, Ricky identified Rat from a photo array and

relayed to the investigating officers that Rat had shot him.

After plaintiff was identified as Rat, the officers went to his family home to speak with

him. They instead spoke with his father, who informed them that he was not there. After

plaintiff learned that the police were looking for him in connection with the shooting, he reported

to the police station voluntarily on March 12, 1990. Plaintiff answered questions, allowed the

officers to search his home, and agreed to participate in a lineup. The investigating officers

brought in the eyewitnesses who were interviewed at the scene and Herbert. Herbert identified

plaintiff as the man who had threatened him. None of the eyewitnesses identified plaintiff as the

shooter, and he did not match the description that was given at the scene. The investigating

officers' lineup report reflected that two of the witnesses relayed to them that they were drunk on

the night of the shooting and may not be able to pick anyone out of the lineup.

Plaintiff was ultimately arrested and charged with murder, attempted murder, and

aggravated battery. Several weeks later, the investigating officers were given a note by hospital

staff who treated Ricky. This note became known as the "Rat note" or, at trial, "Exhibit 20."

Exhibit 20 was a piece of paper that had written on it the name "Rat," a telephone number, and

numbers representing drug quantities and prices. According to the officers, Exhibit 20 was given

to the hospital staff on behalf of Ricky, who told them that plaintiff had given it to him along

with cocaine that he was to sell for plaintiff. It was from this transaction, according to Ricky, that the drug debt between the two arose. Although he sold the cocaine, Ricky never gave plaintiff his share of the proceeds.[3]

With Exhibit 20 and Ricky and Herbert's testimony, the case went to trial. Ricky testified unequivocally that plaintiff shot him and Herbert testified unequivocally that plaintiff threatened to kill the Warner family over the drug debt. No testimony regarding the lineup was elicited by either party, and no evidence of the lineup was used at trial by either party. Plaintiff presented two alibi witnesses: his sister, Angela Boyd, whose apartment he stayed at on the night of the shooting, and her boyfriend, Harold Casey, who also stayed at the apartment. Both of them testified that they, along with plaintiff, ate pizza and watched a Bulls game before going to bed on the night of February 23, 1990. Plaintiff's trial attorney did not elicit testimony from either of them that they had seen plaintiff in the apartment between the time they went to bed and the time they woke up. Plaintiff was found guilty on this evidence.[4]

## DISCUSSION

### I. Summary Judgment Under Rule 56

Defendants have moved for summary judgment on all counts. Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The movant bears the burden of establishing both elements, Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990),

---

[3]Plaintiff later confirmed this.

[4]In plaintiff's post-conviction proceedings, the state court found that plaintiff's trial counsel was not ineffective. People v. Boyd, No. 1-94-3734 (Ill. App. 1996); People v. Boyd, 667 N.E.2d 1059 (Ill. 1996) (denying petition for leave to appeal).

and all reasonable inferences are drawn in favor of the non-movant. Jones v. Illinois Bell Tele. Co., 2013 WL 5781814 at *3 (N.D. Ill. Oct. 24, 2013) (citing Fisher v. Transco Services-Milwaukee, Inc., 979 F.2d 1239, 1242 (7th Cir. 1992)). If the movant satisfies this burden, then the non-movant must set forth specific facts showing there is a genuine issue for trial. Nitz v. Craig, 2013 WL 593851 at *2 (N.D. Ill. Feb. 12, 2013). In doing so, the non-movant cannot simply show there is some metaphysical doubt as to the material facts. Id. (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find in favor for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## II.     Summary Judgment Under Local Rule 56.1

The facts underlying summary judgment proceedings are drawn from the parties' Local Rule 56.1 submissions. "[I]n the Northern District of Illinois, the Rule 56.1 statement is a critical, and required, component of a litigant's response to a motion for summary judgment." Sojka v. Bovis Lend Lease, Inc., 686 F. 3d 394, 398 (7th Cir. 2012). Local Rule 56.1 assists the court "by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." Bordelon v. Chi. Sch. Reform Bd. of Trustees, 233 F.3d 524, 527 (7th Cir. 2000) (internal quotation omitted). It "is designed, in part, to aid the district court, which does not have the advantage of the parties' familiarity with the record and often cannot afford to spend the time combing the record to locate the relevant information in determining whether a trial is necessary." Delapaz v. Richardson, 634 F.3d 895, 899 (7th Cir. 2011) (internal quotation omitted). "This rule may be the most

important litigation rule outside statutes of limitation because the consequences of failing to satisfy its requirements are so dire." <u>Malec v. Sanford</u>, 191 F.R.D. 581, 584 (N.D.Ill. Mar. 7, 2000).

Local Rule 56.1(b)(3) governs the nonmovant's response to the movant's Local Rule 56.1(a)(3) statement of material facts. The party opposing summary judgment must respond to the movant's statement of proposed material facts with a concise response for "each numbered paragraph in the moving party's statement," including specific references to "supporting materials relied upon." L.R. 56.1(b)(3)(B); <u>Id</u>. Each response, and each asserted fact, must be supported with a specific reference to the record. L.R. 56.1(b)(3)(B)–(C); <u>Cracco v. Vitran Exp., Inc.</u>, 559 F.3d 625, 632 (7th Cir. 2009). Responses and facts that are not set out and appropriately supported in an opponent's Rule 56.1 response will not be considered, and the movant's version of the facts – if compliant with the rule – will be deemed admitted. L.R. 56.1(b)(3)(C); <u>Shaffer v. American Medical Ass'n</u>, 662 F.3d 439, 442 (7th Cir. 2011); <u>Rao v. B.P. Products North America, Inc.</u>, 589 F.3d 389, 393 (7th Cir. 2009); <u>Raymond v. Ameritech Corp.</u>, 442 F.3d 600, 608 (7th Cir. 2006). "[A] general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." <u>Malec</u>, 191 F.R.D. at 584. Further, a Rule 56.1(b)(3) response "is not the place for purely argumentative denials," <u>id</u>., nor is it the place for additional facts. <u>Ciomber v. Cooperative Plus, Inc.</u>, 527 F.3d 635, 644 (7th Cir. 2008).

Local Rule 56.1(b)(3)(C) "sets out requirements for the nonmovant's statement of additional facts that are identical to the obligations imposed on the movant's statement of facts." <u>Malec</u>, 191 F.R.D. at 584. The party opposing summary judgement shall file "a concise

response to the movant's statement that shall contain a statement, consisting of short, numbered paragraphs, of any additional facts that require the denial of summary judgment." L.R. 56.1(b)(3)(C).  The nonmovant's statement of additional facts must be "supported by specific references to the record," Malec, 191 F.R.D. at 584, and must be limited to material facts–that is, facts that are relevant to the outcome of the issues presented by the movant's summary judgment motion.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 921 (7th Cir. 1994).

In their Reply to Plaintiff's Responses to Defendants' Rule 56.1 Statement of Material Undisputed Facts, defendants object in general to plaintiff's responses for failing to comply with Local Rule 56.1. The court notes that several of plaintiff's statements of additional facts also fail to comply with Local Rule 56.1.  The Seventh Circuit has consistently "held that a district court has broad discretion to require strict compliance with Local Rule 56.1." Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec, 529 F.3d 371, 382 n.2 (7th Cir. 2008); see also Waldridge, 24 F.3d at 922 (collecting cases).  In accordance with its broad grant of discretion, this court strictly enforces Local Rule 56.1.  Consequently, many of defendants' objections to plaintiff's responses are sustained, and those responses are stricken.  Several of plaintiff's statements of additional facts are stricken for the same reason.

First, as defendants point out, many of plaintiff's responses to defendants' statement of material facts contain allegations that either misstate the cited record or are not supported by citations to the record.  The nonmovant's responses and additional factual allegations must be supported by the record,  Malec, 191 F.R.D. at 584, and it is improper for a party to misstate the cited record.  Nat'l Inspection & Repairs, Inc. v. George S. May Int'l Co., 2008 WL 4389834, at *2 (N.D.Ill. Sept. 24, 2008).  The consequence of plaintiff's failure to comply with Local Rule

56.1 by neglecting to cite the record and misstating the record in many of his responses is that those responses are disregarded and defendants' factual allegations to which they are directed are deemed admitted.[5] Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003). Additionally, several of plaintiff's statements of additional facts fail comply with Local Rule 56.1 for the same reason, and the court therefore disregards them.[6]

Second, many of plaintiff's responses to defendants' statement of material facts are argumentative, immaterial, or both. For example, in his response to paragraph 74 of defendants' statement of material facts, plaintiff disputes the he admitted in his July 22, 2015, deposition that

_____

[5]The court finds that the following responses to defendants' statement of material facts do not comply with Local Rule 56.1 because they are either unsupported by the record or misstate it, and therefore strikes them: ¶¶ 11, 15, 19, and 63–64 (Ricky's inability to communicate with the defendant officers regarding the shooting); 35 and 39 (defendant officers showed Ricky only plaintiff's photo and were not assisted by Nurse Weisman).

[6] The court finds that the following additional facts do not comply with Local Rule 56.1 because they are either unsupported by the record or misstate it, and therefore strikes them: ¶¶ 1 (no follow up was done to determine if the shooting was gang related); 2 (Detective Kowalski searched Ricky Warner's pockets); 17 (Michael Fleming was shot first and the apparent target); 19 (statements made by Jennifer Bonnano more than a decade later were given to detectives at the scene); 21 (plaintiff was never linked to a car described as the shooter's); 23 (Assistant State's Attorney Keane admitted that she discovered new evidence when she interviewed defendant Thezan); 25 (the photo identification of Rat in the hospital was fabricated; defendant Zuley told Ricky to pick out Rat); 26 (March 9, 1990, police report and defendant Sobolewski testimony were fabricated); 28 (Ricky became disconnect from his ventilator and lost consciousness immediately before being interviewed by the defendant officers on March 11, 1990, which further impaired his thought process and memory); 29 (the defendant officers never contacted Ricky's treating physician); 30 (Ricky could not be disconnected from his ventilator for even a short period of time without losing consciousness); 37 and 40 (defendant officers knew that there was no "RAT" license plate when they prepared their March 9, 1990, report); 39 and 41 (defendant Zuley obtained the name Rat); 42 (claim regarding the time line of events); 43 (defendant Zuley testified that he obtained the name Rat); 46, 55, and 58 (Glenn Diamond specifically advised the defendant officers that plaintiff was not the shooter); 51 (defendant Zuley signed defendant Murray's name on police reports); 53 (defendant Zuley was not present for a conversation with lineup witnesses); and 57 (defendant Zuley's July 11, 1990, report is false).

he had written out slips of paper similar to the "Rat note" allegedly given to police on Ricky's behalf and that he may have given one to Ricky. In disputing this fact, plaintiff summarily ignores his own deposition testimony, cited by defendants, admitting that he wrote "a number" of such notes, all of which were "identical," that he could very well have given one to Ricky when he gave him cocaine to sell, and that another one could turn up in the future. <u>See</u> Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, Ex. P. To support his purported denial, plaintiff directs the court's attention to another section of the same deposition where plaintiff states that he last saw the "Rat note" that was used at trial as Exhibit 20 at his cousin, Joey Kelly's house. Plaintiff's response makes clear that there is no true dispute as to any material fact presented by defendants, despite his claim to the contrary. The fact that plaintiff testified that he last saw one of "a number" of "identical" notes that he admitted writing at his cousin's house does nothing to dispute his own testimony that he might have given one such note to Ricky.

The nonmovant's response to the movant's statement of facts and statement of additional facts must represent only material facts and are not the proper province of argumentative or conclusory allegations. <u>Basta v. Am. Hotel Register Co.</u>, 872 F.Supp.2d 694, 700 (N.D.Ill. Jan. 11, 2012). Arguments belong in the supporting memorandum of law in opposition to summary judgment. <u>Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty, Ill.</u>, 424 F.3d 659, 664 n.2 (7th Cir. 2005). The court finds that plaintiff failed to comply with Local Rule 56.1 by relying on argumentative and immaterial assertions in several of his responses to defendants' statement of

material facts.  The court therefore disregards those responses, and the facts to which they are directed are deemed admitted.[7]

Third, as defendants point out, several of plaintiff's statements of additional facts contain inadmissible hearsay.  Hearsay is every bit as inadmissible at summary judgment as it is at trial. Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997).  Accordingly, a party cannot rely on hearsay in a Local Rule 56.1 statement of facts or response.  De v. City of Chi., 912 F.Supp.2d 709, 714 (N.D.Ill. Dec. 14, 2012) (citing Rogers v. City of Chi., 320 F.3d 748, 751 (7th Cir. 2003).  Because plaintiff violated Local Rule 56.1 by relying on inadmissible hearsay, the court disregards all such additional facts.[8]

Finally, defendants object to a number of plaintiff's responses to defendants' statement of material facts for containing non-responsive additional facts that exceed the scope of defendants' statement of material facts.  It is improper, and a violation of Local Rule 56.1, for the nonmovant to add additional facts to his response; the additional facts belong in a separate statement of additional facts.  Ammons v. Aramark Unif. Servs., Inc., 368 F.3d 809, 817 (7th Cir. 2004).  The court finds that plaintiff failed to comply with Local Rule 56.1 by adding additional facts to his

---

[7]  The court finds that the following responses to defendants' statement of material facts do not comply with Local Rule 56.1 because they rely on argumentative and immaterial assertions, and therefore strikes them: ¶¶ 14 and 65 (Ricky's inability to communicate with the defendant officers); 18 (Ricky was misled by the defendant officers); 33–34 (how the defendant officers obtained the name Rat); 38 and 66 (Ricky's trial testimony was inconsistent); 40–43 (police reports regarding Herbert's testimony were fabricated); 67 and 69 (disputing the origin of the Rat note).

[8] The court finds that the following additional facts do not comply with Local Rule 56.1 because they rely on inadmissible hearsay, and therefore strikes them: ¶¶ 11–15 (statements made by Michael Fleming's girlfriend, Charisse Parker); 16 (statements witnesses attributed to Ricky and Fleming); 20 (statements Bonanno made to WGN-TV in 2006); and 59 (statements Ricky made to Joey Kelly).

responses to defendants' statement of material facts and therefore disregards them. The facts to which the improper responses are directed are deemed admitted.[9]

The Seventh Circuit is very clear that a district court possesses the discretion to strike in its entirety the nonmovant's statement of additional facts where the nonmovant fails to comply with Local Rule 56.1. Cichon v. Exelon Generation Co., L.L.C., 401 F.3d 803, 809–10 (7th Cir. 2005); Bordelon, 223 F.3d at 528. The court declines to exercise that discretion only because a significant amount of judicial resources have already been devoted to sifting through the parties' Local Rule 56.1 statements to ascertain those facts which are, in fact, material and disputed. Having done a considerable amount of work to decide defendants' motion, the court takes those facts that are properly pleaded to decide the legal issues presented.[10]

## III. Analysis

Plaintiff alleges that his conviction was the result of serious misconduct on the part of the defendant officers, all of whom violated his constitutional rights. Defendants argue that all of

---

[9] The court finds that the following responses to defendants' statement of material facts do not comply with Local Rule 56.1 because they contain non-responsive additional facts that exceed the scope of defendants' statement of material facts, and therefore strikes them: ¶¶ 16–17, 22, and 37 (Ricky could not communicate with the defendant officers regarding the shooting, so police reports are fabricated); 21 (defendant Zuley first mentioned the name Rat); 25 (plaintiff did not threaten Herbert or own a white Jaguar with a RAT license plate); 26 (plaintiff never owned a beige Nova-like car); 46 (Rat was not a gang name); 52 (plaintiff was driving to his cousin's house when he stopped at the Warner home); 54 (plaintiff had a valid FOID card); 58 (denying that plaintiff went to the Warner home and threatened Herbert twice); 62 (plaintiff's defense attorney never ever saw the lineup report stating he was present); 71 (envelope containing Exhibit 20 was not inventoried); 72–73 (origin of Exhibit 20); and 78 (state court's reasons for dismissing ineffective assistance of counsel petition).

[10] The court notes that plaintiff has made no attempt to correct the instances of noncompliance detailed above, despite defendants' objections in their Reply to Plaintiff's Responses to Defendants' Rule 56.1 Statement of Material Undisputed Facts.

plaintiff's claims fail because there is no evidence of misconduct on the part of any of the defendant officers, or an underlying constitutional violation.

### A.    Count I: Plaintiff's <u>Brady</u> Claims

Count I of plaintiff's complaint alleges that the defendant officers violated 42 U.S.C. § 1983 by concealing material exculpatory and impeachment evidence.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83, 87–88 (1963) (state violates due process by failing to disclose material exculpatory evidence to the defense in time for defendant to make use of it).  To establish a <u>Brady</u> violation, plaintiff must prove three elements: "(1) the evidence at issue is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the suppressed evidence resulted in prejudice."  <u>United States v. O'Hara</u>, 301 F.3d 563, 569 (7th Cir. 2002) (citation omitted); <u>see also United States v. Sanchez</u>, 2009 WL 5166230 at *7 (N.D.Ill. Dec. 22, 2009).  "Favorable evidence is material if its suppression resulted in prejudice, that is, a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>Mosley v. City of Chicago</u>, 2009 WL 3097211 at *4 (N.D. Ill. 2009), <u>aff'd</u>, 614 F.3d 391 (7th Cir. 2010) (internal quotation omitted).  If "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," such a reasonable probability exists.  <u>Id</u>.

"Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."  <u>Carvajal v. Dominguez,</u> 542 F.3d 561, 567 (7th Cir. 2008).  The obligation to turn over potentially exculpatory evidence "extends to

police officers, insofar as they must turn over potentially exculpatory evidence when they turn over investigative files to the prosecution." Harris v. Kuba, 486 F.3d 1010, 1014 (7th Cir. 2007) (citation omitted).

In his Brady claim, plaintiff alleges that defendants concealed a mountain of evidence, yet, as outlined in Section II of this opinion, the majority of plaintiff's claims are either unsupported or contradicted by the record. The court will address a few, all of which the court rejects, for illustrative purposes before turning to plaintiff's one viable Brady claim.

First, plaintiff alleges that the defendant officers concealed information regarding Ricky's medical condition and ability (or inability) to communicate. Defendants contend that the police reports that were tendered to plaintiff's counsel prior to trial do, in fact, disclose Ricky's medical condition and ability to communicate. And indeed they do. A report submitted by defendant Schorsch on March 4, 1990, notes that, due to Ricky's medical condition, he was unable to be interviewed. See Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, Ex. C. Additionally, a report submitted by defendants Sobolewski and Thezan on March 9, 1990, clearly states that Nurse Hendricks of Northwestern Memorial Hospital relayed to the defendant officers that Ricky was "conscious and alert," and thus able to be interviewed, but that he could not talk due to his injuries. See id., Ex. D. The report further states that Nurse Hendricks informed the defendant officers that Ricky "could, however, communicate and that she would assist in this process." Id. Despite noting these barriers to communication, the report then lists fairly intricate details supposedly relayed by Ricky to the defendant officers regarding his activities before the shooting and a person named "Rat," which is plaintiff's childhood nickname, who had previously threatened his family over a drug debt. Id. This report, along

with all known police reports, was tendered to defense counsel prior to trial. Consequently, the evidence defeats plaintiff's <u>Brady</u> claim. <u>See Cairel v. Alberden</u>, 821 F.3d 823, 832 (7th Cir. 2016) (<u>Brady</u> claim fails where detailed police reports were disclosed to the prosecution).

To the extent that plaintiff responds to the defendant officers' contention that police reports were not suppressed, he does not point to any evidence of existing police reports that were suppressed. Instead, plaintiff makes unsubstantiated claims that the defendant officers made unreported visits to Ricky and failed to file reports regarding those visits. Defendants acknowledge one such visit, which took place after the case was closed and was admittedly "social," to "see how he [Ricky] was doing." Plaintiff offers no evidence of any additional visits. Even assuming such visits did occur, the defendant officers would have been under no obligation to submit reports regarding those visits. <u>See Jones v. City of Chicago</u>, 856 F.2d 985, 995 (7th Cir. 1988) ("<u>Brady v. Maryland</u> does not require the police to keep written records of all of their investigatory activities."). Plaintiff fails to cite any evidence in the record to indicate that even one police report was prepared yet not disclosed by the defendant officers, and has not produced any evidence at all from which a reasonable jury could infer that any such reports ever existed. Because there is no evidence that undisclosed police reports ever existed, "[t]here is no evidence in the record that the officers withheld any materially favorable piece of evidence" and thus no <u>Brady</u> violation. <u>Mosley</u>, 614 F.3d at 398. Even if the defendant officers violated police procedures by failing to prepare reports after visiting Ricky - an allegation not made by plaintiff - 42 U.S.C. § 1983 protects against constitutional violations, not violations of police practices, and any such violation would not rise to the level of a <u>Brady</u> violation. <u>See Pasiewicz v. Lake County Forest Preserve Dist</u>., 270 F.3d 520, 526 (7th Cir. 2001).

Additionally, defendants point out that Ricky's medical condition was far from undisclosed, as the entire trial had to be moved to his hospital room because he could not be removed from his ventilator in order to testify in court. Accordingly, defendants contend that any information regarding his medical condition could have easily been obtained through defense counsel's exercise of reasonable diligence. Plaintiff does not address this point, and instead argues that Saunders v. City of Chicago, 2013 WL 6009933 (N.D. Ill. Nov. 13, 2013), stands for the proposition that Brady does not require a defendant to locate government witnesses and interview them to determine the veracity of incriminating statements contained in police officers' reports. Here, however, it is Ricky's ability to make the March 1990 statements at all that plaintiff challenges.

Plaintiff points to nothing in the record to indicate that the defendant officers possessed, much less suppressed, evidence that Ricky was unable to communicate with them in March of 1990. It is well established that "[t]he Brady rule does not apply to evidence not in the possession of the government that a defendant would have been able to discover himself through reasonable diligence." United States v. Tadros, 310 F.3d 999, 1005 (7th Cir. 2002) (citing United States v. Grintjes, 237 F.3d 876, 880 (7th Cir. 2001); Crivens v. Roth, 172 F.3d 991, 996 (7th Cir. 1999); United States v. Dimas, 3 F.3d 1015, 1018–19 (7th Cir. 1993)). Similarly, "Brady does not require the government to gather information or conduct an investigation on the defendant's behalf." Id. Consequently, plaintiff's unsupported assertion that his defense counsel would not have been given the opportunity to interview Ricky and determine his ability to communicate is unavailing.

Plaintiff was made aware through the police reports that the defendant officers claimed to have communicated with Ricky regarding the shooting in March of 1990.  Even assuming defense counsel would have been denied access to Ricky had it been sought, nothing precluded defense counsel from attempting to contact any of the medical professionals who treated Ricky (and were listed in the police reports) to ascertain information regarding his medical condition or whether he would have been able to communicate with the officers as claimed in the police reports.  See Patrick v. City of Chicago, 103 F.Supp.3d 907, 916 (N.D.Ill. Apr. 23, 2015) ("reasonable diligence certainly entails questioning available fact witnesses regarding what they saw.").  Further, plaintiff's trial attorney called one of Ricky's nurses, Cynthia Hendricks, to testify.  When Hendricks testified that Ricky *spoke* with police officers on March 9, 1990, as was reflected in the police report, plaintiff had ample opportunity to explore the veracity of her testimony, but failed to do so.

Because Ricky's medical condition was known to plaintiff's attorney, who could have investigated the extent of Ricky's injuries and their impact on his ability to communicate with the defendant officers, and because there is nothing in the record to indicate that the defendant officers possessed, much less withheld, evidence of Ricky's *inability* to communicate with them, plaintiff's Brady claim fails.

Second, plaintiff alleges that the defendant officers suppressed information obtained during their interviews with Ricky's father, Herbert.  Plaintiff attempts to support this claim by noting minor discrepancies between details in the March 9, 1990, police report filed by defendants Sobolewski and Thezan and details that Herbert testified to at trial.  For example, plaintiff points out that Herbert testified that plaintiff had threatened to kill his family over a

drug debt owed to him by Ricky, while the police report notes only that plaintiff "threatened him and his family" over the drug debt. A reasonable jury could not infer from trivial discrepancies, such as the omission of the word "kill" in the police report, that the defendant officers suppressed material information obtained during their interviews with Herbert.

Plaintiff also attempts to support his allegation that the defendant officers suppressed information obtained during their interviews with Herbert by noting that Herbert relayed to police during their interviews that plaintiff was driving a white Jaguar when he came to the Warner home regarding the alleged drug debt, but testified at trial that plaintiff was driving a beige Nova-like car at the time. Both parties agree, however, that Herbert mentioned the beige Nova-like car for the first time at trial and that he had not mentioned this to the detectives in any of his previous interviews. Given that the parties agree on this fact, it does nothing to support plaintiff's allegation that the defendant officers suppressed any information, much less material information, that they obtained during their interviews with Herbert. Accordingly, plaintiff's Brady claim fails.

Third, plaintiff alleges that the defendant officers fabricated statements that they attributed to Ricky and Herbert and then falsified their reports to conceal the fact that the statements were never made. There is no support for a Brady claim where, as here, the allegation is not that defendants suppressed evidence, but rather that they produced evidence that was fabricated. Patrick, 103 F.Supp.3d at 916. (citing Saunders-El v. Rohde, 778 F.3d 556, 562 (7th Cir. 2015)). Because plaintiff "seeks to charge the officers with a Brady violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of *evidence* to the prosecution," his "Brady claim is more appropriately characterized as a claim for malicious

prosecution." Id. (emphasis provided). And, indeed, plaintiff asserts an Illinois law malicious prosecution claim in Count V of his complaint as well as a 14th Amendment Due Process fabrication of evidence claim in Count II. Plaintiff's fabrication of evidence allegations will be considered in the court's analysis of Counts II and V. His Brady claim fails.

Fourth, plaintiff alleges that the defendant officers suppressed an Illinois Secretary of State list of license plates. The Secretary of State produced to the defendant officers during their investigation a list of license plates containing "RAT" that showed no such license plate had ever been issued to plaintiff. Plaintiff alleges that the defendant officers concealed this list from the prosecutors and defense before, during, and after plaintiff's criminal trial. Defendants admit that this list was produced, but maintain that plaintiff's defense attorney was aware that plaintiff could not be connected to a license plate containing "RAT" and simply chose not to address this issue during trial. And, indeed, plaintiff's defense attorney stated just that while testifying in connection with one of plaintiff's petitions for post-conviction relief. Although plaintiff's attorney was unable to recollect which particular document he received during discovery that led him to conclude that plaintiff could not be connected to a "RAT" license plate, he testified that he was aware prior to trial that Herbert claimed to have seen plaintiff drive away in a car with a "RAT" license plate and that the State could not establish any connection between plaintiff and a "RAT" license plate. See People of the State of Illinois v. Lathierial Boyd, 90 CR 8602, Report of Proceedings, June 28, 1994 (Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, Ex. L). Plaintiff's defense counsel further testified that he chose not to rebut Herbert's testimony regarding the "RAT" license plate because "the license plate issue did not grab [his] attention to the point where [he] would focus in on it with that much emphasis." Id.

Given that plaintiff's defense counsel admitted that he knew prior to trial that the State could not establish a connection between plaintiff and a "RAT" license plate, but declined to rebut Herbert's testimony, a reasonable jury could not conclude that the defendant officers suppressed this information.  See Petty v. City of Chicago, 754 F.3d 416, 423–24 (7th Cir. 2014) (summary judgment denying Brady claim affirmed where opposing counsel knew of the allegedly suppressed statement and "had the opportunity to explore this topic at trial"). Accordingly, plaintiff's Brady claim fails.  Additionally, plaintiff failed to respond at all to this point in his reply to defendants' motion for summary judgment and has therefore waived his right to challenge this claim. Grayson v. City of Aurora, 157 F.Supp.3d 725, 748 (N.D.Ill. Jan. 17, 2016) (citing Bonte v. U.S. Bank, N.A., 624 F.3d 461, 466 (7th Cir. 2010)).

Although the vast majority of plaintiff's Brady claims fail for being either unsupported or contradicted by the record, plaintiff does allege one viable Brady violation.  As with many of his Brady claims, plaintiff misstates the record when he claims that the defendant officers "attempted to force two lineup witnesses to lie and identify Plaintiff as the shooter but they refused to."  Underlying this overstated and unsupported assertion is plaintiff's claim that two witnesses, Jennifer Bonanno and Glenn Diamond, explicitly told the officers conducting the lineup that plaintiff was definitely not the shooter.  Plaintiff's claim as to Glenn Diamond is unsupported by the record and therefore fails.  In his December 14, 2015, deposition, Diamond stated that, after he was unable to identify the shooter in the lineup, the officers asked him who he would pick "if he had to."  See Plaintiff's Local Rule 56.1 Statement, Ex. T, p. 82.  According to Diamond, after he picked an individual who was not plaintiff out of the lineup, but told the officers he was only 60 to 80 percent sure, the officers asked him if he "thought it could have

been somebody else" and motioned toward the end of the lineup where plaintiff stood. <u>See id.</u> at p. 85–86. When Diamond replied "no," "that's when it was over" and Diamond left. The officers did not discuss plaintiff with Diamond and Diamond never explicitly told the officers that plaintiff could not have been the shooter. <u>Id</u>. Further, plaintiff has offered absolutely no evidence that the officers conducting the lineup attempted to force Diamond to lie about the identity of the shooter.

Plaintiff's claim as to Jennifer Bonanno, however, is supported by her deposition testimony that she specifically told the defendant officers that plaintiff was not the shooter. Defendants claim that these statements were not included in the police reports or turned over to plaintiff because Bonanno never made them. Defendants further argue that, because Bonanno was disclosed as an eyewitness to the shooting and a witness to the lineup who did not identify plaintiff as the shooter, plaintiff could have obtained the allegedly undisclosed statements prior to trial through the exercise of due diligence. Plaintiff, relying on <u>Boss v. Pierce</u>, 263 F.3d 734, 740–41 (7th Cir. 2001), argues that due diligence did not require him to seek out witnesses who would not be called to testify at the trial and that were reported to have no information relevant to the case. Not only is plaintiff's reliance on <u>Boss</u> misplaced, his suggestion that eyewitnesses to the shooting would not have information relevant to the case, and thus due diligence did not require plaintiff to seek them out, is totally implausible.

In <u>Boss</u>, the Seventh Circuit found that "it is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a [ ] witness possesses." <u>Id</u>. at 740. The court noted that there are "situations in which it would be nearly impossible" for diligent counsel to discover favorable evidence, like when a witness is "uncooperative or

reluctant" or (as the court suspected had happened in <u>Boss</u>), the "witness learned of certain evidence in the time between when she spoke with defense counsel and the prosecution." <u>Id</u>. Such was not the case with Bonanno who, as an eyewitness to the shooting, clearly had information relevant to the case, yet was not contacted by plaintiff's trial attorney.

As the court noted in <u>Boss</u>, "[d]efense counsel can certainly be expected to ask witnesses (defense and otherwise) questions relevant to what counsel understands the witness's role to be in the case." <u>Id</u>. at 741. In <u>Boss</u>, the defendant's alibi witness told prosecutors that she had heard a third party confess to the crime. The court's analysis relied on the fact that defense counsel could hardly have expected an alibi witness to possess exculpatory evidence unrelated to the defendant's alibi. The court reasoned that the exercise of reasonable diligence simply would not have turned up the evidence in question, and the prosecution therefore had a duty to disclose the witness's statements to the defense.

Here, however, the allegedly suppressed statements related directly to Bonanno's role as an eyewitness. Because plaintiff's trial attorney could have interviewed Bonanno regarding what she saw at the crime scene and what she said during the lineup, her statements could have been obtained through the exercise of due diligence. <u>Patrick</u>, 103 F.Supp.3d at 915–16 ("A criminal defendant may not be expected to ask an alibi witness for evidence unrelated to the alibi issue, but reasonable diligence certainly entails questioning available fact witnesses regarding what they saw."); <u>see also</u> <u>Holland v. City of Chicago</u>, 643 F.3d 248, 256 (7th Cir. 2011) ("A defendant in a criminal case that actually goes to trial has the responsibility to probe the witnesses and investigate their versions of the relevant events.") (internal quotation omitted).

Plaintiff's attempt to distinguish his <u>Brady</u> claim by pointing to Bonanno's deposition testimony as "proof" that favorable statements were suppressed is unavailing. "Evidence that is available to the defendant through the exercise of reasonable diligence is not suppressed for <u>Brady</u> purposes." <u>Mosley</u>, 2009 WL 3097211 at *7 (internal quotation omitted). Accordingly, Bonanno's statements were not suppressed and plaintiff's <u>Brady</u> claim fails. Defendants' motion for summary judgment on plaintiff's <u>Brady</u> claim is granted.

### B.      Count II: Plaintiff's Fabrication of Evidence Claim

Count II of plaintiff's complaint alleges that the defendant officers violated 42 U.S.C. § 1983 by fabricating false evidence that was used at plaintiff's criminal trial. Plaintiff alleges that the defendant officers fabricated the following evidence: witness identifications, witness statements and stories, police reports, and physical evidence.

The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." <u>Whitlock v. Brueggemann</u>, 682 F.3d 567, 580 (7th Cir. 2012). "On the other hand, where a Section 1983 plaintiff seeks to bring a due process claim based upon allegations that police coerced statements from witnesses, the plaintiff in actuality brings a malicious prosecution claim." <u>Grayson</u>, 157 F.Supp.3d at 740 (citing <u>Petty</u>, 754 F.3d at 421–22). Here, although plaintiff's allegations are framed as a fabrication claim, he has failed to provide even a mere scintilla of evidence that the defendant officers fabricated anything. To the extent that his allegations are supported by the record at all, they amount to a coercion claim, which ultimately fails.

Starting with witness identifications and statements, plaintiff argues that the defendant officers were unable to interview Ricky following the shooting because he could not speak. It follows, according to plaintiff, that the defendant officers fabricated the statements they attributed to Ricky and falsified their reports to reflect the fabricated statements. Plaintiff also alleges that the defendant officers fabricated statements that they attributed to Ricky's father, Herbert, and then falsified their reports to reflect those fabricated statements.

First, plaintiff's claim that Ricky was unable to speak to the defendant officers in March of 1990 is flatly contradicted by the record. Plaintiff attempts to bolster this claim by citing to the depositions of medical professionals, only one of which ever treated Ricky, that were taken more than twenty-six years later. Importantly, both of those medical experts opine that Ricky would never again have been able to speak audibly. This is despite the fact that Ricky testified, albeit from his hospital bed, at plaintiff's criminal trial. Further contradicting plaintiff's allegations is the trial testimony of one of Ricky's nurses, Cynthia Hendricks. Hendricks testified at plaintiff's criminal trial that she was present for Ricky's twenty-minute interview with the police on March 9, 1990, and that Ricky *said* to the officers that he did not know who shot him, that the person was not depicted in the photo lineup he was shown, and that he did recognize someone, but it was not the person who shot him. See Defendants' Objections and Responses to Plaintiff's Undisputed Material Facts, Ex. ZZ.

Ricky's medical reports also contradict plaintiff's claim that Ricky could not have possibly spoken to the defendant officers in March of 1990. Ricky's "patient's progress notes" from March 9, 1990, reflect that he, in some way, expressed fairly detailed thoughts regarding his ability to cope with his injuries to his social worker. See id. at Ex. QQ. Then, on March 13,

1990, the social worker noted that Ricky asked to talk to Chicago police officers regarding the shooting.  See id. at Ex. RR.  Plaintiff's own expert agrees that such communications reflect complex thoughts.

Additionally, at plaintiff's criminal trial Ricky testified that he was able to speak to the defendant officers in March of 1990 and that *he* gave *them* the name "Rat."  Plaintiff in no way rebuts this testimony and instead argues that, because Ricky could not speak in March of 1990, he simply adopted a story that was fabricated by the defendant officers.  Nothing in the record supports this allegation and, as outlined above, it is flatly contradicted in a number of ways. Given this record, even when viewed in the light most favorable to plaintiff, no reasonable juror could find that the defendant officers fabricated Ricky's testimony or their police reports.

Plaintiff also attempts to bolster his claim that the defendant officers fabricated the statements attributed to Ricky through the deposition testimony of plaintiff's cousin, Joey Kelly. Kelly testified in a November 2015 deposition that he spoke with Ricky after the shooting and that Ricky told him that the police had pressured him to identify plaintiff as the shooter.  This evidence supports, if anything, a coercion claim, not a fabrication of evidence claim.  Further, it is inadmissible hearsay and is not properly considered in a motion for summary judgment. Accordingly, even a coercion claim would fail.

Second, plaintiff's claim that the defendant officers fabricated statements that they attributed to Herbert, and then falsified their reports to reflect those fabricated statements, is completely unsupported by the record, as defendants point out.  Plaintiff points to the fact that he did not own a white Jaguar with a "RAT" license plate to challenge the veracity of Herbert's statements to police describing the car plaintiff drove when he went to the Warner home and

spoke with Herbert regarding Ricky's drug debt.  While this may be true, it does nothing to prove that the defendant officers fabricated Herbert's statements or falsified their reports.  And, in fact, Herbert did not testify to these details at trial, so they could not have possibly deprived plaintiff of his liberty in any way.  As plaintiff concedes, the crucial portion of Herbert's testimony was that plaintiff went to the Warner home and threatened Herbert and his family over a drug debt that Ricky owed to plaintiff.  Plaintiff has since admitted that he did in fact go to the Warner home and spoke with Herbert regarding the debt, although he denies that he threatened the Warner family.  Aside from that detail, plaintiff and Herbert's accounts of the incident are practically identical.  As with plaintiff's fabrication of evidence claim as it pertains to Ricky, the record not only does not support the claim, it flat out contradicts it.

Plaintiff argues that Harris v. City of Chicago, 2015 WL 1331101 (N.D.Ill. Mar. 19, 2015),  is analogous and supports his evidence fabrication claim.  Plaintiff is incorrect.  The plaintiff in Harris claimed to have been personally abused physically and psychologically by the defendants until she agreed to adopt a false confession that they gave her.  Here, there is no evidence that Ricky or Herbert ever claimed to have been given a false narrative to adopt and, aside from Kelly's hearsay statements, there is no evidence that either of them was coerced by the defendant officers to say something they knew to be untrue.  The other cases plaintiff relies upon are equally inapposite.  The record here, unlike in Harris, simply does not support plaintiff's evidence fabrication claim, and no reasonable juror could find that the defendant officers fabricated Herbert's statements or their reports, even when construing the record in the light most favorable to plaintiff.

Plaintiff also alleges that the defendant officers fabricated their reports regarding the lineup that plaintiff participated in on March 13, 1990, to falsely reflect that: (1) plaintiff's attorney was present; and (2) two of the lineup witnesses, Bonanno and her friend Tashyra Ward, were drunk on the night of the shooting, but had not told the police officers at the scene because they were under age and were afraid they would get into trouble. Plaintiff again relies on Bonanno's deposition testimony to support his claim. Plaintiff's claim fails for two reasons.

First, to maintain a claim of evidence fabrication, plaintiff must show that the allegedly fabricated evidence was used to deprive him of his liberty. Here, nothing about the lineup procedure was introduced at plaintiff's criminal trial. Therefore, even assuming the defendant officers did fabricate their reports regarding the lineup, an evidence fabrication claim cannot be sustained because the allegedly fabricated evidence was not used at plaintiff's trial. When an officer "fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest." Whitlock, 682 F.3d at 582 (citing Buckley v. Fitzsimmons, 20 F.3d 789 (7th Cir. 1994).

Second, plaintiff's claim is again contradicted by the record. In her 2004 deposition, Ward testified that prior to the shooting she and Bonanno had been drinking throughout the night. She also testified that she was drunk at the time of the shooting. And, importantly, she testified that she told the police officers who conducted the lineup that she was "extremely drunk" at the time of the shooting. Additionally, plaintiff's defense attorney has since testified that he had no reason to question the police reports and that he would have raised the issue at

trial if he had, in fact, not been present for the lineup. Given this testimony, no reasonable juror could find that the defendant officers fabricated their reports.

Plaintiff further alleges that the police fabricated their reports to reflect that plaintiff's gun was not registered. As defendants point out, however, plaintiff admitted in his July 22, 2015 deposition that he never registered the gun because he didn't realize that he was required to do so. See Defendants' Local Rule 56.1 Statement of Undisputed Material Facts, Ex. P. Plaintiff's fabrication of evidence claim fails.

Finally, plaintiff alleges that the defendant officers fabricated Exhibit 20, or the "Rat note." According to plaintiff, one of the defendant officers illegally searched the home of his cousin, Joey Kelly, obtained the note during the search, and then fabricated the story that it was given to him by hospital personnel. The only support for this claim is Kelly's deposition testimony that defendant Zuley illegally searched his home and took the note, among other items. Again, plaintiff's claim is contradicted by the record.

First, Exhibit 20, a slip of paper containing the name "Rat" along with drug weights and prices that was used at plaintiff's criminal trial, is not "fabricated." Fabricated evidence "is made up; it is invariably false." Fields v. Wharrie, 740 F.3d 1107, 1110 (7th Cir. 2014). Even if it were taken during an illegal search, there is nothing false about Exhibit 20.

Second, witness testimony, including plaintiff's, undermines his fabrication claim. Ricky testified at trial that he watched plaintiff write out Exhibit 20, which plaintiff then gave to him with cocaine that Ricky was to sell for plaintiff. Plaintiff testified in his 2015 deposition that he wrote a number of notes identical to Exhibit 20 that he gave to people who sold drugs for him and that he might have given one to Ricky when he gave him cocaine to sell for him. Finally,

Nurse Hendricks testified at plaintiff's criminal trial that she was given Exhibit 20 to give to the police. All of this testimony flatly contradicts plaintiff's fabrication of evidence claim.

The record, even when viewed in the light most favorable to plaintiff, fails to demonstrate that the defendant officers fabricated any evidence or testimony. Accordingly, defendant's motion is granted as to plaintiff's fabrication of evidence claim.

### C.    Plaintiff's Remaining Claims

Plaintiff's complaint alleges that the defendant officers violated both 42 U.S.C. § 1983 (count IV) and Illinois law (count VII) by engaging in an unlawful conspiracy. "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." Beaman v. Freesmeyer, 776 F.3d 500, 510 (7th Cir. 2015) (citations omitted). An agreement can "be inferred from circumstantial evidence, but only if it is sufficient to permit a reasonable jury to conclude that a meeting of the minds had occurred and that the parties had an understanding to achieve the conspiracy's objectives." Green v. Benden, 281 F.3d 661, 665 (7th Cir. 2002). "[V]ague and conclusory allegations of the existence of a conspiracy are not enough to sustain a plaintiff's burden at summary judgment." Cooney v. Casady, 735 F.3d 514, 519 (7th Cir. 2013) (internal quotation omitted).

Plaintiff's evidence fails to support a constitutional violation. Without any support in the record, plaintiff claims in his Opposition to Defendants' Motion for Summary Judgment that "[d]efendants all knew that Ricky could not talk," "that they had created the fabricated story from illegally-seized evidence from Joey Kelly's house," and "that two lineup witnesses would have testified at trial that Plaintiff was not the shooter, so they misled Plaintiff's defense counsel

into thinking that these witnesses were too intoxicated to make any positive identification of the shooter." According to plaintiff, "[d]efendants created an investigation based on fabrications and non-disclosures which establishes that they were engaged in a conspiracy." But, as outlined above, plaintiff fails to support these allegations.

First, plaintiff offers no evidence that *any*, much less all, of the defendant officers knew that Ricky could not talk. The record clearly shows that, at the very least, medical staff communicated with Ricky as early as March 9, 1990, and that he relayed to them that he wished to speak with police officers regarding the shooting on March 13, 1990. Because he can't point to any evidence that "[d]efendants all knew that Ricky couldn't talk," plaintiff's claim amounts to a challenge of the defendant officers' credibility, which is insufficient to survive summary judgment. Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008) ("[W]hen challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts–no proof–to support his claims, summary judgment in favor of the defendant is proper.") (emphasis provided). Second, plaintiff provides evidence that, at most, defendant Zuley was aware of the illegal search of Joey Kelly's home. Plaintiff provides no evidence that any of the other defendant officers knew about, much less agreed to carry out, the illegal search. Without supporting evidence, his conspiracy claim fails. Amadio v. Ford Motor Co., 238 F.3d 919, 927 (7th Cir. 2001) ("It is well-settled that speculation may not be used to manufacture a genuine issue of fact."). Finally, plaintiff fails to provide any evidence that the defendant officers conspired to mislead plaintiff's defense counsel into believing that two of the lineup witnesses were drunk and therefore unable to identify the shooter. In fact, the record flatly contradicts this claim. The record shows that at least one lineup witness (Tashyra Ward) did tell the officers

conducting the lineup that she was drunk when the shooting happened and that she was with one

of the other lineup witnesses (Jennifer Bonanno) at the time. Given these statements, it is

reasonable that the defendant officers conducting the lineup would include in their report that

Ward and Bonanno were drunk at the time of the shooting. Further undermining plaintiff's

claim is the fact that there were nine lineup witnesses and the lineup report called into question

the ability to identify the shooter for only two of them. If the defendant officers conspired to

deceive plaintiff's defense counsel by discrediting the lineup witnesses, it is unlikely that they

would do so for only two out of nine. Plaintiff has failed to provide any evidence regarding the

existence of a conspiracy among any of the defendant officers. Accordingly, the court grants

defendants' motion for summary judgment on counts IV and VII.

  In contrast to plaintiff's conspiracy claim, count III of plaintiff's complaint alleges that

the defendant officers violated 42 U.S.C. § 1983 by failing to intervene to prevent the destruction

or concealment of exculpatory and impeachment evidence and fabrication of false evidence. An

officer "who is present and fails to intervene to prevent other law enforcement officers from

infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to

know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested,

or (3) that any constitutional violation has been committed by a law enforcement official; *and*

the officer had a realistic opportunity to intervene to prevent the harm from occurring."

Abdullahi v. City of Madison, 423 F.3d 763, 774 (7th Cir. 2005) (emphasis provided). "An

essential part of finding a failure to intervene is finding a constitutional violation occurred."

Crawley v. City of Rockford, 2014 WL 901448 at *6 (N.D. Ill. Mar. 7, 2014) (citation omitted).

Based on the record, the court cannot conclude that plaintiff's constitutional rights were violated.

As noted above, because plaintiff has failed to establish that any of the defendant officers committed a constitutional violation, none of the defendant officers can be liable for failing to intervene.[11] Accordingly, the court grants defendants' motion for summary judgment on count III.

Count V of plaintiff's complaint sets forth a state law claim for malicious prosecution. To establish a claim for malicious prosecution under Illinois law, a plaintiff must establish: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceedings; (4) the presence of malice; and (5) damages resulting to the plaintiff." Johnson v. Saville, 575 F.3d 656, 659 (7th Cir. 2009). "The absence of any one of these elements bars a plaintiff from pursuing the claim." Id. "[P]robable cause is not determined by retrospect. It depends on what the police know, or reasonably believe at the time." Bridewell v. Eberle, 730 F.3d 672, 675 (7th Cir. 2013).

At the time of plaintiff's arrest, the defendant officers reasonably believed that he had gone to the Warner home and threatened the Warner family over a drug debt that Ricky owed to him. Leaving aside the issue of Ricky's ability to communicate in March of 1990, prior to trial the defendant officers reasonably believed that Ricky had identified plaintiff as the person who shot him. Based on this alone, the defendant officers had probable cause. The defendant officers had no reason to doubt that Herbert and Ricky were credible witnesses, "and an identification or

_____

[11] Even if defendant Zuley illegally searched Joey Kelly's home, doing so would not violate plaintiff's, as opposed to Kelly's, rights in any way. Further, according to Kelly, Zuley was the only officer present during the search, leaving no "realistic opportunity" for any of the other defendant officers to intervene.

a report from a single, credible victim or eyewitness can provide the basis for probable cause." Mosley, 2009 WL 3097211 at *9 (citing Woods v. City of Chi., 234 F.3d 979, 994 (7th Cir. 2000). "It is axiomatic that probable cause is a complete defense to a malicious prosecution claim." Logan v. Caterpillar, 246 F.3d 912, 926 (7th Cir. 2001). Accordingly, the court grants defendants' motion for summary judgment on count V.

Count VI of plaintiff's complaint alleges intentional infliction of emotional distress under Illinois law. Plaintiff's claim fails because it is untimely. In Illinois, the Tort Immunity Act imposes a one-year statute of limitations period on intentional infliction of emotional distress claims. 745 ILCS 10/8–101(a); Bridewell, 730 F.3d at 678. Claims for intentional infliction of emotional distress stemming from an arrest or prosecution accrue on the date of the arrest. Id. Plaintiff was arrested in 1990. His claim is more than 20 years late. The court grants the defendants' motion on count VI.[12]

Plaintiff also brings Illinois law claims for indemnification (count VIII) and respondeat superior (count IX) against the city of Chicago. Because the court grants defendants' motion with respect to the individual officers, there is no basis for counts VIII and IX. See 745 ILCS 10/2–109 ("local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable"). Accordingly, the court grants defendants' motion for summary judgment on counts VIII and IX.

What plaintiff's claim ultimately amounts to is an argument that his version of events, rather than the state's, should have been accepted at trial. Given that he was granted a

---

[12] The court also notes that plaintiff failed to address the IIED issue in his response to defendants' motion for summary judgment.

Certificate of Innocence, plaintiff may very well be right about that.  But a wrongful conviction is not, by itself, evidence of "a tapestry of wrongdoing."   Plaintiff's argument provides no reason to believe, and certainly no evidence, that the defendant officers collaborated in a broad and complex scheme to frame him for the February 24, 1990, shooting.  Consequently, no jury could reasonably find in favor of plaintiff and his claims fail.

## CONCLUSION

For the foregoing reasons, the court grants defendants' motion for summary judgment on all counts.


**ENTER:**       **December 6, 2016**


**Robert W. Gettleman**
**United States District Judge**